## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GARY W. WINTERS )
641 Loma Ridge Road )
Raleigh, North Carolina 27606 )
)
*Plaintiff,* )
)
v. ) Civil Action No.
)
DEPARTMENT OF THE ARMY )
101 Army Pentagon )
Washington, DC 20310-0101 )
)
*Defendant.* )
_____ )

## COMPLAINT
### (Privacy Act, 5 U.S.C. § 552a)

### *Jurisdiction*

1.     The Court has jurisdiction under 28 U.S.C. § 1331 and under 5 U.S.C. § 552a(g)(1), which provides for redress in the District Courts based upon violations of the Privacy Act.

### *Venue*

2.     Venue is proper under 5 U.S.C. § 552a(g)(5) and 28 U.S.C. §1391.

### *Parties*

3.     Plaintiff, Mr. Gary W. Winters, is a citizen of the United States who resides at the address stated in the caption, and who at the time of the incident that led to this lawsuit was honorably separated from the United States Army.

4.     Defendant, the United States Army, is an agency of the United States that

maintains records within the meaning of the Privacy Act.

### *Statute of Limitations*

5.    Under the Privacy Act, suit must be brought within two years of the date on which the claim accrues.  5 U.S.C. § 552a(g)(5).

6.    "[T]he cause of action does not arise and the statute of limitation does not begin to run until the plaintiff knows or should know of the alleged violation." *Tijerina v. Walters*, 821 F.2d 789, 798 (D.C. Cir. 1987).

7.    Here, Plaintiff became aware of one of the disclosures at issue in this case on or about June 24, 2024.

8.    The case is, thus timely filed.

### *Statutory Framework*

9.    As defined in the Privacy Act, "maintain" includes various record keeping functions to which the Act applies:  i.e., maintaining, collecting, using, and disseminating. 5 U.S.C. § 552a(a)(3).

10.    In turn, this connotes control over and responsibility and accountability for systems of records.  5 U.S.C. § 552a(a)(3).

11.    The Department of the Army is required to maintain personnel records on all members of the federally recognized units and organizations of the Army.  10 U.S.C. § 10204.

12.    Such records are records within the meaning of the Privacy Act.

13.    Even state National Guard records are subject to the federal Privacy Act. *In re: Sealed Case,* 551 F.3d 1047,1048 (D.C. Cir. 2009).

14.    Such records need not be physically located in the agency for them to be

maintained by the agency.

### *Predicate Factual Background*

15.    Mr. Winters served in the United States Army from November 15, 2010, until he completed his service to the Nation on January 13, 2020.

16.    Mr. Winters was discharged with an "honorable" characterization of service, having received the Army Commendation Medal, three Army Achievement Medals, among other awards and decorations, and having attained the rank of Staff Sergeant.

17.    In August 2023, met Ms. Morgan Pasewicz, a civilian, on the Tinder app.

18.    At the time, Ms. Pasewicz had no official connection to any Department of the Army or Department of Defense entity.

19.    Mr. Winters and Ms. Pasewicz began dating around Thanksgiving 2023.

20.    Mr. Winters and Ms. Pasewicz, however, had a tumultuous relationship, and they became estranged in February 2024.

21.    In May 2024, Mr. Winters and Ms. Pasewicz each filed Cross-Petitions for Domestic Violence Protection Orders against one another in the General Court of Justice District of Court Division, Wake County, North Carolina.

22.    On June 24, 2024, the Court held a hearing and took evidence related to the Cross-Petitions.  Exhibit 1.

### *The Unlawful and Improper Dissemination of Information*
### *Maintained by the Army in Plaintiff's Case*

23.    The averments of the preceding paragraphs are incorporated herein.

24.    On June 24, 2024, in sworn testimony before the Court, Ms. Pasewicz revealed

that she possessed documents, including an official photo of the Mr. Winters—documents maintained by the Defendant in Mr. Winters' Official Military Personnel File (hereinafter referred to as "OMPF"). Exhibit 1, page 28, 29.  Exhibit 2.

25.    During her testimony, in an effort to discredit him before the Court, Ms. Pasewicz testified that Mr. Winters had lied about his prior military service.  Exhibit 1, page 29.

26.    Specifically, Ms. Paseciwz testified that Mr. Winters had falsely claimed to be a member of the Army Special Forces, which she falsely alleged was not true. Exhibit 1, page 29.

27.    By her own testimony, Ms. Pasewicz conceded that in text messages to Mr. Winters she used this information to harm him, with the intent of causing Mr. Winters profound anxiety.  Exhibit 1, page 25.

28.    Ms. Pasewicz stated that she told Mr. Winters over text: "[c]ome on, pussy.  I'm not done. Let's see that anxiety come."  Exhibit 1, page 25, Exhibit 3.

29.    Ms. Pasewicz testified under oath that her new boyfriend, Michael Chambers, a former Marine enlisted man, had given her evidence from Mr. Winter's OMPF, including an official photograph of Mr. Winters, which allegedly proved that Mr. Winters was, in fact, not a member of the Army Special Forces.  Exhibit 1, page 29.

30.    Ms. Pasewicz testified that the record was "unclassified" and was accessed by Mr. Chambers through the "right channels to make sure that Mr. Winters was Special Forces because they suspected he was not."  Exhibit 1, page 29.

31.    Ms. Pasewicz detailed in her testimony that she had texted the photograph to Mr. Winters on March 18, 2024, accusing him of committing "stolen valor."  Exhibit 1, page 29.

32.    The record was obtained by Mr. Chambers from Staff Sergeant Thomas E. Dines,

U.S. Army, a member of Mr. Winters's former unit.  Exhibit 1, page 29.

33.     Ms. Pasewicz emphasized in her testimony that she herself had not requested the records but that her "boyfriend requested the records from a Special Forces active duty man, Tommy Dines. And he went through the proper channels to get those records.  That means he submitted a request." Exhibit 1, pages 28 29.

34.     Mr. Chambers, according to Ms. Pasewicz, did this out of "concern" for her given Mr. Winters' alleged behavior.

35.     Ms. Pasewicz specifically stated that she wanted to call Mr. Winters out about allegedly not being a member of the Army Special Forces "to embarrass him" and cause him mental and emotional distress.  Exhibit 1, page 61.

36.     Mr. Winters also testified at the June 24, 2024, hearing.

37.     Mr. Winters detailed that Ms. Pasewicz told him that she had obtained not only an official photograph from his OMPF, but other records from his OMPF – something Ms. Pasewicz confirmed in her testimony as well.

38.     In the photograph obtained by Ms. Pasewicz, the words "FOR OFFICIAL USE ONLY" are clearly present on the photo.  Exhibit 11, page 78.

39.     Ms. Pasewicz used Mr. Winters' service records to embarrass him and cause him anxiety, as evidenced by her other outrageous statements wherein she called Mr. Winters a "faggot", that she hoped his "children would die in front of [him]."  Exhibit 1, page 85, Exhibit 3.

40.     Ms. Pasewicz admitted that she did this so that she could get Mr. Winters "riled up" so she could "get [him] put away." Exhibit 1, page 85.

5

41.    Mr. Winters had previously disclosed to Ms. Pasewicz that he was bisexual and had had thoughts of suicide.  Exhibit 1, page 86.

42.    Ms. Pasewicz used the records illegally obtained from Mr. Winters' OMPF to inflict mental and emotional distress upon Mr. Winters, including but not limited to by telling lies about Mr. Winters in open court and under oath.

43.    Following the hearing, Mr. Winters made a complaint regarding the unlawful dissemination of records contained in his OMPF to the Department of the Army Inspector General.

44.    In response, the Defendant convened a 15-6 investigation regarding the disclosure of Mr. Winters' OMPF.

45.    The investigation found that Mr. Winters' allegations were substantiated, and Staff Sergeant Dines was subsequently disciplined by the Army.

46.    However, the Defendant would not disclose what specific action was taken against Staff Sergeant Dines, alleging it would violate his privacy.

47.    This only after Staff Sergeant Dines had himself flagrantly violated Mr. Winters' Privacy Act rights.

48.    Upon information and belief, Defendant, through its agents, intentionally or willfully disclosed the contents of Mr. Winters' record, a record contained in a system of records, without the prior written consent of Mr. Winters, in violation of 5 U.S.C. § 552a(b).

49.    Mr. Winters has suffered both economic and non-economic damages due to the unlawful and intentional disclosure of his OMPF.

***Legal Claim***

*Violation of 5 U.S.C. § 552a(g)(1)(D) – The actions of the United States Army violated the Privacy Act.*

50.     The averments of the preceding paragraphs are incorporated herein.

51.     The Defendant maintains Mr. Winters' OMPF, which is a protected record within the meaning of the Privacy Act.

52.     Staff Sergeant Dines, acting on behalf of the Defendant, intentionally or willfully disclosed and released protected records within the meaning of the Privacy Act by transmitting an unknown number of records from Mr. Winters' OMPF, including Plaintiff's official photo.

53.     Staff Sergeant Dines sent Mr. Winters' OMPF to Mr. Chambers, who then provided the records to Ms. Pasewicz.

54.     Ms. Pasewicz, in turn, used the records from Mr. Winters' OMPF to embarrass and discredit Mr. Winters in open court and cause Mr. Winters profound and severe anxiety.

55.     This heinous treatment required Mr. Winters to seek further mental health care and counseling, costing him thousands of dollars to this point and necessitating further care for as yet unknown but certainly substantial period of time.

56.      Neither Staff Sergeant Dines, Mr. Chambers, nor Ms. Pasewicz had the written consent of Mr. Winters to access his OMPF.

57.      Nor did this disclosure of Mr. Winters' OMPF meet any of the exceptions stated in 5 U.S.C. § 552a(b)(1) through (12).

58.     Staff Sergeant Dines intentionally or willfully disseminated specific information covered under the Privacy Act to Mr. Winters' estranged girlfriend, who then used the records in court proceedings.

59.     This constituted a willful and intentional effort by Staff Sergeant Dines to harm Mr. Winters by exposing his alleged "misrepresentations," which were in fact nothing of the sort.

60.     The intentional, willful, and unlawful dissemination of Mr. Winters' OMPF by Staff Sergeant Dines caused Mr. Winters significant pecuniary loss.

61.     Among other things, Mr. Winters has had to seek out mental health counseling because of the wrongful disclosure.

62.     For all these reasons, Defendant is liable to Mr. Winters for its unlawful and intentional disclosure as provided for under the Privacy Act. *See* 5 U.S.C. § 552a(g)(1)(D).

### *Prayer for Relief*

WHEREFORE, Plaintiff prays that judgment be entered:

(a) awarding him monetary damages for the unlawful release of his records which caused him severe injury, pursuant to 5 U.S.C. § 552a(g)(1)(D);

(b) ordering Defendant to expunge all records or information maintained by Defendant regarding Mr. Winters that is inaccurate and/or derogatory, pursuant to 5 U.S.C. § 552a(g)(2)(A);

(c) awarding reasonable attorney's fees and costs of this action in accordance with the Privacy Act, including but not limited to 5 U.S.C. § 552a(g)(2)(B) and 5 U.S.C. § 552a(g)(3)(B); and

(d) ordering such other and further relief as may, in the circumstances, be just and proper.


Dated: April 30, 2025.

Respectfully submitted,

Dylan Thayer
Counsel of Record
Law Offices of David P. Sheldon, P.L.L.C.
100 M Street, SE, Ste 600
Washington, DC 20003
Tel: 202.546.9575
Fax: 202.546.0135
Email: dthayer@militarydefense.com


David P. Sheldon (DC Bar #4346039)
Law Offices of David P. Sheldon, P.L.L.C.
100 M Street, SE, Ste 600
Washington, DC 20003
Tel: 202.546.9575
Fax: 202.546.0135
Email: davidsheldon@militarydefense.com

Attorneys for Plaintiff

**EXHIBIT 1**



# Transcript of Hearing

**Date:** June 24, 2024
**Case:** Transcription Services

**Planet Depos**

**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**1**

```
 8              DVPO HEARING IN RE:
 9        MORGAN PASEWICZ V. GARY WINTERS
10                JUNE 24, 2024
11            WAKE COUNTY COURTHOUSE
12               NORTH CAROLINA

20  Job No.: 574794
21  Pages: 1 - 123
22  Transcribed by: Christian Naaden
```

**2**

P R O C E E D I N G S

1  THE COURT:  Matter of Morgan [inaudible]
2  versus Gary Winters. Files were 24CV600878-910, as well
3  as cross [inaudible] Gary Winters versus Morgan
4  [inaudible] - 910. Going in order this list on the
5  calendar, Mr. Detweiler, do you want to make a
6  statement?
7  MR. DETWEILER:  [inaudible].
8  THE COURT:  And Mr. Holmes, [inaudible]?
9  MR. HOLMES:  No, Your Honor. [inaudible] the
10 plaintiff in this case [inaudible].
11 THE COURT:  [inaudible]?
12 MS. PASEWICZ:  Yes, ma'am.
13 THE COURT:  Go ahead and have a seat. At this
14 time, the witness is the counsel. I am going to start
15 with [inaudible]. We imagine that each party will need
16 more than 30 minutes?
17 COUNSEL 1:  I think it is possible. Yes Judge.
18 I agree that it's possible.
19 THE COURT:  I'll pop in at 45 minutes.
20 COUNSEL 1:  Awesome, thank you Your Honor.
21 Please state your name for the recording.

**3**

1  MS. PASEWICZ:  Morgan Elizabeth Pasewicz.
2  COUNSE 1L:  Where do you live?
3  MS. PASEWICZ:  I live at 2820 Aloha Street.
4  COUNSEL 1:  Are you currently employed?
5  MS. PASEWICZ:  No. I attend University.
6  COUNSEL 1:  What university?
7  MS. PASEWICZ: Savannah School of Art and
8  Design.
9  COUNSEL 1:  How do you know the defendant
10 [inaudible]?
11 MS. PASEWICZ:  I met him on Tinder. Yeah.
12 COUNSEL 1:  When was that?
13 MS. PASEWICZ:  We met up August 23rd of 2023.
14 COUNSEL 1:  [inaudible] gives you a dating
15 relationship with that?
16 MS. PASEWICZ:  Yes. Sometime after
17 Thanksgiving of 2023.
18 COUNSEL 1:  Regarding your relationship, did
19 he ever assault you?
20 MS. PASEWICZ:  Yes.
21 COUNSEL 1:  Describe what happened on those
22 instances, please.

**4**

1  MS. PASEWICZ:  He was -- he was very rough
2  with sex. He would hit me repeatedly. He would choke me
3  to the point where I couldn't breathe and almost passed
4  out. Bruises all over me. He would also verbally abuse
5  me. He would blame these angry outbursts on autism.
6  And, yeah, that's --
7  COUNSEL 1:  When you say autism, is having
8  autism where you're at [inaudible]?
9  MS. PASEWICZ:  His having autism.
10 COUNSEL 1:  Did you ever consent to any of
11 that violent behavior during your sexual relations?
12 MS. PASEWICZ:  No.
13 COUNSEL 1:  Did you ever tell him that that
14 was okay for him to do?
15 MS. PASEWICZ:  Yes, I told him multiple times.
16 COUNSEL 1:  You told him that it was not okay.
17 MS. PASEWICZ:  Yeah.
18 COUNSEL 1:  During your relationship, at any
19 point, did he sexually assault you while you were
20 unconscious?
21 MS. PASEWICZ:  Yes.
22 COUNSEL 1:  And tell the court how that

---

5

1  happened.
2      MS. PASEWICZ: I would -- I would smoke weed
3  with him, and I would fall asleep high out of my mind,
4  but he would -- I would wake up to him having sex with
5  me. A lot. And he wouldn't stop when I told him to
6  stop.
7      COUNSEL 1: At any point. Did you ever told
8  him that you would consent to having sex while you were
9  unconscious?
10     MS. PASEWICZ: No.
11     COUNSEL 1: Did you specifically tell him that
12 you did not consent?
13     MS. PASEWICZ: Yes.
14     COUNSEL 1: Throughout the course of your
15 relationship, at any point, did he insult you?
16     MS. PASEWICZ: Yes.
17     COUNSEL 1: What type of things would you say
18 to him?
19     MS. PASEWICZ: It came with -- he just -- he
20 would call me fat. He would say that I'm just a pretty
21 face. He would say that I only got into the
22 opportunities I got into because I have a pretty face.

---

6

1  Stuff like that.
2      COUNSEL 1: At any point in your relationship,
3  did [inaudible] gaslight you or say things to make you
4  think that you were crazy?
5      MS. PASEWICZ: Yes.
6      COUNSEL 1: What type of things would he say?
7      MS. PASEWICZ: He would say things like I
8  don't share enough with him and that's why our
9  relationship was going under. That I was in a clear
10 communicator when I told him that I didn't want to have
11 the sex that we were having. Stuff like that.
12     COUNSEL 1: When did your relationship come to
13 an end?
14     MS. PASEWICZ: February 10th of 2024.
15     COUNSEL 1: Tell the court how that happened.
16     MS. PASEWICZ: How I -- he -- whenever I would
17 criticize him, he would get very angry and volatile, so
18 the way that I went about it was I knew he didn't want
19 children.
20     So I told him a story that was sort of true
21 about me wanting to have kids and me wanting to have
22 kids soon and use that instead of telling him that he's

---

7

1  angry and violent and I'm scared of him. I later told
2  him that on February 13th, 2024.
3      COUNSEL 1: At what point did you tell them
4  that you were not interested in continuing? You were
5  making --
6      MS. PASEWICZ: February 10th.
7      COUNSEL 1: After that, did he contact you?
8      MS. PASEWICZ: Yes.
9      COUNSEL 1: Did you express to him that you
10 did not want to have contact with him?
11     MS. PASEWICZ: Yes.
12     COUNSEL 1: How often?
13     MS. PASEWICZ: Every time that he would text
14 me, I asked him over and over why he would ever want to
15 communicate with someone that didn't want to be with
16 him.
17     And he told me that I wasn't giving the
18 relationship a chance and that I was an awful person,
19 and he would just keep berating me verbally.
20     COUNSEL 1: At some point, did you block his
21 number?
22     MS. PASEWICZ: Yes.

---

8

1      COUNSEL 1: Do you remember when that was?
2      MS. PASEWICZ: No, not the exact date. I
3  blocked him multiple times and unblocked him throughout
4  the time.
5      COUNSEL 1: [inaudible].
6      MS. PASEWICZ: I knew that he was monitoring me
7  through social media, and I was -- I was afraid that I
8  was being followed.
9      COUNSEL 1: That's fine. We don't have to talk
10 about that. Did you express that you had a fear that
11 you were being followed?
12     MS. PASEWICZ: Yeah.
13     COUNSEL 1: Okay. [inaudible] Judge?
14     THE COURT: Yes sir.
15     COUNSEL 1: I have what is marked as exhibit
16 one. I've given these copies to opposing counsel. May I
17 approach, please?
18     THE COURT: [inaudible].
19     COUNSEL 1: Do you recognize this document
20 that is marked as Plaintiff's exhibit one?
21     MS. PASEWICZ: Yes, sir.
22     COUNSEL 1: What is this?

9

1    MS. PASEWICZ: These are all the text messages
2 that Mr. Winters sent me from I believe it's March 12th
3 to April 23rd.
4    COUNSEL 1: Okay. How do you know that these
5 are the messages that are coming from him?
6    MS. PASEWICZ: Because that's his number that
7 I communicated with him with, and I took the
8 screenshots.
9    COUNSEL 1: is this a fair and accurate
10 representation of the messages that you received from
11 Mr. Winters?
12    MS. PASEWICZ: Yes sir it is.
13    COUNSEL 1: Have these messages have been
14 altered in any way?
15    MS. PASEWICZ: No.
16    COUNSEL 1: Okay. Judge, at this point, I
17 would move to introduce Plaintiff's exhibit one and ask
18 that it be published.
19    COUNSEL 2: I do have an objection and a
20 question, and I'd like to know if it's the plaintiff's
21 contention that the text messages that are included in
22 that exhibit are complete and comprehensively reflect

10

1 any conversation that may have happened in both
2 directions between Ms. Pasewicz and Mr. Winters.
3    So I want to make sure that it is reflective
4 of the complete conversation and if that's the
5 testimony.
6    THE COURT: Yes, sir. Do you have any more
7 foundational questions?
8    COUNSEL 1: Okay. Are there any messages from
9 you that have been deleted in [inaudible]?
10    MS. PASEWICZ: I didn't personally delete
11 them, but they were -- I recovered all of these
12 messages from my previous phone. So there may or may
13 not be missing texts -- text messages from me. I don't
14 remember the exact details of the conversations that we
15 did have.
16    COUNSEL 1: All of the messages that you're
17 seeing, though are --
18    MS. PASEWICZ: He sent those.
19    COUNSEL 1: -- [inaudible] he sent to you,
20 correct?
21    MS. PASEWICZ: Yes, he sent those.
22    COUNSEL 1: Judge [inaudible] exhibit again.

11

1    COUNSEL 2: I'm going to repeat the objection.
2 It sounds like the testimony -- putting it most
3 charitably, the witness's memory is patchy with respect
4 to whether or not she or someone else may have deleted
5 a bunch of text messages coming from her in the course
6 of this conversation.
7    MS. PASEWICZ: I didn't delete any text
8 messages.
9    THE COURT: Based on the fact that it was not
10 a complete, accurate, and untouched copy unless you
11 want to break down [inaudible] --
12    COUNSEL 1: Let me -- let me ask the
13 questions. So when we're looking at Plaintiff's Exhibit
14 one, it shows messages just from essentially Mr.
15 Winters. Is that correct?
16    MS. PASEWICZ: Yes, sir.
17    COUNSEL 1: And we don't really have any
18 messages in this exhibit from you. Is that right?
19    MS. PASEWICZ: I think we have a couple? I
20 think we have some related to his -- yeah.
21    COUNSEL 1: At least on the initial pages. And
22 do you think that you responded to any of these

12

1 messages?
2    MS. PASEWICZ: I know I responded to messages.
3    COUNSEL 1: It will -- in some of it. Do you
4 think that there's messages here that he has written
5 that you responded to that are not on this document?
6    MS. PASEWICZ: Yes.
7    COUNSEL 1: Okay. And why do you think that
8 they're not on there?
9    MS. PASEWICZ: Because stuff just didn't save.
10 I don't even know if I have the full conversation from
11 him. My iCloud got all weird, and it didn't save
12 everything.
13    COUNSEL 1: So how is it that your iCloud
14 would have saved some of the messages, but not all?
15    MS. PASEWICZ: I'm not sure. I was trying to
16 figure it out with Verizon.
17    COUNSEL 1: I guess I would need to exhibit
18 the exhibit again. I just [inaudible] asking her
19 briefly. Because I think these are still messages and
20 statements that were made by the defendant.
21    Whether or not they're complete is, I think, a
22 little bit unclear. She's testified that he sent these

---

**13**

1  messages. [inaudible] that she can't specifically
2  recall whether she responded to these or not, and she
3  didn't specifically believe that.
4      I think it's still relevant for the -- and the
5  court can use that to judge the weight of the evidence,
6  and whether or not there's context that needs to be put
7  in here. But it doesn't change the fact that he sent
8  these messages. There's statements by a party opponent.
9      They're made by him, she's authenticated them.
10  Just because there's not potential that we know of
11  responses from her character doesn't change the fact
12  that this is well in evidence and her statements by the
13  party. So I would ask that they admit that.
14      COUNSEL 2:  Your Honor, there is something
15  known as the rule of [inaudible], and I think it
16  applies here.
17      This is -- I mean, it's ambiguous at best, but
18  the witness has testified that she did, in fact,
19  respond to some of these text messages, and none of
20  those responses are included in this 20 plus page
21  [inaudible] text messages.
22      So I want to back to this piecemeal

---

**14**

1  presentation of this conversation -- and not the
2  piecemeal.
3      It's part of a conversation, and I would
4  submit that it has little to no relevance beyond the
5  fact that the plaintiff has produced a record
6  presumably to reflect a one sided conversation where
7  now we know that, in fact, it's not a one-sided
8  conversation. So I wouldn't [inaudible].
9      THE COURT:  The Court finds that the
10  plaintiff's [inaudible] is not a [inaudible]. You can
11  ask questions that you can testify.
12      COUNSEL 1:  Of course. After you expressed to
13  Mr. Winters that you didn't want to have any contact
14  with them, but -- how frequently did he contact you?
15      MS. PASEWICZ:  Oh. He contacted me pretty
16  frequently. At the beginning, around March 12th, he was
17  contacting me every day. I remember him texting me -- I
18  think it was 64 Fuck you's in a row.
19      Just rehashing all the beef he had with me.
20  They started to -- they started to go down as the weeks
21  went on. And it would -- I think at the last points it
22  was like every two weeks he was texting me and

---

**15**

1  insulting me, berating me.
2      COUNSEL 1:  In addition to insulting you, was
3  he expressing any positive feelings for you?
4      MS. PASEWICZ:  At the beginning he did. Yeah.
5  He -- he said that he loved me. Something he never said
6  during the relationship. That he thought that I was
7  perfect. The nice text messages are very much
8  outweighed by the nasty and violent text messages.
9      COUNSEL 1:  Would you say that you were
10  receiving inconsistent messages from him?
11      MS. PASEWICZ:  Yes.
12      COUNSEL 1:  Was that erratic behavior at all
13  concerning to you?
14      MS. PASEWICZ:  Yes.
15      COUNSEL 1:  How did it make you feel to
16  receive these types of messages and inconsistent
17  indications from him?
18      MS. PASEWICZ:  It was -- it scared me a lot to
19  see the text messages, especially when he referenced
20  rape, and referenced me getting beaten. He -- it was --
21  it was -- it was like seeing into his emotions a little
22  bit. It was pretty freaky.

---

**16**

1      COUNSEL 1:  At any point, did he tell you you
2  deserved to be raped?
3      MS. PASEWICZ:  Yes.
4      COUNSEL 1:  At any point, did he call you a,
5  "Fucking spoiled trust fund slut"?
6      MS. PASEWICZ:  Yes.
7      COUNSEL 1:  What is your new boyfriend's name?
8      MS. PASEWICZ:  Michael Chambers.
9      COUNSEL 1:  Does he go by Mikey?
10      MS. PASEWICZ:  I call him Mikey.
11      COUNSEL 1:  Did Mr. Winters say that he was
12  going to look Mikey up?
13      MS. PASEWICZ:  Yes.
14      COUNSEL 1:  He said he's curious what this
15  motherfucker --
16      COUNSEL 2:  I'm going to object.
17      MS. PASEWICZ:  Yes.
18      COUNSEL 2:  At this point, it is not
19  substantiated by the text message that's admissible in
20  evidence to the court.
21      THE COURT:  I'm going to allow counsel to
22  rephrase that [inaudible] testifying from the table.

---

**17**

1    COUNSEL 1: [inaudible]. At any point, did he
2 insult you and call you a retard?
3    MS. PASEWICZ: Yes. Yeah.
4    COUNSEL 1: Did he admit to being a terrible
5 boyfriend?
6    MS. PASEWICZ: Yes.
7    COUNSEL 1: Given the trauma of your
8 relationship and the breakup and his behavior after the
9 breakup, how has that affected you in your mental
10 health?
11    MS. PASEWICZ: I was already going to therapy
12 for ADHD, but I had to recenter my focus on trying to
13 debunk a lot of the a -- lot of the gaslighting, and I
14 would – like -- sounds dramatic, but grooming that he
15 did do.
16    And also just trying to, like, figure out why
17 he was doing this to me, and why I was being targeted
18 by him.
19    COUNSEL 1: Has his behavior affected your
20 sleep?
21    MS. PASEWICZ: Yes.
22    COUNSEL 1: In what way?

---

**18**

1    MS. PASEWICZ: I often can't fall asleep until
2 I -- I just can't stay awake anymore because I'm so
3 scared that he's going to come and try to do something.
4    COUNSEL 1: Has this affected your happiness?
5    MS. PASEWICZ: Yes.
6    COUNSEL 1: And why is that?
7    MS. PASEWICZ: Mr. Winters wanted to monitor
8 my weight, so I developed an eating disorder after we
9 dated.
10    COUNSEL 1: During your relationship, at any
11 point did he threaten to commit suicide?
12    MS. PASEWICZ: Yes.
13    COUNSEL 1: On how many occasions?
14    MS. PASEWICZ: I would say like a handful.
15    COUNSEL 1: Give the court a little bit more
16 detail about what happened [inaudible].
17    MS. PASEWICZ: It would be very vague. He
18 would reference that there wasn't anything to live for,
19 that he wasn't a loser -- or he was a loser and stuff
20 like that.
21    And I would try to be supportive, and try to
22 uplift him and make sure that he didn't do that,

---

**19**

1 because I was terrified of him killing himself.
2    He -- he said that he's lost too many friends
3 in war ,and he wants to join them. Stuff like that.
4    COUNSEL 1: May I inquire how many
5 [inaudible]?
6    THE COURT: [inaudible].
7    COUNSEL 1: I might also ask, given that we're
8 doing both at the same time, I think I'd prefer to just
9 make our case, and then wait for him to testify that he
10 recall my client to respond [inaudible].
11    THE COURT: But I have no problem with
12 recalling.
13    COUNSEL 1: [inaudible] sure. We'll figure it
14 out.
15    THE COURT: [inaudible]. Anything else for
16 your client?
17    COUNSEL 1: Yes, Judge. Do you want to have
18 any contact with Mr. Winters?
19    MS. PASEWICZ: No.
20    COUNSEL 1: Why is it that you do not want to
21 have any contact with him?
22    MS. PASEWICZ: Because we are no longer

---

**20**

1 together. And I told him before that I have no interest
2 in being in contact with him because he scares me.
3    COUNSEL 1: To what extent are you afraid of
4 that?
5    MS. PASEWICZ: I'm very afraid of him. He --
6 he displayed very violent sexual behaviors. He
7 displayed a lot of mental health issues that were very
8 violent.
9    COUNSEL 1: Are you concerned that if you do
10 not give this order, then he will continue to contact
11 you?
12    MS. PASEWICZ: I believe that immediately
13 after I don't get this order, he will.
14    COUNSEL 1: Anything else you want to tell the
15 court about [inaudible]?
16    MS. PASEWICZ: No, I don't think so.
17    THE COURT: [inaudible].
18    THE COURT: At this time, [inaudible].
19    COUNSEL 2: Good morning.
20    THE COURT: Hi.
21    COUNSEL 2: So, in the first line of your
22 complaint, you say, "Gary Winters has been nonstop

**21**

1 texting me since we've gotten out of our relationship
2 on February 9th, 2024."
3 MS. PASEWICZ: Yes.
4 COUNSEL 2: Those are -- those are your words,
5 correct?
6 MS. PASEWICZ: Yes.
7 COUNSEL 2: But what you left out of your
8 complaint is that you continued a constant thread of
9 text messages with Gary throughout that entire time.
10 Would that be fair to say?
11 MS. PASEWICZ: I told the judge that I was
12 continuing communication.
13 COUNSEL 2: You didn't include that in your
14 complaint?
15 MS. PASEWICZ: No, I just told the judge in
16 person.
17 COUNSEL 2: [inaudible] statement, correct?
18 MS. PASEWICZ: Yes, but I told the judge in my
19 sworn statement.
20 COUNSEL 2: Not in your written statement?
21 MS. PASEWICZ: No.
22 COUNSEL 2: In fact, there came a time when he

**22**

1 asked you to leave him alone, and you refused. You
2 recall that?
3 MS. PASEWICZ: I didn't refuse. I told him
4 that I wouldn't block him, but I stopped texting him.
5 COUNSEL 2: If I may approach the witness? I
6 want to show you what I've marked as defendant's
7 exhibit one. Do you recognize these text messages?
8 MS. PASEWICZ: I'm not sure whose side is who
9 on this, sir.
10 COUNSEL 2: This would be Mr. Winters on the
11 right, and those would be your responses on the left.
12 Does that look familiar?
13 MS. PASEWICZ: Okay, yeah.
14 COUNSEL 2: And would you agree that that's a
15 fair and accurate reflection of those text messages
16 exchanged between the two of you on March 18th, 2024?
17 MS. PASEWICZ: Yes, this is after I found out
18 that Mr. Winters lied to me about his military service.
19 I was angry.
20 COUNSEL 2: So he texted you. He said, "Stop
21 typing and go away. We've already said everything that
22 needs to be said. I need to move on." And if you would

**23**

1 just read for the court your response.
2 MS. PASEWICZ: , "Fucking loser. Block me. I'm
3 not going anywhere. You only -- you were only fucking
4 support, bitch."
5 COUNSEL 2: And then he responds, "And why the
6 fuck are you trying to dig shit up when we're done?
7 Just fucking go away." What's your response to that?
8 MS. PASEWICZ: , "All trying to scare me away.
9 I'm not going anyway – where. Block me, you fucking
10 beta POS."
11 COUNSEL 2: And could you just explain for the
12 court what do you mean when you say, "You fucking beta
13 POS?"
14 MS. PASEWICZ: I believed that Mr. Winters was
15 a Special Forces Service Member because --
16 COUNSEL 2: I'm asking you to explain the
17 word's meaning.
18 COUNSEL 1: Objection. She can answer the
19 question and then explain [inaudible].
20 MS. PASEWICZ: Yeah, I'm trying to explain
21 context here.
22 THE COURT: [inaudible] the question is, what

**24**

1 do you mean by that particular --
2 MS. PASEWICZ: Beta POS means, "beta piece of
3 shit." I said that because Mr. Winters had told me he
4 is a Special Forces veteran, and I got pissed off
5 because he was provably not.
6 And he had lied to me, and that's a lot of the
7 reason that I was scared of him was because he told me
8 that he was Special Forces, and he had killed so many
9 people.
10 COUNSEL 2: And is that what you meant when
11 you said that because you were concerned that he might
12 harm himself, that you tried to build him up and be
13 supportive? Is that a good example [inaudible] to build
14 him up?
15 MS. PASEWICZ: After he had insulted me for
16 months, I was kind of done with him.
17 COUNSEL 2: I'm going to mark evidence exhibit
18 two. If I may approach the witness again, Your Honor?
19 Showing you what I've marked as defendant's exhibit two
20 for identification, some text messages from April 5th,
21 2024.
22 Would you agree is that a fair and accurate

| 25 |
|---|
| 1  reflection of the text messages exchanged between you |
| 2  and Mr. Winters on April 5th of this year? |
| 3       MS. PASEWICZ:  Yeah. |
| 4       COUNSEL 2:  So would another good example -- |
| 5       MS. PASEWICZ:  You're going to read those out? |
| 6       COUNSEL 2:  Would another – well, let me -- I |
| 7  just want to ask you a question. Would another good |
| 8  example of when you explain that you wanted to build |
| 9  them up [inaudible] a concern that he might harm |
| 10 himself when you said, "Bullshit. You have no friends. |
| 11 No one is on your side." Would that be -- those were |
| 12 your words, right? |
| 13      MS. PASEWICZ:  Yes. |
| 14      COUNSEL 2:  And you also said, "Come on, |
| 15 pussy. I'm not done. Let's see that anxiety come." |
| 16 Those are all your words, correct? |
| 17      MS. PASEWICZ:  He called his anger outbursts |
| 18 anxiety. So yes, they were my words. |
| 19      COUNSEL 2:  And then when he said, "If you'd |
| 20 stop popping back up to fight me, I'd forget you a lot |
| 21 easier." You remember him saying that to you? |
| 22      MS. PASEWICZ:  Yes, but -- |

| 27 |
|---|
| 1       MS. PASEWICZ:  No. Not in my written |
| 2  complaint. |
| 3       COUNSEL 2:  Did you tell the judge when you |
| 4  were under oath that you said to Gary, "Come on pussy, |
| 5  I'm not done –" |
| 6       COUNSEL 1:  It's not relevant to say that you |
| 7  didn't include every detail of the relationship in your |
| 8  complaints, that there were some of the details that |
| 9  you didn't include are not relevant. |
| 10      To this line of questioning, that you didn't |
| 11 include every single text message, it just doesn't |
| 12 really make sense. It's not that -- |
| 13      THE COURT:  You can argue that. [inaudible] |
| 14 allow the question, that's how you -- |
| 15      COUNSEL 2:  Do you remember sending -- |
| 16 [inaudible] one of our defendants exhibit three for |
| 17 identification. If I may approach again? |
| 18      THE COURT:  Yes, sir. |
| 19      COUNSEL 2:  Showing you what I have marked as |
| 20 defendant's exhibit three. |
| 21      MS. PASEWICZ:  Yes. |
| 22      COUNSEL 2:  Do you recall -- |

| 26 |
|---|
| 1       COUNSEL 2:  And then your response was, "I'm |
| 2  not popping up. You are trying to gaslight me all you |
| 3  want. I'm here to break you so you can finally get some |
| 4  help." Do you remember saying that? |
| 5       MS. PASEWICZ:  No, I don't remember saying |
| 6  that. |
| 7       COUNSEL 2:  Well, if I may approach again. If |
| 8  you can just refer to the last line on that series of |
| 9  text messages. Those are your words, correct? |
| 10      MS. PASEWICZ:  Yes. Yeah. |
| 11      COUNSEL 2:  So you did say that in a text |
| 12 message to Gary on April 5th, right? |
| 13      MS. PASEWICZ:  Yes, sir. |
| 14      COUNSEL 2: , "I'm here to break you so you can |
| 15 finally get some help", right? |
| 16      MS. PASEWICZ:  Yes, sir. |
| 17      COUNSEL 2:  And you didn't make any reference |
| 18 to any of those text messages that you sent to Gary in |
| 19 the months following February 9th or February 10th, |
| 20 whichever it is. You didn't mention any of those text |
| 21 messages that you sent to Gary in your complaint, |
| 22 correct? |

| 28 |
|---|
| 1       MS. PASEWICZ:  Yes. |
| 2       COUNSEL 2:  -- well, can you tell us what that |
| 3  is? |
| 4       MS. PASEWICZ:  This is a unclassified record |
| 5  that one of my boyfriend Michael Chambers friends |
| 6  accessed in the right channels to make sure that Mr. |
| 7  Winters was Special Forces, because they suspected that |
| 8  he was not. |
| 9       COUNSEL 2:  And is this what I've shown you as |
| 10 defendant's exhibit three, that's a photograph of Mr. |
| 11 Winters in the military uniform. Is that a fair and |
| 12 accurate representation of a photograph that you texted |
| 13 to Mr. Winters on March 18th? |
| 14      MS. PASEWICZ:  Yes, sir. |
| 15      COUNSEL 2:  And, Your Honor, I didn't say this |
| 16 earlier, but I would move to admit that exhibits one |
| 17 through three at this time. |
| 18      COUNSEL 1:  No objection. |
| 19      THE COURT:  And those include the [inaudible] |
| 20 from April 5th and the unclassified record. |
| 21      COUNSEL 2:  Correct. |
| 22      THE COURT:  Yes, sir. [inaudible]. |

---

29

1    COUNSEL 2: And after sending this photo, this
2  photo of Mr. Winters in his military uniform, you
3  accused him of what you called stolen valor.
4    MS. PASEWICZ: Yes.
5    COUNSEL 2: And that was your attempt to
6  suggest that he wasn't who he represented, that he was
7  with respect to the military service. Is that right?
8    MS. PASEWICZ: He had referenced stolen valor
9  numerous times throughout our relationship. I had told
10 him that he was that.
11   COUNSEL 2: So you were -- just to clarify,
12 you were suggesting to him that he was not accurately
13 representing --
14   MS. PASEWICZ: Yes, he had lied -- I was
15 saying that he had lied to me the entire time.
16   COUNSEL 2: About his military service?
17   MS. PASEWICZ: Yes.
18   COUNSEL 2: So where did you get this photo?
19   MS. PASEWICZ: It was sent to me through Mr.
20 Tommy Dines, who is a Special Forces active duty who
21 went through the proper channels to get the records.
22 Behest of my request. I did not request that.

---

30

1    COUNSEL 2: So you're saying Mr. Tommy Dines
2  has reached out to you and [inaudible] photo?
3    MS. PASEWICZ: No. My boyfriend had reached
4  out to him.
5    COUNSEL 2: Michael?
6    MS. PASEWICZ: Michael.
7    COUNSEL 2: [inaudible] as exhibit four for
8  identification, showing opposing counsel.
9    COUNSEL 1: I remember looking at it, Your
10 Honor.
11   COUNSEL 2: Showing you another series of text
12 messages.
13   MS. PASEWICZ: Yes, sir.
14   COUNSEL 2: Again with --
15   MS. PASEWICZ: Are you aware that this is not
16 the full screenshot? This has been cropped.
17   COUNSEL 2: Are you telling me that --
18   MS. PASEWICZ: That's been cropped.
19   COUNSEL 1: -- [inaudible] one side or the
20 other have been omitted? Within that string of text
21 messages, is it your -- are you telling me that
22 someone's response has been omitted from the beginning

---

31

1  -- between the beginning and the end?
2    MS. PASEWICZ: Yeah, that's what I'm saying.
3    COUNSEL 2: Well, let's -- let's [inaudible] --
4    MS. PASEWICZ: It's not full context.
5    COUNSEL 2: Let me ask you a question. So
6  March 19th, 2024, this is a string of text messages
7  between you and Mr. Winters on March 19th, 2024.
8  Correct?
9    MS. PASEWICZ: Yes.
10   COUNSEL 2: And he says -- at the top, he
11 says, "That picture is from March 13th", which I
12 believe he means to indicate March of 2013, right?
13 That's in reference to that photo that you just said?
14   MS. PASEWICZ: Sure.
15   COUNSEL 2: Correct?, "Why the fuck have you
16 been --" this is Gary., "Why the fuck have you been
17 running around doing that shit? You were very clear
18 that you didn't love me, and you don't want to be with
19 me. I'm done fighting for us. I just want to go on with
20 my life." And your response is., "Then do it. Block
21 me." Right?
22   MS. PASEWICZ: Yes, because he had been

---

32

1  multiple times texting me throughout the months.
2    COUNSEL 2: And then he says, "Why are you
3  contacting me?" Your response, "You're a fucking coward
4  and a liar." Right?
5    MS. PASEWICZ: Yes.
6    COUNSEL 2: And then he says again, "Why are
7  you contacting me?" Your response, "Block me, you
8  fucking coward. I'm done with this shit." Right?
9    MS. PASEWICZ: Yes.
10   COUNSEL 2: And then he says again, "Why are
11 you contacting me?" You say, "Fucking block me, you
12 pathetic little man." Right?
13   MS. PASEWICZ: Yes.
14   COUNSEL 2: And then he says again, "Why are
15 you contacting me?" And your response is, "You're no
16 man, you pathetic little loser." Right?
17   MS. PASEWICZ: Yes.
18   COUNSEL 2: And then he again says, "Why are
19 you contacting me?"
20   MS. PASEWICZ: Okay.
21   COUNSEL 2: And that's a fair and accurate
22 representation of that exchange of text messages,

---

33

1   correct?
2        MS. PASEWICZ:  Not the entire text message
3   history.
4        COUNSEL 2:  You're saying went on after that?
5        MS. PASEWICZ:  It went on before and after.
6        COUNSEL 2:  Right. But within the context from
7   beginning to end, it's a complete representation of the
8   text, starting – starting --
9        MS. PASEWICZ:  It's not a representation of
10  the full conversation.
11       COUNSEL 2:  Starting -- well, the truth is you
12  had ongoing and ongoing conversation with Gary that
13  lasted months and months following February 9th, 2018.
14  Correct?
15       MS. PASEWICZ:  They were incremental.
16       COUNSEL 2:  But there were long strings of
17  back and forth messages --
18       MS. PASEWICZ:  Yes.
19       COUNSEL 2:  -- between you 00 from you and
20  from Gary, spanning from the time of the relationship
21  February 9th until -- until April 23rd, right? When it
22  all stopped?

34

1        MS. PASEWICZ:  Yes, sir.
2        COUNSEL 2:  So with the understanding that
3   there was a long string of texts that preceded this and
4   a long string of text that followed, this is a fair and
5   accurate representation of the text messages within
6   this snippet of time, from the first one to the last
7   one?
8        MS. PASEWICZ:  Yeah.
9        COUNSEL 2:  Your Honor, I would move to
10  [inaudible].
11       COUNSEL 1:  no objection.
12       THE COURT:  [inaudible].
13       COUNSEL 2:  Let me go ahead and mark it as
14  exhibit five [inaudible]. [inaudible]. So the following
15  day -- I'm showing you some text messages. This
16  defendant's exhibit five.
17       A string of text messages from the following
18  day, March 20th 24. You'd agree that that reflects a
19  series of text messages between you and Gary on that
20  date?
21       MS. PASEWICZ:  Yes. This reflects me trying to
22  heal stuff up so he doesn't continue to contact me.

35

1        COUNSEL 1:  You said, "I'm sorry we didn't
2   understand each other." He said in response, "The time
3   for this discussion has passed." Right?
4        MS. PASEWICZ:  Yes.
5        COUNSEL 2:  Those were his words.
6        MS. PASEWICZ:  Yes.
7        COUNSEL 2:  You say, "I'm just saying I'm
8   sorry, Gary. I have no interest in rehashing. I'm just
9   sorry." Right?
10       MS. PASEWICZ:  Yes.
11       COUNSEL 2:  And he says, "Far too little, far
12  too late." Right?
13       MS. PASEWICZ:  Yeah.
14       COUNSEL 2:  I ask you about another one. I'm
15  going to move to admit exhibit five, Your Honor.
16       THE COURT:  [inaudible].
17       COUNSEL 2:  I'm going to fast forward all the
18  way to April 23rd.
19       MS. PASEWICZ:  Fantastic.
20       COUNSEL 2:  You actually called Gary's ex-
21  wife? [inaudible] --
22       MS. PASEWICZ:  No sir, I did not.

36

1        COUNSEL 2:  Did you ask someone else to call
2   her on your behalf?
3        MS. PASEWICZ:  No, sir. I don't even know the
4   woman's last name.
5        COUNSEL 2:  Well, I'm showing you what I'm
6   marking as defendant's exhibit. Is it your testimony
7   you've never had any contact of any kind with Gary's
8   ex-wife?
9        MS. PASEWICZ:  Yes, I know that I said that I
10  contacted him -- her to him because I was trying to,
11  in my mind, having an outside validation like another
12  person being abused by him.
13       Because he said that she had claimed that he
14  abused him -- or her. I thought that this would make
15  him stop contacting me and stop harassing me.
16       COUNSEL 2:  So again, just for the interest of
17  due diligence, so these text messages would are
18  identified on defendant's exhibit six.
19       That's again, a fair and accurate
20  representation of the string of text messages between
21  you and Gary on April 23rd of this year?
22       MS. PASEWICZ:  Yes.

37

1    COUNSEL 2: Your Honor, I'd move to admit
2 defendant's exhibit six at this time.
3    THE COURT: [inaudible].
4    COUNSEL 2: Now, you've also been physically
5 violent toward Gary while you were with him, correct?
6    MS. PASEWICZ: No, sir.
7    COUNSEL 1: Do you recall back on February 8th
8 of this year, just before the breakup, you recall
9 threatening him with a kitchen knife?
10    MS. PASEWICZ: No, sir. That was my birthday.
11    COUNSEL 2: [inaudible].
12    MS. PASEWICZ: No, sir. I had a great night.
13 We -- we both got a great night.
14    COUNSEL 2: You threatened your boyfriend in
15 the kitchen.
16    MS. PASEWICZ: I didn't get drunk. I was sober
17 the whole night.
18    COUNSEL 2: And so stone cold sober you
19 threatened your boyfriend with a kitchen?
20    MS. PASEWICZ: I didn't threaten my boyfriend
21 with anything.
22    COUNSEL 1: You also physically struck him at

38

1 least three or four times prior to that. Correct?
2    MS. PASEWICZ: No, sir.
3    COUNSEL 1: One of those times you slapped him
4 in the face and called him, "faggot".
5    MS. PASEWICZ: No, sir. No, sir. And I would
6 never call anyone a faggot. I am actually bisexual. I
7 don't do that.
8    COUNSEL 2: Correct?
9    MS. PASEWICZ: No, I had no idea.
10    COUNSEL 2: You called him a pussy and you
11 called him.
12    MS. PASEWICZ: I had no idea that he was half
13 -- that's fine. I've never hit him, I've never insulted
14 him, like, in person while we were in a relationship.
15 Never.
16    COUNSEL 2: You recall getting so drunk that
17 you couldn't recall what you've done with him?
18    MS. PASEWICZ: No.
19    COUNSEL 2: I want to back up a little bit. So
20 it's your testimony -- well, in your sworn complaint,
21 you stated that, "Gary Winters had been nonstop texting
22 me since we'd gotten out of relationship on February

39

1 9th." Is it your testimony that the last time you saw
2 him in person was February 9th?
3    MS. PASEWICZ: No. I saw him March 12th after
4 he had asked me to meet up with him for closure. So we
5 met up at Midway Tavern, and I had to over and over
6 explain to him why I was breaking up with him. It's
7 because he scared me.
8    COUNSEL 2: Did your attorney just before this
9 hearing show you the exhibits that we plan to introduce
10 [inaudible]?
11    MS. PASEWICZ: Yeah. The receipts, yeah. I --
12    COUNSEL 2: [inaudible] over that?
13    MS. PASEWICZ: Yes. Yes.
14    COUNSEL 2: [inaudible] before you are aware
15 that there were actual receipts from that night, you
16 didn't mention that in your sworn complaint, correct?
17    MS. PASEWICZ: I -- how do you -- how do you
18 mean? Like I told him -- I told her that we went out
19 and we had drinks and food.
20    COUNSEL 2: You're saying that you testified
21 under oath to the Judge who took the DVPO, that you had
22 had physical contact with Gary in the intervening

40

1 period between February [inaudible] --
2    MS. PASEWICZ: Yes. I told her that -- yeah. I
3 told her that on March 12th we had met again.
4    COUNSEL 2: So if we pull the recording from
5 that proceeding, it's going to show it's going to have
6 an audio recording of you telling the Judge under oath
7 own that you've met with Gary in person voluntarily?
8    MS. PASEWICZ: Yes.
9    COUNSEL 2: Over a month after you alleged
10 that the breakup?
11    MS. PASEWICZ: I believe so, yeah. I'm pretty
12 sure. Either way that did happen. Yes.
13    COUNSEL 2: You didn't say anything in your
14 sworn complaint about any in-person contact between you
15 --
16    MS. PASEWICZ: Nor did Mr. Winters.
17    COUNSEL 2: Your Honor [inaudible]. I may
18 approach the witness again. So March 12th -- I'm
19 showing you what I've marked. It's two pages marked
20 Defendant's Exhibit seven. That's a receipt dated March
21 12th, correct?
22    MS. PASEWICZ: Yes, sir.

41

1    COUNSEL 2: And that is from the – the Myway
2 Tavern, correct?
3        MS. PASEWICZ: Yes.
4    COUNSEL 2: And you -- you Ubered to Myway,
5 right?
6        MS. PASEWICZ: Yes I did.
7    COUNSEL 2: And you -- you went to Myway for
8 the purpose of meeting Mr. Winters, correct?
9        MS. PASEWICZ: Yes.
10   COUNSEL 2: Voluntarily, right?
11       MS. PASEWICZ: Yes.
12   COUNSEL 2: And while you were at Myway, you
13 drank three glasses of tequila. Correct?
14       MS. PASEWICZ: Yes.
15   COUNSEL 2: You paid the tab, right?
16       MS. PASEWICZ: Yes.
17   COUNSEL 2: And is that a fair and accurate
18 representation of the -- the receipts that the two of
19 you shared from that night?
20       MS. PASEWICZ: Yeah.
21   COUNSEL 2: Move to admit defendant's exhibit
22 seven. Your Honor, [inaudible] exhibit eight. I am

42

1 showing you -- so, from -- after Myway --
2        MS. PASEWICZ: Yes, sir. I had another drink.
3    COUNSEL 2: So the -- the two of you at Myway,
4 you had three glasses of tequila. Gary had one PBR.
5 Correct?
6        MS. PASEWICZ: Correct.
7    COUNSEL 1: And then from there, the two of
8 you -- again, voluntarily, you went to Dram and Draft
9 from there, correct?
10       MS. PASEWICZ: Yes.
11   COUNSEL 2: And Dram and Draft. You had two
12 glasses of whiskey, correct?
13       MS. PASEWICZ: No, I had a Manhattan. I had, I
14 guess, two Manhattans.
15   COUNSEL 1: Okay. So when it was the whiskey,
16 they were in the [inaudible] --
17       MS. PASEWICZ: Yeah. They're just talking
18 about what was in it.
19   COUNSEL 1: Two whiskey Manhattans.
20       MS. PASEWICZ: Yeah.
21   COUNSEL 2: And then again, Gary was drinking
22 PBR. Correct?

43

1        MS. PASEWICZ: Yes.
2    COUNSEL 2: And this is a fair and accurate
3 representation of the receipt also from March 12th of
4 this year, where you went with Gary after -- after
5 Myway Tavern, correct?
6        MS. PASEWICZ: Yes, sir.
7    COUNSEL 2: Okay. I'd move to admit
8 defendant's exhibit eight as well, Your Honor.
9        THE COURT: [inaudible].
10   COUNSEL 2: So is it your testimony now that
11 that's the only other in-person contact that you had
12 with Gary between February 9th, the day you
13 [inaudible]?
14       MS. PASEWICZ: No. We had contact -- I believe
15 it was February 13th? That was when I told him that I
16 was afraid of him and I wished to never see him again.
17   COUNSEL 2: And what was the context -- what
18 was the context of the meeting that you're claiming
19 happened on February 13th?
20       MS. PASEWICZ: It was just at my apartment. He
21 had been texting me and saying -- asking me if I could
22 give him another chance, and that he could go to

44

1 therapy and work on himself and work on his anger
2 issues.
3        And I invited him over to explain everything
4 that he had done, and why I was feeling the way that I
5 was feeling, because I genuinely -- he had told me he
6 had autism and that he had all these problems.
7        So I genuinely thought that he didn't
8 understand why I was getting him -- like I was
9 separating myself from him.
10   COUNSEL 2: So it's your testimony that the
11 last time you saw him in person was on February 13th,
12 2024, is that right?
13       MS. PASEWICZ: Sorry, wait --
14   COUNSEL 1: The last time that you saw Gary
15 Winters in person -- outside of this courtroom --
16       MS. PASEWICZ: No, no, I saw him March – or --
17 yeah.
18   COUNSEL 2: [inaudible]. I'm sorry,
19 [inaudible] --
20       MS. PASEWICZ: Yeah.
21   COUNSEL 2: You saw him on March 12th, right?
22       MS. PASEWICZ: Yes.

**45**

1    COUNSEL 2: When you went out with him, you
2  went to Myway, you went to Dram and Draft?
3    MS. PASEWICZ: Yes. Yeah.
4    COUNSEL 2: And before we leave that that
5  night, there was some discussion about the possibility
6  of the two of you --
7    MS. PASEWICZ: No, never. Never ever. Nope.
8    COUNSEL 2: You got too drunk, and he decided
9  he didn't want to get anywhere --
10    MS. PASEWICZ: No.
11    COUNSEL 2: -- [inaudible] and drop you off at
12  home?
13    MS. PASEWICZ: No. He and -- I was going to
14  Uber back home and he insisted on driving me.
15    Then the next day, he later reflected, and was
16  like, "I was going to kiss you because I thought that
17  you wanted that."
18    COUNSEL 2: What do you think?
19    MS. PASEWICZ: No, he did not.
20    COUNSEL 2: So according to your testimony,
21  you saw him on March -- on February 13th?
22    MS. PASEWICZ: Yes, sir.

**46**

1    COUNSEL 2: Again on March 12th?
2    MS. PASEWICZ: Yes, sir.
3    COUNSEL 2: And then outside of court
4  proceedings, have not seen him otherwise?
5    MS. PASEWICZ: No, I don't -- I don't think
6  so.
7    COUNSEL 2: Now, in your complaint, you say --
8  you say you broke up with Gary on February 9th and then
9  you blocked him on February 17th. Correct?
10    MS. PASEWICZ: Yes. I believe my complaint
11  says that I – I messed up the date. It's not February
12  9th. It's February 10th.
13    COUNSEL 2: Okay. So yeah, you would correct
14  that to say, "We broke up on February 10th, and on the
15  17th I blocked him."
16    MS. PASEWICZ: Yes.
17    COUNSEL 2: Correct?
18    MS. PASEWICZ: Yes.
19    COUNSEL 2: And then you testified that you
20  unblocked his number on March 13th, right?
21    MS. PASEWICZ: Yes.
22    COUNSEL 2: And your claim and your complaint

**47**

1  is that some friend told you that she saw him outside
2  her house?
3    MS. PASEWICZ: Yeah. I later -- no, I later
4  found out that she had been lying. She had told me
5  after I was unloading, like, girl talk.
6    I was at a meet up with friends, and we were
7  just girl talking, and we were talking about this
8  situation and how crazy it was. And she had lied and
9  said that he had been outside of her house. I think she
10  said an hour. For an hour.
11    And she told me the make and model of his car,
12  so I did believe her. And she later told one of my
13  friends that that was untrue.
14    COUNSEL 2: Was there a text message in which
15  she told you all those things?
16    MS. PASEWICZ: No, no.
17    COUNSEL 2: She told you --
18    MS. PASEWICZ: She told me in person. We were
19  in person. At dinner.
20    COUNSEL 2: So in your complaint, you say you
21  broke up on February 9th. I understand you're revising
22  that to February 10th now.

**48**

1    MS. PASEWICZ: Yes.
2    COUNSEL 2: You say, "On the 17th of February,
3  I blocked him. I unblocked Gary's number on March
4  13th." Right?
5    MS. PASEWICZ: Yes. That was also a day after
6  we met up, too.
7    COUNSEL 2: And you didn't mention anything
8  about the fact that you'd actually been with him in
9  person and he dropped you off at home the day before.
10  Correct.
11    MS. PASEWICZ: I think I mentioned it. Again,
12  I think I mentioned it during my sworn testimony.
13    COUNSEL 2: And I'm mark a couple of other
14  exhibits. I've got [inaudible] exhibits. If I may
15  approach again, Your Honor. So before the March 12th
16  meet up in Myway and Dram and Draft, you actually
17  called Gary to set up --
18    MS. PASEWICZ: Yes. He requested -- he
19  requested that I call him and we talked. And he had
20  promised me that on March 12th, it would just be a
21  conversation about closure, and it wouldn't be anything
22  else. He wouldn't try to get with me or anything like

49

1  that.
2       COUNSEL 2:  So you've just testified that on -
3  -
4       MS. PASEWICZ:  So yes, we did call each other.
5       COUNSEL 2:  -- February 17th --
6       MS. PASEWICZ:  He asked me to call him.
7       COUNSEL 2:  -- to March 13th, you had him
8  blocked, right?  You recall testifying to that under
9  oath and also including it in your sworn complaint?
10      MS. PASEWICZ:  I thought I had, yes.
11      COUNSEL 2:  You thought you had him blocked?
12      MS. PASEWICZ:  Yes.
13      COUNSEL 2:  But -- but you actually had actual
14 conversations between the two of you?
15      MS. PASEWICZ:  I – I didn't recall.
16      COUNSEL 2:  Well, you'd agree with me.  I'm
17 directing your attention to defendant's exhibit nine.
18 This is a call log which shows two calls.  An incoming
19 call and an outgoing call --
20      MS. PASEWICZ:  Yes.
21      COUNSEL 2:  -- coming -- and that's your phone
22 number, right?

50

1       MS. PASEWICZ:  Yes.
2       COUNSEL 2:  (919) 819-8467?
3       MS. PASEWICZ:  Yes.
4       COUNSEL 2:  And it looks like probably a
5  missed call, a four second missed call, which was --
6  well, this is outgoing call.  So it looks like you had a
7  missed call from Gary, and then you called him back and
8  talked for 41 minutes, correct?
9       MS. PASEWICZ:  Yes.
10      COUNSEL 2:  Move to admit defendant's exhibit
11 nine, Your Honor.
12      COUNSEL 1:  [inaudible] objection,
13 [inaudible].
14      COUNSEL 2:  Now, there was another time that
15 we haven't talked about on February 22nd, 2024, when
16 you actually reached out to Gary and asked him to come
17 to your apartment.  Do you recall that?
18      MS. PASEWICZ:  No, I don't.
19      COUNSEL 2:  I'm showing you what I've marked
20 as defendant's exhibit 10.  That's -- again, that's your
21 phone number at the top, right?
22      MS. PASEWICZ:  Yes, but I --

51

1       COUNSEL 2:  This is a call between you and
2  Gary Winters, correct?
3       MS. PASEWICZ:  Yes.
4       COUNSEL 2:  And it shows an incoming call that
5  took -- that lasted eight minutes, correct?
6       MS. PASEWICZ:  Yes.
7       COUNSEL 2:  That's at 7:16 p.m. on February
8  22nd, 2024, correct?
9       MS. PASEWICZ:  Yes.
10      COUNSEL 2:  And again, that's a fair and
11 accurate representation of a call that you received
12 from Gary --
13      MS. PASEWICZ:  That -- that is a call that I
14 received.  Yes.
15      COUNSEL 2:  I move to admit defendant's
16 exhibit 10 Your honor.
17      THE COURT:  [inaudible].
18      COUNSEL 2:  So you've now testified that you
19 had Gary blocked between February 27th -- I'm sorry,
20 February 17th.
21      MS. PASEWICZ:  I -- I mis- -- I misremembered.
22 I have -- I had blocked him and unblocked him so many

52

1  times that I -- I can't tell you how many times I've
2  done it.  I don't really see how it's relevant.
3       COUNSEL 2:  If it's true that you ever did
4  have him blocked, you did reach out to him on February
5  22nd and asked him to come to your apartment.
6  [inaudible] --
7       MS. PASEWICZ:  I -- I don't recall that.  Also
8  there's -- is there proof for that?
9       COUNSEL 2:  You did have sex with him at that
10 time, right?
11      MS. PASEWICZ:  No.  I had -- I had not had sex
12 with him at all.
13      COUNSEL 2:  Ever?
14      MS. PASEWICZ:  Since – no.  Since we had broken
15 up, I had not had sex with him.
16      COUNSEL 2:  [inaudible] February 22nd.
17      MS. PASEWICZ:  No.
18      COUNSEL 2:  Well, this is the call log, right?
19      MS. PASEWICZ:  Okay.  Is -- does it say that we
20 had sex?
21      COUNSEL 2:  I'm asking you to tell the truth.
22      MS. PASEWICZ:  Sir --

53

1    COUNSEL 2:  After he left your apartment, he
2  called you. [inaudible] you.
3    MS. PASEWICZ:  I did not have sex with him.
4  No.
5    COUNSEL 2:  But you do agree that he was at
6  your apartment that night? [inaudible].
7    MS. PASEWICZ:  No. I don't think so, no.
8    COUNSEL 2:  But you're not sure if he was at
9  your apartment by your invitation on February 22nd?
10    MS. PASEWICZ:  Do you have text?
11    COUNSEL 2:  I'm asking you to just tell the
12  truth.
13    MS. PASEWICZ:  No. I did not have sex with him
14  after we broke up. No.
15    COUNSEL 2:  So he was at your apartment?
16  [inaudible].
17    MS. PASEWICZ:  He -- he was at my apartment on
18  February 13th. And I don't think that there was another
19  time, unless he came to my apartment without me
20  knowing.
21    COUNSEL 2:  Do you recall having an eight
22  minute long conversation?

54

1    MS. PASEWICZ:  No, I don't.
2    COUNSEL 2:  [inaudible].
3    MS. PASEWICZ:  I don't. It was probably
4  something with him trying to get back together with me.
5    COUNSEL 2:  During the period that you had
6  testified under oath that you had blocked --
7    MS. PASEWICZ:  I had thought I blocked him.
8    THE COURT:  [inaudible].
9    COUNSEL 2:  Appreciate the indulgence. Now, I
10  also want to ask you -- I want to go back to your
11  complaint. You stated in your sworn complaint in this
12  case -- you filed your complaint on May 6th. Correct?
13    MS. PASEWICZ:  I believe so.
14    COUNSEL 2:  And you stated in your complaint,
15  you said, "He has continued to contact me even since
16  last Tuesday, and I don't think he'll let up. It's been
17  nearly constant contact."
18    MS. PASEWICZ:  Yes.
19    COUNSEL 2:  So last Tuesday before May 6th
20  would have been April 30th.
21    MS. PASEWICZ:  Yeah.
22    COUNSEL 2:  Right? So it's your sworn

55

1  statement that between April 30th of 2024 and May 6th
2  of 2024, there was near constant contact between --
3    MS. PASEWICZ:  No no no no.
4    COUNSEL 2:  [inaudible].
5    MS. PASEWICZ:  I said -- I said last time he
6  had contacted me was the last time he had contacted me.
7  I did not make any claim that he texted me after that.
8    COUNSEL 1:  Well, let me just read -- well,
9  here, let me -- just if I may approach with -- with --
10  if you would just read from -- let's see. Let me get my
11  bearings. Yeah, just the very -- the last two sentences
12  starting right here, if you would.
13    MS. PASEWICZ:  , "He has continued to contact
14  me even since last Tuesday. I don't think he'll let up.
15  It's been nearly constant contact."
16    COUNSEL 2:  So your sworn statement was --
17  when you file this on May 6th, 2024, your sworn
18  statement was that, "He has continued to contact me
19  even since last Tuesday", right?
20    MS. PASEWICZ:  How -- it was a bad phrase of
21  words. What I had meant was since last Tuesday. Last
22  Tuesday was the last time he had contacted me. Meaning

56

1  it was recent. I didn't mean that it was in -- but I
2  had told her that the last contact was on that date.
3    COUNSEL 2:  Your words were, "He has continued
4  to contact me even since last Tuesday, and I don't
5  think he'll let up."
6    MS. PASEWICZ:  Yes, it's --
7    COUNSEL 2:  [inaudible].
8    MS. PASEWICZ:  -- yes, it's a bad wording.
9    COUNSEL 2:  So it's now it's your testimony
10  that when you said that he had been in nearly constant
11  contact with you from April 30th to May 6th, that's not
12  what you meant.
13    MS. PASEWICZ:  No, that is not what I meant.
14    COUNSEL 2:  There are no text messages that
15  would corroborate --
16    MS. PASEWICZ:  Yeah, there's – yeah. I -- and
17  I'm aware of that.
18    COUNSEL 2:  [inaudible].
19    MS. PASEWICZ:  I'm aware of that, yes. And I -
20  - I did not mean to make that statement in that way.
21  Yeah.
22    COUNSEL 2:  [inaudible] constant contact from

57

1 Gary between April 30th and May 6th when you went to
2 the [inaudible]?
3     MS. PASEWICZ: Yeah, between those dates yes.
4     COUNSEL 2: I don't have any more questions.
5     THE COURT: [inaudible]. Witnesses?
6     COUNSEL 1: Thank you. Your Honor. There's a
7 lot of back and forth about when he was blocked and
8 when he was not blocked. How often were you blocking
9 him and unblocking during this period of time?
10     MS. PASEWICZ: It was constant because in a
11 way, Mr. Winters giving me the exact emotions that he
12 was having during that time, the slew of text messages,
13 it somehow brought comfort in knowing that I knew what
14 he was thinking if he was going to try to do something.
15     It was me gathering evidence just to make sure
16 that I'm not going crazy, that I was valid in a way to
17 be afraid of him.
18     COUNSEL 1: I think you said this previously,
19 but could you recall approximately how many times you
20 would have locked and unlocked him?
21     MS. PASEWICZ: I mean, it must have been -- it
22 was -- it was a decent amount. I think it was like

58

1 seven or eight different times.
2     Sometimes, like unblocking and blocking in one
3 day, just because I was -- I would block him and want
4 to be over with him, but I knew that he was monitoring
5 me in other ways, and I wanted to make sure.
6     I wanted to make sure that he -- I knew what
7 he was thinking. That I knew that he could -- you know.
8     COUNSEL 1: To what extent were you -- and
9 there's been this talk of building him up. To what
10 extent were you trying to do that, to make sure that
11 you don't do anything to you?
12     MS. PASEWICZ: I would -- I would try to make
13 him feel better about himself. He was genuinely just a
14 very obviously an unhappy individual.
15     So I would try to uplift him as a partner,
16 nearly constantly without any reciprocation. And I knew
17 that if I wouldn't do that, the mood swings would go
18 downhill and I would end up feeling the -- the cost
19 later on.
20     COUNSEL 1: You were asking questions about
21 some of the potentially offensive things that you said
22 to him on specifically April 5th, but also on March

59

1 18th.
2     On April 5th, there's a text message where I
3 think -- tell me if you recall this or not. He says to
4 you, "I hope your kids have birth defects", right?
5     MS. PASEWICZ: Yes, sir.
6     COUNSEL 1: What would you consider that an
7 insult?
8     MS. PASEWICZ: Yes, sir.
9     COUNSEL 1: [inaudible] consider a reasonable
10 person to react negatively to that type of statement?
11     MS. PASEWICZ: Yes, sir.
12     COUNSEL 1: In that same conversation, shortly
13 after that -- actually, his next message is, "How many
14 orgasms do you have on our first date, slut?" Is that
15 right?
16     MS. PASEWICZ: Yeah.
17     COUNSEL 1: Okay. Again, something that you
18 would take offense to correct?
19     MS. PASEWICZ: Yes, sir.
20     COUNSEL 1: And wouldn't you think an average
21 person would take offense to something like that?
22     MS. PASEWICZ: I would -- I would hope so.

60

1     COUNSEL 1: There was also question -- the
2 question asked about accessing his military records.
3 And you said this, but I just want to be clear. At no
4 point did you ask anybody to request those records.
5     MS. PASEWICZ: No. I -- I did not.
6     COUNSEL 1: And again, who requested them?
7     MS. PASEWICZ: My boyfriend requested the
8 records from a Special Forces active duty man, Tommy
9 Deines. And he went through the proper channels to get
10 those records. That means he submitted a request.
11     COUNSEL 1: Why do you think your boyfriend
12 did that?
13     MS. PASEWICZ: Because Mr. Chambers frankly
14 heard about Mr. Winters behavior, and was concerned.
15     THE COURT: [inaudible] speculation.
16     COUNSEL 2: I think it's hearsay and
17 speculation because [inaudible].
18     COUNSEL 1: Did you ever contact his
19 [inaudible]?
20     MS. PASEWICZ: No.
21     COUNSEL 1: Did you even have the means to
22 contact her if you wanted to?

61

1    MS. PASEWICZ:  No, I don't -- I don't think
2  so. I don't know her last name. All I know is the
3  spelling of her first name, and that's only because he
4  has a tattoo on his arm of it.
5    COUNSEL 1:  There's a March 20th streak of
6  text where he asked you, "Why are you -- why are you
7  contacting me?" Why were you contacting him
8  [inaudible]?
9    MS. PASEWICZ:  Because he had just recently
10  contacted me. And he was continuing to contact me, and
11  I decided to call him out. And the thought of calling
12  him out on him not being Special Forces, I thought,
13  would embarrass him enough to stop contacting me.
14    COUNSEL 1:  After all, this has been going on
15  for approximately a month, why is it you agree to meet
16  with him at Myway Tavern?
17    MS. PASEWICZ:  Because, again, he promised me
18  through that call that he would leave me alone after
19  this. That this was a closure agreement of sorts. I was
20  terrified.
21    COUNSEL 1:  There were questions asked about
22  the specific dates of his excessive contact. Is it fair

62

1  to say that over the course of that period of time, you
2  would have received many messages?
3    MS. PASEWICZ:  I've received so many that I
4  don't think I could accurately count them all.
5    COUNSEL 1:  How difficult is it to [inaudible]
6  the exact dates of that many messages in your head when
7  you're on the spot [inaudible]?
8    MS. PASEWICZ:  It's -- it's crazy, yeah.
9    COUNSEL 1:  No further questions.
10    THE COURT:  Anything else [inaudible]?
11    COUNSEL 1:  Nothing further, [inaudible].
12    THE COURT:  Thank you ma'am. [inaudible].
13    COUNSEL 2:  So just to clarify where we are
14  procedurally, so I know [inaudible] inquired about
15  potential rebuttal, but my intent is to go ahead and
16  move into Mr. Winters plaintiff's case against his
17  [inaudible] will have the time constraints associated
18  with that separate block, and then we'll [inaudible].
19    COUNSEL 1:  Well, I kind of got the sense that
20  this was happening as [inaudible] so much time. I
21  thought it was 45 minutes for everything.
22    THE COURT:  That's -- that was my intention,

63

1  which is why I brought up with 10 minutes left.
2    COUNSEL 2:  And I misunderstood. I thought it
3  was 45 minutes per side, so I apologize, but -- but I
4  was expecting to have a comparable amount of time to
5  Mr. Winters on the stand in his case, and I thought we
6  were counting down the 45 minutes in the plaintiff's
7  case, and then we would count that as seven, 45
8  minutes.
9    I mean, I'll do my best to be efficient and
10  brief, but I'd like to have time to put him on and give
11  him an opportunity to tell the side of what happened.
12    COUNSEL 1:  The other issue I have is my
13  client has requested for her to [inaudible].
14    THE COURT:  Yes, so we can have a brief
15  bathroom break, and then we will come back and discuss
16  timing.
17    COUNSEL 2:  For today?
18    THE COURT:  So for each side 45 minutes and
19  has been keeping track of the time, which then leaves
20  us with six minutes to write a 20 minutes. How much
21  more time, Counselor, do you think that you are going
22  to need?

64

1    COUNSEL 2:  Well, I mean, candidly -- and I
2  will let you know, Mr. Winters, he went off to the
3  restroom.
4    He just -- he wanted to wait so he didn't
5  overlap with Ms. Pasewicz when he went out to the
6  restroom, so I suggested now would be a good time to go
7  ahead and do that. Your Honor, and that's my fault.
8    I misinterpreted when -- when -- I thought the
9  court was -- was sort of signaling that there were
10  indications that this was going to be a prolonged
11  hearing that was giving both sides, each side 45
12  minutes.
13    THE COURT:  And each side has had 45 minutes.
14    COUNSEL 2:  Okay. So I misunderstood. That's -
15  - that's -- that's my fault. I thought you were -- I
16  thought we were going to fight – okay.
17    It was going to be 45 minutes on the one side,
18  and then we would restart another 45 minutes on the
19  other side when the -- Mr. Winter's case began.
20    So I just -- I misinterpreted that, and I
21  apologize. I'd like to have an opportunity to put them
22  on, and I just ask for the -- for the grace of the

65

1 court. I'll try to be as efficient as I possibly can.

2 THE COURT: I'll give each side an extra 10

3 minutes. If -- not all of the apps we have are super

4 helpful. However, there is an app that allows us to

5 mark time when each Counselor speaks. So at this time,

6 would you like to call it?

7 COUNSEL 2: Yes, Your Honor, I'll go ahead and

8 call Mr. Winters to stand.

9 THE COURT: Please raise your right hand. Do

10 you solemnly affirm the testimony, you have the whole

11 truth, and nothing but the truth?

12 MR. WINTERS: I do.

13 THE COURT: Thank you, [inaudible].

14 COUNSEL 2: Thank you, Your Honor. Good

15 morning. I'm going to try to be quick in addition.

16 MR. WINTERS: Good morning.

17 COUNSEL 2: Can you just tell us a little bit?

18 We got your name on the record. Can you just tell us

19 a little bit about how you're currently employed, and

20 tell us a little bit about your employment history?

21 MR. WINTERS: I am currently an accountant at

22 a software company. I also run a small burger shop on

66

1 nights and weekends. I race full time as well. But --

2 so my previous -- prior to that, I was in the Army for

3 10 years.

4 I was a logistician. I spent my last seven

5 years at first Special Forces Group, active duty. I

6 have an honorable discharge. I am a disabled veteran

7 and I have no violations of the Uniform Code of

8 Military Justice during that decade.

9 THE COURT: What was your [inaudible]?

10 MR. WINTERS: .92 Yankee. Three – three

11 Sierra.

12 COUNSEL 2: And can you just respond briefly

13 to -- Ms. Pasewicz has made this allegation about

14 stolen valor.

15 She was claiming that you -- you didn't

16 achieve the rank that you claimed that you did in the

17 military. Can you just explain that a little bit?

18 MR. WINTERS: I'm not really sure what

19 allegations she's making, to be honest. I --

20 COUNSEL 2: [inaudible] Special Forces

21 [inaudible]?

22 MR. WINTERS: Yes, I spent my last seven years

67

1 in first Special Forces Group.

2 COUNSEL 2: And did you see a photograph --

3 MR. WINTERS: Yes.

4 COUNSEL 2: -- that's in evidence now? Was

5 that prior to the time that you achieved that Special

6 Forces rank?

7 MR. WINTERS: Actually, that was when I first

8 reported to -- for SF or first group, actually. After

9 looking at it. I reported to that unit in August of

10 2014. I was the group PBO sergeant. That was -- that's

11 what that photo is from.

12 COUNSEL 2: Okay. Did you ever misrepresent

13 your rank in the military?

14 MR. WINTERS: No, we -- we don't really speak

15 about the military.

16 COUNSEL 2: We [inaudible] very -- well, I'm

17 going to skip over how you met Ms. Pasewicz and just --

18 and just move straight into the time that you were in a

19 relationship with her. Did you learn anything about her

20 mental health during the relationship?

21 MR. WINTERS: Yes. She claims to -- that she's

22 been diagnosed with Autism Spectrum Disorder type one,

68

1 generalized anxiety disorder, depression, and bipolar.

2 I've not seen any documentation for any of these,

3 though.

4 COUNSEL 2: Did Morgan ever become physically

5 violent with you during the time you were together?

6 MR. WINTERS: Yes. There were seven or eight

7 different times throughout our relationship that she

8 did get violent.

9 COUNSEL 2: And tell us a little bit about

10 what specifically happened.

11 MR. WINTERS: It was different -- on different

12 times the -- most of the time she would just slap me in

13 the face. Sometimes she would say something.

14 It was always when she was under the -- under

15 the influence of something, usually alcohol. I did see

16 her take pills at times, no idea what they were. She

17 wouldn't talk about it her own or tell me what it was.

18 But for instance, the first time was mid-

19 October, when we first got back together after we had

20 broken up. The first time. She just walked by and

21 slapped me in the face.

22 And I said, "What was that?" And she just

69

1 giggled to herself as she walked away. The second time
2 was a few weeks later. She walked up, stopped, slapped
3 me in the face, and then I looked at her, she just
4 called me a faggot and then walked away.
5      That sort of thing happened. Sometimes she'd
6 say something, sometimes she wouldn't. It would --
7 pretty much always when she was inebriated.
8      There was one time we came back from New
9 Year's Eve. We went back to my -- or New Year -- New
10 Year's party we went back to my apartment, and she
11 grabbed me by the hair.
12      She was very drunk, and she wouldn't let go.
13 It was just really weird stuff like that. The last time
14 was February 8th. We went out for her birthday to
15 Boxcar with some of her friends. She drank profusely at
16 her apartment around all of her friends. They saw it.
17      She went out, continued to drink at Boxcar,
18 got back to -- her and I went back to her apartment
19 alone. She continued to drink there and she struck me.
20 She used hate speech again.
21      When I went into the restroom to sort of --
22 neither one of us was sober, so I wasn't going

70

1 anywhere. So I went into the bathroom, hopefully --
2 closed the door behind me.
3      Hopefully it would de-escalate the situation.
4 When I came out a few minutes later, she was standing
5 there with a kitchen knife. She wasn't coming at me,
6 but she was sort of waving it around.
7      Saying things about not coming between her and
8 her friends. She was clearly not mentally well. That --
9      COUNSEL 2: [inaudible]?
10      MR. WINTERS: This was at her apartment that
11 night. The next morning we had a talk and I demanded
12 that she either attend AA or rehab if we're going to
13 continue seeing each other now.
14      COUNSEL 2: Now, Ms. Pasewicz has now alleged
15 the first time in her testimony that you forced
16 yourself on her sexually while she was unconscious. Did
17 that ever happen?
18      MR. WINTERS: Absolutely not.
19      COUNSEL 2: Would it be fair to say when --
20 when you were sexually intimate with her, was there a
21 physical component? I mean, a more aggressive sort of
22 physical component outside of sort of traditional

71

1 sexual relations that -- that would occur when you were
2 having sex with Ms. Pasewicz?
3      MR. WINTERS: Yes. We had a very colorful sex
4 life, I would say.
5      COUNSEL 2: And were there times when you
6 checked in with her to confirm that everything was 100%
7 consensual when she [inaudible]?
8      MR. WINTERS: Yes. Yeah. For the record, the
9 things that she claims, as far as me striking her and
10 choking her, those absolutely did happen during sex.
11 And they were specifically requested by the plaintiff.
12      She would yell it during sex. She would say,
13 "Spit in my mouth, slap me, choke me, harder." She said
14 these things regularly.
15      There were two specific instances. Once there
16 was a few weeks into our dating relationship and then
17 once there's a few -- a few months later that I
18 specifically walked up to her when we were both sober
19 and clothed, and I asked her, "Is everything we do --
20 are you comfortable?
21      Like, is there anything that makes you
22 uncomfortable? Anything that hurts you? Anything you

72

1 don't want to do? Because you can tell me. It's not a
2 big deal."
3      And both times she looked me in the eye, she
4 smiled and said, "I love everything you do to me." She
5 said exactly that both times.
6      COUNSEL 2: Okay. Now, Morgan says in her
7 complaint that she wanted no further contact with you
8 after the breakup either February 9th, February 10th.
9 I'm going to jump ahead to February 13th because I
10 think that date was thrown out there. Did you see her
11 again after February 13th?
12      MR. WINTERS: Yes. February -- February 13th
13 for the record, she came to my apartment. I didn't go
14 to hers when we kind of broke up. February 22nd, she
15 invited me to her apartment.
16      I was at the gym. I have the gym -- the
17 records of where I was at the gym are actually over
18 there. We were texting back and forth. I had said
19 something to the effect of, "I'd like to meet up with
20 you, get drinks or something and talk."
21      She said, "Sure. Just come over to my
22 apartment." So I left the gym. I went to her apartment.

73

1    COUNSEL 2:  And then what happened? Did you
2  have sex with her that night?
3    MR. WINTERS:  Yes. We hung out and talked for
4  about 30 or 45 minutes, and then we had sex twice. At
5  that point, I ended up leaving, and the phone call that
6  you have from 22nd February for eight minutes is when
7  she called me after I got home.
8    I don't remember exactly what was said, but we
9  did discuss giving the relationship another shot, and
10 she said she needed a little bit of space to think
11 about it.
12   COUNSEL 2:  One jump ahead to this March 8th
13 night. Can you walk us through what happened that
14 night?
15   MR. WINTERS:  So that was just a phone call.
16 We had been texting back and forth.
17   COUNSEL 2:  [inaudible] I'm sorry. I said -- I
18 have it labeled March 8th 9th night out, but I'm
19 referencing March 12th. So it was --
20   MR. WINTERS:  Oh, yes.
21   COUNSEL 2:  -- March 8th, and then there was
22 March 12th. You can just walk us through those two

74

1  days.
2    MR. WINTERS:  March 8th, we were talking the
3  entire day via text message. And then I had said, "I
4  would like to talk to you on the phone when I get home
5  from work today."
6    She said, "Sure, call me when you get home."
7  So that's what I did. She claims that I'm blocked, but
8  you can clearly see where she saw -- I called, she
9  didn't answer and she immediately, within that minute,
10 called me back.
11   We spoke for 41 minutes. We essentially
12 decided to -- to get back together and potentially give
13 the relationship another try. We had decided to meet up
14 March 12th for drinks to see how we were feeling,
15 because we hadn't really spent time in person in a
16 while.
17   Did you want me to go through that entire
18 night?
19   COUNSEL 2:  No, I think it's -- I just want to
20 touch on it. You were with her, and then what happened
21 at the end of the night?
22   MR. WINTERS:  Oh, she drank far more than I

75

1  thought. I did not realize she had drank as much as she
2  had. She got pretty belligerent. The original plan once
3  we had met up is that we were going to spend the night
4  together.
5    She drank far more than I thought she had. She
6  got pretty drunk and belligerent out of nowhere, so I
7  decided to just take her home and call it a night. On
8  the ride home, she got very aggressive and started
9  telling me about the new guy she's been seeing. This
10 Mikey, Michael Chambers.
11   She told me that if he saw me in public, he
12 was going to, quote, "Kick my ass" and that -- and then
13 she started screaming, "Mikey is going to fucking kill
14 you" over and over again while throwing her body around
15 the passenger side of my seat or my car.
16   There's only a 10 minute ride to get her home,
17 so I just dropped her off at her apartment and got out
18 of there as quickly as I could that night. Around 10
19 p.m..
20   COUNSEL 2:  I want to jump to a different
21 subject. I want to ask you -- she makes a reference in
22 her complaint about her -- about you showing her a

76

1  Glock. Do you recall that -- that she – she made that
2  allegation?
3    MR. WINTERS:  She specifically says Glock
4  three different times, yes.
5    COUNSEL 2:  And have you ever owned a Glock?
6    MR. WINTERS:  I have never owned a Glock.
7    COUNSEL 2:  And did you ever have a gun in
8  your possession in the time you were with Morgan?
9    MR. WINTERS:  I have owned one gun my entire
10 life. It's -- has not been in my possession. When I got
11 out of the Army in January 2020, I left it at a
12 friend's house. He happens to be here today.
13   It has been in his sole possession for four
14 and a half years, 40 minutes away from my apartment.
15 Not in my apartment where that says it is.
16   I've also got tax history with the Wake County
17 Sheriff's Department coordinating to go to his house to
18 pick up said weapon, but it is a Smith & Wesson --
19 Smith & Wesson nine millimeter.
20   It looks nothing like a Glock, it can't be
21 confused for a Glock, and I have far too much training,
22 specifically in weapon systems, to ever call a weapon a

**77**

1   Glock, unless it actually were a Glock.
2       COUNSEL 2:  And when you say you have text
3   message with the sheriff's department to pick it up,
4   that's after she filed a complaint, right?
5       MR. WINTERS:  Yes. It was whatever day I was
6   served with the restraining order.
7       COUNSEL 2:  And you let law enforcement know
8   that there was a gun at this other location --
9       MR. WINTERS:  Yes.
10      COUNSEL 2:  -- 45 minutes from your home, and
11  gave them the information they needed to or coordinated
12  how to pick it up?
13      MR. WINTERS:  Yes, I did.
14      COUNSEL 2:  But that gun and no other – at no
15  point through the duration of your relationship with
16  Morgan did you ever have a gun in your possession?
17      MR. WINTERS:  No.
18      COUNSEL 2:  Never showed her a gun?
19      MR. WINTERS:  No.
20      COUNSEL 2:  And there was never a gun in your
21  apartment?
22      MR. WINTERS:  Never, no.

**78**

1       COUNSEL 2:  Would it be fair to say that's
2   just an outright fabrication?
3       MR. WINTERS:  It is an absolute fabrication.
4       COUNSEL 2:  Now, can you just tell us. We saw
5   this photo that's in evidence. Can you just tell us a
6   little bit about what you understand about that photo,
7   and how someone would come into possession of that
8   photo?
9       MR. WINTERS:  Well, the military one?
10      COUNSEL 2:  Correct.
11      MR. WINTERS:  Someone intentionally and
12  illegally took a picture of a government -- federal
13  government system that was not done through proper
14  channels. I know how the proper channels operate.
15      That is not it. That person intentionally and
16  willingly -- willingly violated the Uniform Code of
17  Military Justice to pull that from a PAO server. She
18  also told me that she has various other military
19  records, but refused to disclose what they were.
20      You can clearly see where someone took a
21  picture of that computer, and that computer clearly has
22  a bar across. It says, "For official use only." That is

**79**

1   a clear violation of infosec and the UCMJ.
2       COUNSEL 2:  Were there times when you asked
3   Morgan to leave you alone?
4       MR. WINTERS:  Quite a few times, yes.
5       COUNSEL 2:  Do you recall on March 18th you
6   asked her to block you and leave you alone?
7       MR. WINTERS:  I began asking her when to leave
8   me alone or to leave me alone on March 13th, but I
9   would assume I did also on March 18th.
10      COUNSEL 2:  Did she in fact leave you alone
11  after that?
12      MR. WINTERS:  Absolutely not.
13      COUNSEL 2:  When was the last time you had any
14  contact at all with Morgan?
15      MR. WINTERS:  Between the two of us would have
16  been April 23rd, unless we're counting this.
17      COUNSEL 2:  Not counting court, but --
18      MR. WINTERS:  April 23rd.
19      COUNSEL 2:  -- [inaudible] last text message,
20  any communication at all?
21      MR. WINTERS:  23rd April. Yes.
22      COUNSEL 2:  And if anyone were able to get all

**80**

1   text messages in the universe, they would show that
2   there was no further contact of any kind in any shape
3   or form through April 23rd?
4       MR. WINTERS:  No messages, no phone calls, no
5   likes, no follow requests, no nothing. I -- on April
6   23rd, I blocked her number and I deleted her completely
7   out of my phone.
8       COUNSEL 2:  Why did you file your complaint in
9   this case?
10      MR. WINTERS:  When I was originally served
11  with the report that she had filed, and I read through
12  the -- I don't know a nice way to say it, but the
13  allegations, I was incredibly upset and offended, and
14  felt the need to come in here and defend myself, as
15  well as set the record straight and bring to light the
16  things that she has done and the things that she has
17  said. I fear that without this, she's not going to
18  stop.
19      COUNSEL 2:  And when you say that you were --
20  you were offended and I think shocked, tell us a little
21  bit more. Why in particular -- just so it's on the
22  record, why were you offended by the allegations that

**81**

1   she made the complaint?

2       MR. WINTERS: Because I'm not that person. I -

3   - during our time together, I absolutely adored the

4   plaintiff.

5       Absolutely. I never harmed her in any way

6   whatsoever. I never would have considered it. So to see

7   her tell -- saying these things in front of other

8   people, it's -- it's deeply upsetting.

9       COUNSEL 2: And just to be clear, it's

10  upsetting because it's false, right?

11      MR. WINTERS: Yes, absolutely.

12      COUNSEL 2: And you were offended by the

13  complaint because the allegations she made were untrue,

14  correct?

15      MR. WINTERS: Absolutely. Grossly.

16      COUNSEL 2: And when -- at the sort of end of

17  this, the relationship, and then this -- this sort of

18  slow motion breakup in the months that followed, would

19  it be fair to say that after you repeatedly asked her

20  to stop contacting you, and then you received this

21  military photo from some classified source, and then

22  she told -- told you that she had contacted or said

**82**

1   something indicating that she had contacted your ex-

2   wife, and then followed by a long list of false

3   allegations against you in a sworn complaint, would it

4   be fair to say that all of that together caused you to

5   be in fear of continued harassment, or potentially

6   worse?

7       MR. WINTERS: Absolutely.

8       COUNSEL 2: Let me ask you this. Has anything

9   changed about your -- your daily life, your -- your

10  mental health status, your routines, your day-to-day

11  life since Ms. Pasewicz past week has filed these false

12  allegations against you?

13      MR. WINTERS: I mean, some of it was before

14  the false allegations, some of it was afterwards. I

15  moved in April so she wouldn't know where I live. I've

16  lost 35 pounds as a result of the abuse sustained both

17  during and after the relationship. Since this -- these

18  false allegations come out, I've been -- I have a new

19  nervous tic.

20      I -- I log my GPS every 15 minutes because I'm

21  constantly looking over my shoulder, waiting for the

22  police to show up, ready to arrest me because there's

**83**

1   new false allegations.

2       Like -- I had to enroll in mental health in

3   February to deal with this. I'm now in intensive

4   therapy and medication as a result of my experience

5   with the plaintiff.

6       COUNSEL 2: Do you believe that a court order

7   is necessary to stop her from continuing to harass you?

8       MR. WINTERS: Absolutely. Now that she's filed

9   this? Absolutely. I don't -- I don't see it ending

10  unless there's something in place to make it end.

11      COUNSEL 2: I don't have any more questions.

12  Thank you.

13      THE COURT: It's time for a [inaudible]. You

14  have 30 [inaudible].

15      COUNSEL 1: You testified that you were

16  trained in Special [inaudible], correct?

17      MR. WINTERS: That you'd have to be more

18  specific.

19      COUNSEL 1: As part of your Special Forces

20  training, did you at any point receive training on how

21  to respond to interrogation or capture?

22      MR. WINTERS: I have.

**84**

1       COUNSEL 1: As part of that training, did they

2   teach you how to misrepresent things to the enemy?

3       MR. WINTERS: I don't believe so.

4       COUNSEL 1: You weren't trained that there

5   were certain ways to say things to make them more

6   believable?

7       MR. WINTERS: I don't specifically recall that

8   part of the training, no.

9       COUNSEL 1: Is it called [inaudible] training?

10  Is that what it's called?

11      MR. WINTERS: That is a school, yes.

12      COUNSEL 1: Did you go to that school?

13      MR. WINTERS: That one? I went to one of the

14  versions. There's like six different versions of that

15  school I went to one of them.

16      COUNSEL 1: Okay. And one of those you're

17  trained on how to react to situations where you're

18  captured and being interrogated, correct?

19      MR. WINTERS: Yeah. It's just generally a

20  prisoner of war school.

21      COUNSEL 1: You contacted her school in an

22  effort to try to get her in trouble. Is that correct?

85

1      MR. WINTERS:  That's not how I would word it,
2  no.
3      COUNSEL 1:  But you did contact your school,
4  right?
5      MR. WINTERS:  Yes I did.
6      COUNSEL 1:  Okay. What was the purpose of
7  doing that?
8      MR. WINTERS:  On April 5th, while I was on a
9  date, the plaintiff, out of the blue, after over a week
10  of no contact, contacted me in an attempt to get me,
11  quote, "Riled up so she could," quote, "get me put
12  away."
13      It's the long string of rage. At some point,
14  to get -- she wouldn't stop. It's -- I didn't respond
15  to her, she just kept going. At one point, she called
16  me a faggot. And at one point she told me she hopes
17  that, "I watched my children die in front of me."
18      She said a lot of other things I don't
19  specifically remember. But I repeatedly asked her
20  during this conversation to go away again, and she did
21  not.
22      Oh, she also kept telling me to come over to

86

1  her apartment and get her. I don't know, I'm not sure
2  what that was about. Obviously I did not. But --
3      COUNSEL 1:  [inaudible].
4      MR. WINTERS:  During that conversation, she
5  was not -- she got very aggressive and she wouldn't
6  stop.
7      When she called me a faggot, knowing very well
8  that after numerous conversations that I am a bisexual
9  male and that does constitute hate speech.
10      If you check her university website, they do
11  specifically ask that members of the public contact
12  them should any of their members of their community act
13  in a way that's -- doesn't portray the university
14  values.
15      I feel like that did not portray their values,
16  I forwarded it to them. I was hoping in some way would
17  get her to leave me alone.
18      COUNSEL 1:  So it's fair to say that you were
19  insulting her repeatedly over this period of time where
20  you guys were gradually making [inaudible], correct?
21      MR. WINTERS:  I was -- I'm sorry, what's the
22  question?

87

1      COUNSEL 1:  Repeatedly insulted her, correct?
2  You're talking about your being insulted right now?
3      MR. WINTERS:  Yes, we – we --
4      COUNSEL 1:  [inaudible] just heard something -
5  -
6      MR. WINTERS:  Oh, we absolutely insulted each
7  other throughout that entire post relationship period.
8      COUNSEL 1:  And you repeatedly told her, "Fuck
9  you", correct?
10      MR. WINTERS:  You have to show me the context
11  for that.
12      COUNSEL 1:  You just texted the phrase, "Fuck
13  you" to her, like, over 50 times [inaudible].
14      MR. WINTERS:  Oh, yes.
15      COUNSEL 1:  Okay. You also repeatedly texted,
16  "I love you", correct?
17      MR. WINTERS:  Depends on when we're talking
18  about, but it did happen, yes.
19      COUNSEL 1:  You remember calling her a,
20  "spoiled trust fund slut." Correct?
21      MR. WINTERS:  I said something to that effect,
22  yes.

88

1      COUNSEL 1:  You said, "You deserve the rape",
2  correct?
3      MR. WINTERS:  I don't specifically remember
4  what was said, but it was to that effect, yes.
5      COUNSEL 1:  , "You deserve to [inaudible]",
6  correct?
7      MR. WINTERS:  Again, something to that extent
8  was said yes.
9      COUNSEL 1:  And you're saying that to her? Am
10  I right about that?
11      MR. WINTERS:  Oh, yes. I was in a moment of
12  mental weakness. I was responding to the things that
13  she had said. I'm not proud of what I've said. That's
14  why I asked her to block me in the first place.
15      COUNSEL 1:  You also took it upon yourself to
16  figure out who her new boyfriend was, correct?
17      MR. WINTERS:  No. She told me.
18      COUNSEL 1:  You went on social media and
19  looked and that's how you found out?
20      MR. WINTERS:  No. She told me his name was
21  Mikey Chambers when she was flipping out on March 12th.
22      COUNSEL 1:  And you texted her, "I'm going to

89

1  look Mikey up now. I'm curious what this motherfucker
2  looks like," correct?
3      MR. WINTERS: I was curious what he looked
4  like, yes.
5      COUNSEL 1: Well, speaking of hate speech, at
6  one point you called her a retard, correct?
7      MR. WINTERS: I don't remember that. At all.
8      COUNSEL 1: Did you just call your retard when
9  you said something along those lines, correct?
10     MR. WINTERS: I don't remember that specific
11 line at all.
12     COUNSEL 1: [inaudible], "I'm sorry you -- I'm
13 sorry I was a terrible boyfriend", right?
14     MR. WINTERS: I – yeah. She did gaslight me to
15 the point that I thought I was the one that was wrong
16 during the things that went down. But, yeah, I did
17 apologize a few times for my perceived wrongdoings.
18     COUNSEL 1: You objectified her by saying,
19 "Your only redeeming qualities or looks", correct?
20     MR. WINTERS: I don't recall that line.
21     COUNSEL 1: You wouldn't be surprised if you
22 said something like that, though, correct?

90

1      MR. WINTERS: It could have happened.
2      COUNSEL 1: You agree that you did discuss
3  suicide with her on multiple occasions, correct?
4      MR. WINTERS: That never happened. That's a
5  complete fabrication.
6      COUNSEL 1: Did you send her a text message
7  that says there was talk of suicide and scare you,
8  correct?
9      MR. WINTERS: We talked about suicide. No
10 threats were ever made or alluded to in any way at all.
11     COUNSEL 1: You testified that at one point
12 she had a knife. I guess that was a [inaudible]. Is
13 that correct?
14     MR. WINTERS: No, that was February 8th. It
15 was her birthday.
16     COUNSEL 1: February 8th. So you would also --
17 that's not the first time that you're alleging that a
18 woman had a knife pulled on you, correct? Is it true
19 you told her that your ex-wife pulled a knife?
20     MR. WINTERS: No, I've never said that, and my
21 ex-wife did not pull a weapon on me at any point.
22     COUNSEL 1: On New Year's Eve, you're

91

1  testifying about how impaired she was, correct? Is it
2  true that you kicked a door down on New Year's Eve,
3  right?
4      MR. WINTERS: Yes. It wasn't a moment of anger
5  in any way. We got home. We Ubered from my place to a
6  party. She left the keys in her vehicle – or no, we
7  drove to it I believe in her vehicle.
8      We Ubered back. It was a good 30, 40 minute
9  drive. By the time we got back, it was 2:30 in the
10 morning. It was cold and there were no keys to be
11 found. I didn't feel like Ubering and I happen to have
12 extra locks.
13     I'm a landlord. I know how to replace doors
14 and locks. It seemed the most convenient thing to do
15 was to just force my way in and replace the lock in the
16 morning, and that's exactly what happened.
17     COUNSEL 1: Okay. We looked into details about
18 who her [inaudible] Twitter and Instagram?
19     MR. WINTERS: No not really.
20     COUNSEL 1: Did you send messages that --
21 saying that [inaudible] hooked you up with an
22 adulterer?

92

1      MR. WINTERS: Yes, she told me about that on
2  March 12th when she was drunk.
3      COUNSEL 1: Did you also send a message that
4  said, "He's getting a divorce because he cheated on her
5  and when you [inaudible] that right"?
6      MR. WINTERS: I don't specifically recall. We
7  had a conversation about that. I don't remember the
8  exact text messages.
9      COUNSEL 1: Does it make sense for you to be
10 texting her, informing her of these things that she you
11 need to [inaudible], correct?
12     MR. WINTERS: Which part?
13     COUNSEL 1: Either one. [inaudible] doesn't
14 make sense if it's something that she told you, but
15 it's fine. So it's your testimony that since you got
16 out of the military, you haven't had a firearm in your
17 residence?
18     MR. WINTERS: I have not. Well, I lived with
19 Rudolf Dodan back there for a year to a year and a
20 half. And during that time, the weapon was in that
21 house. When I moved out, the weapon stayed there.
22     COUNSEL 1: Any particular reason why?

93

1    MR. WINTERS:  I'm not a gun person.  I couldn't
2  care less about it.  It's a ratty old junk weapon that I
3  shoot cans with once every five years.
4    COUNSEL 1:  Thank you, sir.  No further
5  questions.
6    THE COURT:  So officially, you're out of time.
7  Would you like to save your last two minutes for
8  closing, or would you like to use them?
9    COUNSEL 2:  I could use 30 seconds on
10  redirect.
11    THE COURT:  Okay.
12    COUNSEL 2:  Showing both counsel [inaudible],
13  I believe we were at exhibit 10.  Here's defendant's
14  exhibit 11.  In two page that is not included.  We
15  anticipate.  You can dig that up.
16    But these are [inaudible].  Right.  [inaudible].
17  If I may.  Sir, you referenced some text messages on
18  April 5th in which Ms. Pasewicz called you a faggot,
19  and said that you're -- if you have -- that she hopes
20  you have children, that they die in front of you.
21    MR. WINTERS:  Yes.
22    COUNSEL 2:  Are these -- pages one and two of

94

1  defendant's exhibit 11, are those fair and accurate
2  representations of those text messages that she sent
3  and you exchanged with her on April 5th?
4    MR. WINTERS:  Yes they are.
5    COUNSEL 2:  Thank you.  No further questions.
6    THE COURT:  [inaudible] you go back to
7  [inaudible].  [inaudible] the hard copy exhibit?
8    COUNSEL 2:  Yes.  I wonder if I could trouble
9  [inaudible] resisting that.  I've got two that are two
10  pages.  Thank you.  Thank you.
11    THE COURT:  [inaudible]?
12    COUNSEL 1:  Yes [inaudible] call my client to
13  the stand again.
14    THE COURT:  And remind you that you're still
15  under oath.
16    COUNSEL 1:  [inaudible].  How old are you?
17    MS. PASEWICZ:  I'm 22.  I was 21 when I started
18  dating Mr. Winters.
19    COUNSEL 1:  [inaudible]?
20    MS. PASEWICZ:  36.
21    COUNSEL 1:  How did that age gap [inaudible]
22  the power, dynamic [inaudible] relationship?

95

1    MS. PASEWICZ:  If I'm going to be really
2  honest, it was very much like a abusive father daughter
3  type thing.  He would reference me as kiddo and stuff
4  like that.
5    COUNSEL 1:  Do you have an opportunity to
6  briefly look at the text messages that Mr. Winters has
7  in evidence, correct?
8    MS. PASEWICZ:  Yes, sir.
9    COUNSEL 1:  Okay.  To what extent that that is
10  just a snapshot of those conversations over that period
11  of time?
12    MS. PASEWICZ:  They really are.  It's -- it's -
13  - a lot of those ones with me replying is to the point
14  where he just kept berating me that -- of course, I
15  said some really awful shit to him.
16    Like, I did.  Like, and I'm not proud of that,
17  and a lot of the times I'm apologizing later on because
18  he makes me feel guilty about it throughout the
19  conversation.
20    COUNSEL 1:  How much of the general back and
21  forth of text messages is him just sending a bunch of
22  text, and then [inaudible]?

96

1    MS. PASEWICZ:  The majority is that.  Yeah.
2    COUNSEL 1:  When you see that snapshot, is
3  that that little piece where he finally --
4    MS. PASEWICZ:  He finally gets to me.  Yeah.
5    COUNSEL 1:  How do you feel emotionally when
6  you lash out like that?
7    MS. PASEWICZ:  I feel guilty about it because
8  I don't -- I don't want to insult people.  I'm not a
9  very angry person.
10    I'm generally a very positive person, so I --
11  I don't like to insult people.  But when people start
12  bringing up my previous sexual assaults, and rapes, and
13  very traumatic things, it's -- it's hurtful.
14    COUNSEL 1:  Were you aware prior to today that
15  Mr. Winters is bisexual?
16    MS. PASEWICZ:  No.  In fact, he -- he was
17  pretty homophobic during our entire time of dating.  I'm
18  very surprised that he's bisexual.
19    He -- he would joke and say that he wished
20  that he could choose men, but I never knew that he was
21  bisexual.
22    COUNSEL 1:  Did you ever use any slurs?

97

1    MS. PASEWICZ: I mean, no, not knowing. No.
2  And he used plenty of slurs about me knowing full well
3  that I am bisexual, and that I've had female partners.
4    He would call me a faggot, he would -- a lot
5  of the times he would demean female relationships,
6  which he would -- he would just be like -- he would ask
7  me if I wanted to pick up a girl that night and he
8  could watch us have sex.
9    And I told him vehemently that I'm -- I'm one
10 person only, and I think that that's diminishing a
11 sexual relation – like, that's diminishing the
12 relationship that women have with each other.
13   COUNSEL 1: You heard him testify about your
14 slapping him, correct?
15   MS. PASEWICZ: Yeah.
16   COUNSEL 1: And how often do you drink?
17   MS. PASEWICZ: Not very often. Maybe once a
18 week?
19   COUNSEL 1: How often do you black out?
20   MS. PASEWICZ: Almost never. I've --
21   COUNSEL 1: [inaudible] during your
22 relationship?

98

1    MS. PASEWICZ: Not during our relationship,
2  no. I think I've blacked out twice in my whole life.
3    COUNSEL 1: Is it possible that any of these
4  alleged assaults happened while you were blackout
5  drunk?
6    MS. PASEWICZ: No.
7    COUNSEL 1: Would he get blacked out from
8  drinking?
9    MS. PASEWICZ: He would -- he would drink very
10 often during our relationship. He would get a -- I
11 think a 12 pack of Bud Light. Drink it in one night. He
12 would often drink while driving too.
13   He called them road sodas. And he would get
14 very much more violent when he's drinking.
15   COUNSEL 1: Were you on any [inaudible]
16 substances that would have prevent you from remembering
17 any of these things?
18   MS. PASEWICZ: No.
19   COUNSEL 1: Did he tell you that his ex-wife
20 threatened him?
21   MS. PASEWICZ: Yes he did.
22   COUNSEL 1: He testified that he sat you down

99

1  one time and asked if everything he did to you sexually
2  was okay with you. Do you recall that happening?
3    MS. PASEWICZ: That never happened. Either
4  way, I had repeatedly tell him -- I had to tell him all
5  the time because he would stop doing the abuse, and it
6  would be all fine, and I would feel like the
7  relationship was going up and up, and then he would
8  continue to do it again.
9    COUNSEL 1: He said that you said, "I love
10 everything you do to me." Did you ever say [inaudible]?
11   MS. PASEWICZ: No.
12   COUNSEL 1: Did you say the opposite of that?
13   MS. PASEWICZ: Yes.
14   COUNSEL 1: Did you agree to get back together
15 with him on March 12th?
16   MS. PASEWICZ: No.
17   COUNSEL 1: Did you have sex with him on
18 February 27th?
19   MS. PASEWICZ: No.
20   COUNSEL 1: Do you ever recall telling him
21 that your new boyfriend is going to kill him?
22   MS. PASEWICZ: No.

100

1    COUNSEL 1: Let's talk about the gun now. How
2  do you know that he has in his possession?
3    MS. PASEWICZ: Mr. Winters once showed me his
4  weapon. He showed me where he kept it for safety
5  reasons. Like that -- that makes sense. It was in the -
6  - right next to the stove where the scissors are in the
7  drawer.
8    COUNSEL 1: And it's not illegal to own a
9  firearm. It's --
10   MS. PASEWICZ: No.
11   COUNSEL 1: -- [inaudible] to own a firearm,
12 but why is it important to you knowing that he has a
13 firearm?
14   MS. PASEWICZ: It makes it a little scarier
15 just knowing that he has the weapon to do it. Either
16 way, I don't think it matters because he's -- it --
17 like, he still scares me either way, even if he doesn't
18 have a weapon and he's just coming at me. He does scare
19 me. So, yeah.
20   COUNSEL 1: Does – would you know the
21 difference between a Glock and a Smith and Wesson?
22   MS. PASEWICZ: No.

---

101

1    COUNSEL 1:  He's testified that he's worried
2  that you won't stop unless he gets to the order. Do you
3  want to have any additional contact with [inaudible]?
4    MS. PASEWICZ:  No, I have a boyfriend. I have
5  a very nice, very loving boyfriend who has actually
6  supported me very, very much throughout this process,
7  which he did not have to do.
8    COUNSEL 1:  At any point after you broke up
9  with him, did you suggest that you all might get back
10 together?
11   MS. PASEWICZ:  No. He wanted to. Vehemently,
12 he was like, "I feel like you're giving up on something
13 that's really good. And we had something beautiful."
14   And that was part of the gaslighting too was
15 him just convincing that our relationship was something
16 that it just wasn't.
17   COUNSEL 1:  [inaudible]?
18   MS. PASEWICZ:  No.
19   COUNSEL 1:  [inaudible] he would assault you
20 during sex, that you would have bruises. Is that right?
21   MS. PASEWICZ:  I would have a lot of bruises,
22 yeah.

---

102

1    COUNSEL 1:  Anything else you want to tell the
2  court about why you wanted [inaudible]?
3    MS. PASEWICZ:  The sexual violence -- a lot of
4  the texts are sexually suggestive, or talking about
5  rape, talking about all that. I just -- I -- I can't
6  handle stuff like that.
7    I've already been through my experiences. I
8  don't -- I don't need to -- it would -- it would break
9  me if that ever happened again. And he -- he -- he's
10 clearly like obsessed with that idea.
11   And I just -- I can't -- I -- I'm scared of
12 him. I am. I'm scared that he's going to do something
13 to me.
14   COUNSEL 1:  Thank you very much.
15   THE COURT:  [inaudible].
16   COUNSEL 2:  I'll -- I'll be super brief. You
17 testified that Mr. Winters beat you and caused
18 bruising. There's not a single photograph --
19   MS. PASEWICZ:  I never -- [inaudible] said he
20 didn't beat me. It happened during sex. He would hit
21 me. I guess that could be -- no, there's no
22 photographic proof. No.

---

103

1    COUNSEL 2:  And you said that he drinks and
2  drives. He had to pick you up from the jail when you
3  got arrested for a DWI yourself in November.
4    MS. PASEWICZ:  The DWI was expunged because I
5  had nothing in my system.
6    COUNSEL 2:  I'll -- I'll defer to the court --
7  I'll ask the court to take judicial notice of the
8  status of the DWI.
9    You said that it was a father daughter type
10 relationship. [inaudible] your father a faggot and a
11 pussy, and tell him that you hope that his children
12 died in front of him?
13   MS. PASEWICZ:  I got frustrated after us
14 texting back and forth, and I did say those things. He
15 said a lot worse to me too.
16   COUNSEL 2:  So Morgan, your DWI blood results
17 came back with no alcohol or controlled substances in
18 your system.
19   MS. PASEWICZ:  Yes, sir.
20   COUNSEL 2:  And the case is not yet expunged,
21 but --
22   MS. PASEWICZ:  It's in the process.

---

104

1    COUNSEL 2:  -- the DA's office is imminently
2  going to dismiss it, is that correct?
3    MS. PASEWICZ:  Yes.
4    COUNSEL 2:  No further questions, Judge.
5    THE COURT:  [inaudible] are we ready to move
6  towards [inaudible]?
7    COUNSEL 2:  Yes, Your Honor, and I will just -
8  - I will put it out there. I know that I'm over time.
9  I'd be happy to extend any time Mr. Detweiler might
10 require. I'd just like  --I'd like to have the
11 opportunity to be heard briefly. And I'll do my best to
12 be extremely efficient. But I just would like to
13 [inaudible].
14   THE COURT:  [inaudible] two minutes, and
15 [inaudible] on -- put on evidence. You will be the last
16 to present [inaudible].
17   COUNSEL 1:  [inaudible]. This is a
18 relationship between a 36 year old and a 21 year old,
19 where she suffered assaults that had been committed
20 injury, and that's happened very clearly based on her
21 testimony.
22   And that's really all you need to give people

105

1 [inaudible]. So we could just stop there, but I think
2 that the more complicated and a better case here is
3 that she's the victim of stalking, and continued
4 harassment.
5 And we look in the context of everything
6 that's happened over the course of their relationships,
7 the things that he said, but more importantly, what's
8 happening after the relationship.
9 The volume of text messages that's been
10 testified to uncontradicted, the nature of the text
11 messages, her blocking him or asking him not to have
12 contact with her, and then sending these types of
13 insults, gaslighting her, and just generally insulting
14 her, that's going to rise to the level of stalking all
15 day long. So there's two separate bases here for her to
16 get her DVD.
17 But when you look specifically at some of the
18 statements that have been said, "I -- I hope that you
19 get raped." Because, you know, I -- it's just -- it
20 doesn't get much worse than that when you know that
21 someone's been victim of a sexual assault.
22 And there's no legitimate purpose for this.

106

1 They're not going to say, "Oh, you know, well, we are
2 reaching out because we got kids in common, and that's
3 why there was this repeated contact. We were arguing
4 about, you know, parenting the kids. There was a
5 legitimate reason." There's absolutely no legitimate
6 purpose for this volume and this nature of messages.
7 And when we look at one of the elements, which
8 is going to be digging intend to inflict substantial
9 emotional distress, I asked him point blank, "Did you
10 say that to hurt her?"
11 And he said, "Yes I did." He's not proud of
12 it. but that doesn't excuse it. So her suffering
13 substantial emotional distress is clear. She's
14 testified about what she's gone through since the
15 breakup.
16 She's had had increased therapy. She's having
17 trouble sleeping, she's having trouble eating. That's
18 substantial emotional distress. That's where -- the
19 contract is not for legitimate business. He intended
20 for it to inflict substantial emotional distress.
21 And I would say that it's not difficult for us
22 all to agree that if you're saying things along the

107

1 lines of calling somebody a retard or a stupid slut, or
2 that you're, you know, glad that they got raped, like
3 all of that, any reasonable person is going to suffer
4 substantial emotional distress as a result of the
5 volume and the nature of these insults. So all the
6 elements are meant for stalking.
7 And there's a lot of stuff in this case where
8 I think it's fair to say that the evidence is
9 contradictory. And Your Honor might be saying, "Well,
10 I'm not exactly sure what happened on this date or on
11 that date."
12 But the things that we can be clear about are
13 the messages that are sent, the volume of the message,
14 and the messages, and the nature of the messages. That
15 constitutes stalking.
16 No person should have to go through that. No
17 person should suffer through those types of messages
18 being sent. And there's no excuse that, "Oh, well, if
19 she said some mean things too."
20 But when Your Honor has from, you know, Mr.
21 Winters' side is going to be like little pieces of what
22 amounts to numerous messages over the course of, you

108

1 know, an extended period of time.
2 So they're going through. They're cherry
3 picking the little pieces where she finally reacted.
4 And she's blocking him and saying, "I can't take this
5 anymore."
6 And then she's sitting there thinking to
7 herself, "I wonder what he's saying. I wonder if he's
8 texting me, saying that he's going to show up at my
9 house and he's going to do something to my new
10 boyfriend."
11 Let her unblock him just to see what's going
12 on. And that's really not something that anyone should
13 ever have to make a decision about. "Am I going to
14 block somebody so that I don't have to go through this
15 type of abuse, or am I going to unblock them so they
16 don't have to deal with the uncertainty on what's being
17 said to me?" Putting a person in that situation is
18 absolutely domestic violence.
19 And so she's blocking him at times. Who knows
20 what he said when she had him blocked? We don't know.
21 He's blocked. And they're certainly not going to
22 present the full picture.

109

1    Even some of the images that you'll get of
2 their text messages, it's not a full screenshot. It's
3 like cropped. We don't see what's above or below it. So
4 we talk about the Rule of Completeness gap.
5    We had some technical difficulties in our text
6 messages. We had technical difficulties getting in this
7 stack of text messages.
8    But it's better for me to try to put in
9 everything that we've got, even if we have, you know,
10 not the ability due to technical issues, getting her
11 messages in, than to cherry pick a few little pieces
12 over the course of a month plus.
13    Of course a person is going to react like
14 that. What they've been told, the terrible things that
15 she has been told over the course of this exchange. And
16 the fact that they met up to get closure doesn't excuse
17 these insults either.
18    She even testified the only reason that she
19 did that was to try to get him to stop, to try to make
20 sure that nothing happened to her. Again, a position
21 that no person should have to be in.
22    Where you're saying, "I don't want to see this

110

1 person anymore, and they're saying really terrible
2 things to me, but I'm afraid they're going to do
3 something to me.
4    So maybe I should meet up with him to try to
5 smooth it over." That is a decision that a victim of
6 domestic violence would make. It's not a decision that
7 people make during the course of their regular lives.
8    She [inaudible] put in a terrible position,
9 and just because she agrees to do that, doesn't mean
10 that everything that [inaudible] said is done to her is
11 excused. She's making difficult decisions about whether
12 she should block him or not block him, whether she
13 should have contact with him or not.
14    And eventually, it's reasonable to react to
15 these types of insults and say some of the things that
16 she said. Okay?
17    So I don't think that there really is any
18 question, I hope I'm right about this, that she's the
19 victim of an act of domestic violence, of multiple acts
20 of domestic violence.
21    She needs her order, and she deserves an
22 order. So I'm going to turn my attention now to whether

111

1 or not Mr. Winters needs or deserves an order.
2    I would contend that there's just no proof
3 that she assaulted him. Or the only proof they have is
4 his testimony, and her testimony is that it didn't
5 happen. So it's contradictory here.
6    And when it comes to his current job, when it
7 comes to his experience in the military, there's no
8 doubt that a DVPO would have a significant effect on
9 him [inaudible], and I understand that.
10    I'm sensitive to that because I'm usually
11 representing the defendant, whether it's in this
12 courtroom, or across the street. I know about
13 collateral consequences. My point is is that with him
14 having so much to lose, it's not unreasonable to think
15 that his credibility is in question.
16    He has a job on the line, he has a career in -
17 - or a former career in the military that will be
18 tarnished by something like this. He has a lot to lose
19 if he is in a position where a domestic violence
20 protective order is granted against him.
21    What does she have to lose? I mean, she
22 doesn't want to have an DEPO granted against her.

112

1 Nobody does. But it's not like she's got a ton on the
2 line, you know?
3    And [inaudible] she's [inaudible] her way out
4 of getting a DEPO to make sure that she doesn't, you
5 know, ruin her career.
6    So there's a credibility issue here because he
7 has a significant incentive to make sure that there's
8 not an DEPO granted against him.
9    There's credibility issues. admittedly, on
10 both sides when it comes to substance abuse issues. But
11 she doesn't abide by it. I don't –, "I blacked out
12 twice in my life.
13    There's no way [inaudible] that's happening."
14 She testified that he's drinking a 12 pack regularly at
15 night. I didn't hear any testimony from him that, "Oh,
16 no, I wouldn't have, you know --  this isn't me
17 remembering things."
18    And when he does testify about certain things
19 that happened there on nights where they've been out
20 drinking. So there's significant credibility issues
21 with his testimony, with the case that he's making,
22 specifically when it comes to the assaults.

113

1  But here's the thing. It's not an assault. I
2  think it's -- you know, it's an assault inflicting an
3  injury. It doesn't have to be a serious injury. It
4  certainly doesn't have to be a serious bodily injury,
5  but there's got to be some injury there.
6  And there's no testimony from Mr. Winters that
7  he in any way suffered an injury as a result of these
8  alleged slaps.
9  So they don't get their DEPO for assault with
10 an injury. It just has not been proven that assault
11 occurred at all, but certainly that he was injured in
12 any way from this assault.
13 So then we move on to is this stalking? is she
14 doing this for something other than a legitimate
15 purpose? And I would contend that we've heard
16 legitimate purposes from her about the things that she
17 has said.
18 She's been berated, she's been repeatedly
19 contacted, and eventually he breaks her and she says
20 something that she wishes she shouldn't have said.
21 But, you know, a reasonable person in that
22 position after they've received the volume and nature

114

1  of those messages, it's not shocking that she would
2  respond with an insult or two of her own.
3  And she didn't do this specifically attempting
4  to inflict substantial emotional distress on him by the
5  testimony. She did this because she was hoping that
6  this would get him to stop. That she would shame him
7  into not having contact with her anymore.
8  And she's trying different -- different
9  methods, honestly. In some ways she's trying to be nice
10 to him to make him go away. In other ways, she's trying
11 to be mean to make him go away.
12 All of this is her effort to end an abusive
13 relationship. Things that you can't take a little
14 snippet. You can't take this little, you know, cropped
15 screenshot and say, "Well, she said some nasty stuff
16 too, so he should get a DEPO also."
17 You've got to look at the context, you've got
18 to look at whether or not this is done for a legitimate
19 purpose. Whether she did it to intentionally inflict
20 substantial emotional distress, and they just haven't
21 proven that.
22 So there's not an assault inflicting injury,

115

1  there's not stalking here, this behavior is not
2  unreasonable given the circumstances. I mean, some of
3  these attempts that they've made of he contacted -- or
4  she contacted his ex-wife just has not been proven.
5  She said specifically, "I didn't do that." She
6  said -- she said that she mentioned something along
7  those lines to him, again, in an effort to try to get
8  him to stop what he's doing.
9  Then you've got this issue with the military
10 records. Said specifically, "I didn't access those
11 records. It wasn't me who was trying to do this."
12 We can, I think, gather from the different
13 pieces of testimony what happened there. New
14 boyfriend's concern about ex-boyfriend stalker and
15 wants to figure out what he's dealing with on
16 [inaudible] --
17 THE COURT:  [inaudible] just arguing.
18 COUNSEL 1:  [inaudible]. Wants to know if the
19 ex-boyfriend stalker has any issues in the military,
20 asks his buddy to get in there and check it out, and
21 that's how he gets the military records.
22 This isn't her trying to dig up dirt on him.

116

1  How does that even make sense? How does that
2  [inaudible]? Then, once she's given this information,
3  once, you know her new boyfriend presumably says
4  something along the lines of, "Hey, you know, it looks
5  like your ex was lying about, you know, his rank and
6  all that."
7  She gets even more upset after receiving these
8  text messages, last 00 lashes out and says something
9  along the lines of, "Hey, you know, you're lying about
10 you know, your rank and all that." Right?
11 I didn't know who he was or not. Based on what
12 I've heard, I believe him. I totally believe that he
13 achieved that rank.
14 I don't think that there's any sort of valid
15 accusation here from our part, or what I've heard, or
16 from his testimony that would suggest that in any way,
17 he's engaged in stolen valor.
18 That's neither here nor there, really, when it
19 comes to this hearing. Just because he achieved the
20 rank that he said he did, doesn't mean he didn't commit
21 an act of domestic violence against him.
22 It also doesn't mean that just because he has

117

1  a certain rank that he somehow is entitled to a DEPO
2  when they can't prove their case.
3         You know, what they really have here is some
4  disputed assaults that aren't proven [inaudible] that
5  don't have an injury. So it's just not there.
6         And then they've got text messages that are
7  give and take given their little snapshot, and it just
8  does not rise to the level of the DEPO. So Judge with
9  respect to request to the court grants our request for
10 the DEPO and denies Mr. Winters [inaudible].
11        COUNSEL 2:  Your Honor, I think Mr. Detweiler
12 got it close when he said the evidence is
13 contradictory. I think a more accurate statement is
14 that the objective evidence in the case is contradicted
15 by Ms. Pasewicz's sworn testimony, and her sworn
16 complaint.
17        What we found at every single turn is that
18 when an objective claim was made by her, it was
19 disproven by the objective evidence in the case.
20        The central claim that she stated in her sworn
21 statement, her sworn complaint, was that Mr. Winters
22 had been texting her nonstop since February 9th when

118

1  they broke up.
2         And if you read the complaint, it sounds like
3  she's just begging to be left alone. From February 9th
4  on, she's begging to be left alone, and Mr. Winters
5  won't let her be.
6         But what we've learned, she claims she blocked
7  him on February 17th, had no contact until March 13th.
8  What we learned now, is that she invited him into her
9  apartment to have sex with him on February 22nd, then
10 called.
11        We've got her phone call that corroborates
12 that, an eight minute phone call shortly after the fact
13 that evening. Then she meets him for drinks, they had a
14 conversation about it on March 8th, which we know
15 because we've got the phone log. And then they met on
16 March 12th, and we have the actual receipts.
17        At every turn, every claim she made was
18 demonstrably proven to be false. The gun? Another
19 fabrication. Showing up at one of her friends houses?
20 Another fabrication.
21        Your Honor, I would submit that Ms. Pasewicz
22 perjured herself at every turn in this complaint and in

119

1  her testimony today, and it shouldn't be tolerated.
2         They attempted to introduce a bunch of one-
3  sided text messages that didn't reveal the fact that
4  there was an ongoing conversation for months.
5         Your Honor, and when it comes to the DEPO
6  filed by Mr. Winters in this case, he was ready to let
7  this go. There was no more communication from April
8  23rd onward, he had moved on with his life.
9         Two weeks later, Ms. Pasewicz files a
10 complaint against him making a laundry list of false
11 claims against him, which made clear to him that she
12 would not let this go.
13        If you look at the history of the months
14 leading up to it, the only objective evidence is that
15 Mr. Winters asked over and over, "Why are you
16 contacting me? Why are you contacting me?"
17        And she continues to respond, she continues to
18 pile on. She says in a text message to him that she
19 wants to break him, and I would submit that she got
20 pretty close.
21        And the cherry on top was a DEPO complaint
22 littered with perjury and false claims, specifically

120

1  relating to Mr. Winters character and his conduct. And
2  we heard what the -- clearly I think the behavior
3  amounts to stalking.
4         It's stalking, and it's harassment, and it's
5  sort of -- it culminates in this false claim against
6  him, which he testified has caused him to lose sleep.
7  It's caused him to engage in paranoid behavior where
8  he's logging his own GPS whereabouts every 15 minutes.
9         He's had to engage in therapy. His mental
10 health has been absolutely undermined by her stalking,
11 by her harassing, her refusing to leave him alone, and
12 then the collection of false claims directly attacking
13 his character.
14        Your Honor, I think what we've got here is, on
15 one side, every claim made by Ms. Pasewiczhas been
16 undercut by the evidence. Not a single claim by Mr.
17 Winters has been contradicted by any objective
18 evidence.
19        So I think it's clear what we have here, which
20 is a false complaint by one party, and a totally
21 truthful complaint by Mr. Winters, which granted, he
22 did file in response because, as he testified, he

121

1 believed that he needed at that point to defend himself
2 with truth.
3        Your Honor, for all those reasons, I would ask
4 you to dismiss the complaint filed by Ms. Pasewicz
5 against Mr. Winters and grant the complaint filed by
6 Mr. Winters against her. Thank you very much.
7        THE COURT: In matters of Morgan Pasewicz
8 versus Gary Winters [inaudible] to ensure the requested
9 test about the pecking order in matter of Gary Winters
10 versus Morgan Pasewicz file number 24-CV-00924-910
11 [inaudible] enter the requested [inaudible] protective
12 order.
13        The court finds that amid the toxicity and the
14 conceptual awfulness, there was also harassment
15 fighting party together. Each party is ordered not to
16 commit any further acts of domestic violence against
17 the other, and not to have any contact, directly or
18 indirectly.
19        The order will be in place for one year
20 expiring June 23rd, 2025. Each party is ordered to stay
21 at least 100 yards away from the other.
22        Additionally, your order not to assault during

122

1 abuse or harass or interfere with the other person, not
2 to drive a member of the other person's family or
3 household, to stay away from the other person's
4 residence, or even where they received temporary
5 shelter, and to stay away from their job.
6        Neither one of you can give the other
7 permission to violate a court order. In the event that
8 something changes between you, it has to go in
9 [inaudible].
10        COUNSEL 2: Thank you Your Honor. [inaudible].
11        THE COURT: [inaudible].
12
13
14
15
16
17
18
19
20
21
22

123

1        CERTIFICATE OF TRANSCRIBER
2        I, Chris Naaden, a transcriber, hereby declare
3 under penalty of perjury that to the best of my ability
4 from the audio recordings and supporting information;
5 and that I am neither counsel for, related to, nor
6 employed by any of the parties to this case and have no
7 interest, financial or otherwise, in its outcome, the
8 above 122 pages contain a full, true and correct
9 transcription of the tape-recording that I received
10 regarding the event listed on the caption on page 1.
11
12        I further declare that I have no interest in
13 the event of the action.
14
15
16
17        Chris Naaden
18        March 10, 2025
19
20
21 (574794, DVPO Hearing, 6-24-24)
22

| A |
| --- |

**aa**
70:12
**abide**
112:11
**ability**
109:10, 123:3
**able**
79:22
**about**
6:18, 6:21,
8:10, 18:16,
20:15, 22:18,
29:16, 35:14,
40:14, 42:18,
45:5, 47:7,
48:8, 48:21,
50:15, 57:7,
58:13, 58:20,
60:2, 60:14,
61:21, 62:14,
65:19, 65:20,
66:13, 67:15,
67:19, 68:9,
68:17, 70:7,
73:4, 73:11,
75:9, 75:22,
78:6, 82:9,
86:2, 87:2,
87:18, 88:10,
90:9, 91:1,
91:17, 92:1,
92:7, 93:2,
95:18, 96:7,
97:2, 97:13,
100:1, 102:2,
102:4, 102:5,
106:4, 106:14,
107:12, 108:13,
109:4, 110:11,
110:18, 111:12,
112:18, 113:16,
115:14, 116:5,
116:9, 118:14,
121:9
**above**
109:3, 123:8

**absolute**
78:3
**absolutely**
70:18, 71:10,
79:12, 81:3,
81:5, 81:11,
81:15, 82:7,
83:8, 83:9,
87:6, 106:5,
108:18, 120:10
**abuse**
4:4, 82:16,
99:5, 108:15,
112:10, 122:1
**abused**
36:12, 36:14
**abusive**
95:2, 114:12
**access**
115:10
**accessed**
28:6
**accessing**
60:2
**according**
45:20
**accountant**
65:21
**accurate**
9:9, 11:10,
22:15, 24:22,
28:12, 32:21,
34:5, 36:19,
41:17, 43:2,
51:11, 94:1,
117:13
**accurately**
29:12, 62:4
**accusation**
116:15
**accused**
29:3
**achieve**
66:16
**achieved**
67:5, 116:13,
116:19
**across**
78:22, 111:12

**act**
86:12, 110:19,
116:21
**action**
123:13
**active**
29:20, 60:8,
66:5
**acts**
110:19, 121:16
**actual**
39:15, 49:13,
118:16
**actually**
35:20, 38:6,
48:8, 48:16,
49:13, 50:16,
59:13, 67:7,
67:8, 72:17,
77:1, 101:5
**addition**
15:2, 65:15
**additional**
101:3
**additionally**
121:22
**adhd**
17:12
**admissible**
16:19
**admit**
13:13, 17:4,
28:16, 35:15,
37:1, 41:21,
43:7, 50:10,
51:15
**admittedly**
112:9
**adored**
81:3
**adulterer**
91:22
**affected**
17:9, 17:19,
18:4
**affirm**
65:10
**afraid**
8:7, 20:3,

20:5, 43:16,
57:17, 110:2
**after**
3:16, 7:7,
14:12, 17:8,
18:8, 20:13,
22:17, 24:15,
29:1, 33:4,
33:5, 39:3,
40:9, 42:1,
43:4, 47:5,
48:5, 53:1,
53:14, 55:7,
59:13, 61:14,
61:18, 67:8,
68:19, 72:8,
72:11, 73:7,
77:4, 79:11,
81:19, 82:17,
85:9, 86:8,
101:8, 103:13,
105:8, 113:22,
116:7, 118:12
**afterwards**
82:14
**again**
10:22, 12:18,
24:18, 26:7,
27:17, 30:14,
32:6, 32:10,
32:14, 32:18,
36:16, 36:19,
40:3, 40:18,
42:8, 42:21,
43:16, 46:1,
48:11, 48:15,
50:20, 51:10,
59:17, 60:6,
61:17, 69:20,
72:11, 75:14,
85:20, 88:7,
94:13, 99:8,
102:9, 109:20,
115:7
**against**
62:16, 82:3,
82:12, 111:20,
111:22, 112:8,

116:21, 119:10,
119:11, 120:5,
121:5, 121:6,
121:16
**age**
94:21
**aggressive**
70:21, 75:8,
86:5
**agree**
2:19, 22:14,
24:22, 34:18,
49:16, 53:5,
61:15, 90:2,
99:14, 106:22
**agreement**
61:19
**agrees**
110:9
**ahead**
2:14, 34:13,
62:15, 64:7,
65:7, 72:9,
73:12
**alcohol**
68:15, 103:17
**all**
4:4, 9:1,
10:11, 10:16,
12:11, 12:14,
14:19, 15:12,
23:8, 25:16,
26:2, 33:22,
35:17, 44:6,
47:15, 52:12,
61:2, 61:14,
62:4, 65:3,
69:16, 79:14,
79:20, 79:22,
82:4, 89:7,
89:11, 90:10,
99:4, 99:6,
101:9, 102:5,
104:22, 105:14,
106:22, 107:3,
107:5, 113:11,
114:12, 116:6,
116:10, 121:3

**allegation**
66:13, 76:2
**allegations**
66:19, 80:13,
80:22, 81:13,
82:3, 82:12,
82:14, 82:18,
83:1
**alleged**
40:9, 70:14,
98:4, 113:8
**alleging**
90:17
**allow**
16:21, 27:14
**allows**
65:4
**alluded**
90:10
**almost**
4:3, 97:20
**aloha**
3:3
**alone**
22:1, 61:18,
69:19, 79:3,
79:6, 79:8,
79:10, 86:17,
118:3, 118:4,
120:11
**along**
89:9, 106:22,
115:6, 116:4,
116:9
**already**
17:11, 22:21,
102:7
**also**
4:4, 17:16,
19:7, 25:14,
37:4, 37:22,
43:3, 48:5,
49:9, 52:7,
54:10, 58:22,
60:1, 65:22,
76:16, 78:18,
79:9, 85:22,
87:15, 88:15,

90:16, 92:3,
114:16, 116:22,
121:14
**altered**
9:14
**always**
68:14, 69:7
**ambiguous**
13:17
**amid**
121:13
**amount**
57:22, 63:4
**amounts**
107:22, 120:3
**anger**
25:17, 44:1,
91:4
**angry**
4:5, 6:17, 7:1,
22:19, 96:9
**another**
25:4, 25:6,
25:7, 30:11,
35:14, 36:11,
42:2, 43:22,
50:14, 53:18,
64:18, 73:9,
74:13, 118:18,
118:20
**answer**
23:18, 74:9
**anticipate**
93:15
**anxiety**
25:15, 25:18,
68:1
**any**
4:10, 4:18,
5:7, 5:15, 6:2,
9:14, 10:1,
10:6, 10:8,
11:7, 11:17,
11:22, 14:13,
15:3, 16:1,
16:4, 17:1,
18:10, 19:18,
19:21, 26:17,

26:18, 26:20,
36:7, 40:14,
55:7, 57:4,
58:16, 68:2,
79:13, 79:20,
80:2, 81:5,
83:11, 83:20,
86:12, 90:10,
90:21, 91:5,
92:22, 96:22,
98:3, 98:15,
98:17, 101:3,
101:8, 104:9,
107:3, 110:17,
112:15, 113:7,
113:12, 115:19,
116:14, 116:16,
120:17, 121:16,
121:17, 123:6
**anybody**
60:4
**anymore**
18:2, 108:5,
110:1, 114:7
**anyone**
38:6, 79:22,
108:12
**anything**
18:18, 19:15,
20:14, 37:21,
40:13, 48:7,
48:21, 48:22,
58:11, 62:10,
67:19, 71:21,
71:22, 82:8,
102:1
**anyway**
23:9
**anywhere**
23:3, 45:9,
70:1
**apartment**
43:20, 50:17,
52:5, 53:1,
53:6, 53:9,
53:15, 53:17,
53:19, 69:10,
69:16, 69:18,

70:10, 72:13,
72:15, 72:22,
75:17, 76:14,
76:15, 77:21,
86:1, 118:9
**apologize**
63:3, 64:21,
89:17
**apologizing**
95:17
**app**
65:4
**applies**
13:16
**appreciate**
54:9
**approach**
8:17, 22:5,
24:18, 26:7,
27:17, 40:18,
48:15, 55:9
**approximately**
57:19, 61:15
**apps**
65:3
**april**
9:3, 24:20,
25:2, 26:12,
28:20, 33:21,
35:18, 36:21,
54:20, 55:1,
56:11, 57:1,
58:22, 59:2,
79:16, 79:18,
79:21, 80:3,
80:5, 82:15,
85:8, 93:18,
94:3, 119:7
**aren't**
117:4
**argue**
27:13
**arguing**
106:3, 115:17
**arm**
61:4
**army**
66:2, 76:11

**around**
14:16, 31:17,
69:16, 70:6,
75:14, 75:18
**arrest**
82:22
**arrested**
103:3
**art**
3:7
**asked**
7:14, 22:1,
39:4, 49:6,
50:16, 52:5,
60:2, 61:6,
61:21, 71:19,
79:2, 79:6,
81:19, 85:19,
88:14, 99:1,
106:9, 119:15
**asking**
12:18, 23:16,
43:21, 52:21,
53:11, 58:20,
79:7, 105:11
**asks**
115:20
**asleep**
5:3, 18:1
**ass**
75:12
**assault**
3:19, 4:19,
101:19, 105:21,
113:1, 113:2,
113:9, 113:10,
113:12, 114:22,
121:22
**assaulted**
111:3
**assaults**
96:12, 98:4,
104:19, 112:22,
117:4
**associated**
62:17
**assume**
79:9

**attacking**
120:12
**attempt**
29:5, 85:10
**attempted**
119:2
**attempting**
114:3
**attempts**
115:3
**attend**
3:5, 70:12
**attention**
49:17, 110:22
**attorney**
39:8
**audio**
40:6, 123:4
**august**
3:13, 67:9
**authenticated**
13:9
**autism**
4:5, 4:7, 4:8,
4:9, 44:6, 67:22
**average**
59:20
**awake**
18:2
**aware**
30:15, 39:14,
56:17, 56:19,
96:14
**away**
22:21, 23:7,
23:8, 69:1,
69:4, 76:14,
85:12, 85:20,
114:10, 114:11,
121:21, 122:3,
122:5
**awesome**
2:21
**awful**
7:18, 95:15
**awfulness**
121:14

| **B** |
| --- |

**back**
13:22, 25:20,

33:17, 37:7,
38:19, 45:14,
50:7, 54:4,
54:10, 57:7,
63:15, 68:19,
69:8, 69:9,
69:10, 69:18,
72:18, 73:16,
74:10, 74:12,
91:8, 91:9,
92:19, 94:6,
95:20, 99:14,
101:9, 103:14,
103:17
**bad**
55:20, 56:8
**bar**
78:22
**based**
11:9, 104:20,
116:11
**bases**
105:15
**bathroom**
63:15, 70:1
**bearings**
55:11
**beat**
102:17, 102:20
**beaten**
15:20
**beautiful**
101:13
**because**
5:22, 9:6,
12:9, 12:19,
13:10, 18:2,
19:1, 19:22,
20:2, 23:15,
24:3, 24:5,
24:7, 24:11,
28:7, 31:22,
36:10, 36:13,
39:7, 44:5,
45:16, 57:10,
58:3, 60:13,
60:17, 61:3,
61:9, 61:17,

72:1, 72:9,
74:15, 81:2,
81:10, 81:13,
82:20, 82:22,
92:4, 95:17,
96:7, 99:5,
100:16, 103:4,
105:19, 106:2,
110:9, 111:10,
112:6, 114:5,
116:19, 116:22,
118:15, 120:22
**become**
68:4
**beef**
14:19
**been**
9:13, 10:9,
20:22, 30:16,
30:18, 30:20,
30:22, 31:16,
31:22, 37:4,
38:21, 43:21,
47:4, 47:9,
48:8, 54:16,
54:20, 55:15,
56:10, 57:21,
58:9, 61:14,
63:19, 67:22,
73:16, 75:9,
76:10, 76:13,
79:16, 82:18,
102:7, 104:19,
105:9, 105:18,
105:21, 109:14,
109:15, 112:19,
113:10, 113:18,
115:4, 117:22,
120:10, 120:15,
120:17
**before**
20:1, 33:5,
37:8, 39:8,
39:14, 45:4,
48:9, 48:15,
54:19, 82:13
**began**
64:19, 79:7

**begging**
118:3, 118:4
**beginning**
14:16, 15:4,
30:22, 31:1,
33:7
**behalf**
36:2
**behavior**
4:11, 15:12,
17:8, 17:19,
60:14, 115:1,
120:2, 120:7
**behaviors**
20:6
**behest**
29:22
**behind**
70:2
**being**
8:8, 8:11,
17:4, 17:17,
20:2, 36:12,
61:12, 84:18,
87:2, 107:18,
108:16
**believable**
84:6
**believe**
9:2, 13:3,
20:12, 31:12,
40:11, 43:14,
46:10, 47:12,
54:13, 83:6,
84:3, 91:7,
93:13, 116:12
**believed**
23:14, 121:1
**belligerent**
75:2, 75:6
**below**
109:3
**berated**
113:18
**berating**
7:19, 15:1,
95:14
**best**
13:17, 63:9,

104:11, 123:3
**beta**
23:10, 23:12,
24:2
**better**
58:13, 105:2,
109:8
**between**
10:2, 22:16,
25:1, 31:1,
31:7, 33:19,
34:19, 36:20,
40:1, 40:14,
43:12, 49:14,
51:1, 51:19,
55:1, 55:2,
57:1, 57:3,
70:7, 79:15,
100:21, 104:18,
122:8
**beyond**
14:4
**big**
72:2
**bipolar**
68:1
**birth**
59:4
**birthday**
37:10, 69:14,
90:15
**bisexual**
38:6, 86:8,
96:15, 96:18,
96:21, 97:3
**bit**
12:22, 15:22,
18:15, 38:19,
65:17, 65:19,
65:20, 66:17,
68:9, 73:10,
78:6, 80:21
**bitch**
23:4
**black**
97:19
**blacked**
98:2, 98:7,

112:11
**blackout**
98:4
**blame**
4:5
**blank**
106:9
**block**
7:20, 22:4,
23:2, 23:9,
31:20, 32:7,
32:11, 58:3,
62:18, 79:6,
88:14, 108:14,
110:12
**blocked**
8:3, 46:9,
46:15, 48:3,
49:8, 49:11,
51:19, 51:22,
52:4, 54:6,
54:7, 57:7,
57:8, 74:7,
80:6, 108:20,
108:21, 118:6
**blocking**
57:8, 58:2,
105:11, 108:4,
108:19
**blood**
103:16
**blue**
85:9
**bodily**
113:4
**body**
75:14
**both**
10:1, 19:8,
37:13, 64:11,
71:18, 72:3,
72:5, 82:16,
93:12, 112:10
**boxcar**
69:15, 69:17
**boyfriend**
17:5, 28:5,
30:3, 37:14,

37:19, 37:20,
60:7, 60:11,
88:16, 89:13,
99:21, 101:4,
101:5, 108:10,
116:3
**boyfriend's**
16:7, 115:14
**break**
11:11, 26:3,
26:14, 63:15,
102:8, 119:19
**breaking**
39:6
**breaks**
113:19
**breakup**
17:8, 17:9,
37:8, 40:10,
72:8, 81:18,
106:15
**breathe**
4:3
**brief**
63:10, 63:14,
102:16
**briefly**
12:19, 66:12,
95:6, 104:11
**bring**
80:15
**bringing**
96:12
**broke**
46:8, 46:14,
47:21, 53:14,
72:14, 101:8,
118:1
**broken**
52:14, 68:20
**brought**
57:13, 63:1
**bruises**
4:4, 101:20,
101:21
**bruising**
102:18
**bud**
98:11

**buddy**
115:20
**build**
24:12, 24:13,
25:8
**building**
58:9
**bullshit**
25:10
**bunch**
11:5, 95:21,
119:2
**burger**
65:22
**business**
106:19

---
**C**

**calendar**
2:6
**call**
5:20, 16:4,
16:10, 17:2,
36:1, 38:6,
48:19, 49:4,
49:6, 49:18,
49:19, 50:5,
50:6, 50:7,
51:1, 51:4,
51:11, 51:13,
52:18, 61:11,
61:18, 65:6,
65:8, 73:5,
73:15, 74:6,
75:7, 76:22,
89:8, 94:12,
97:4, 118:11,
118:12
**called**
25:17, 29:3,
35:20, 38:4,
38:10, 38:11,
48:17, 50:7,
53:2, 69:4,
73:7, 74:8,
74:10, 84:9,
84:10, 85:15,
86:7, 89:6,

93:18, 98:13,
118:10
**calling**
61:11, 87:19,
107:1
**calls**
49:18, 80:4
**came**
5:19, 21:22,
53:19, 69:8,
70:4, 72:13,
103:17
**can't**
13:1, 18:1,
18:2, 52:1,
76:20, 102:5,
102:11, 108:4,
114:13, 114:14,
117:2
**candidly**
64:1
**cans**
93:3
**caption**
123:10
**capture**
83:21
**captured**
84:18
**car**
47:11, 75:15
**care**
93:2
**career**
111:16, 111:17,
112:5
**carolina**
1:12
**case**
2:11, 19:9,
54:12, 62:16,
63:5, 63:7,
64:19, 80:9,
103:20, 105:2,
107:7, 112:21,
117:2, 117:14,
117:19, 119:6,
123:6

**caused**
82:4, 102:17,
120:6, 120:7
**central**
117:20
**certain**
84:5, 112:18,
117:1
**certainly**
108:21, 113:4,
113:11
**certificate**
123:1
**chambers**
16:8, 28:5,
60:13, 75:10,
88:21
**chance**
7:18, 43:22
**change**
13:7, 13:11
**changed**
82:9
**changes**
122:8
**channels**
28:6, 29:21,
60:9, 78:14
**character**
13:11, 120:1,
120:13
**charitably**
11:3
**cheated**
92:4
**check**
86:10, 115:20
**checked**
71:6
**cherry**
108:2, 109:11,
119:21
**children**
6:19, 85:17,
93:20, 103:11
**choke**
4:2, 71:13
**choking**
71:10

**choose**
96:20
**chris**
123:2, 123:17
**christian**
1:22
**circumstances**
115:2
**claim**
46:22, 55:7,
117:18, 117:20,
118:17, 120:5,
120:15, 120:16
**claimed**
36:13, 66:16
**claiming**
43:18, 66:15
**claims**
67:21, 71:9,
74:7, 118:6,
119:11, 119:22,
120:12
**clarify**
29:11, 62:13
**classified**
81:21
**clear**
6:9, 31:17,
60:3, 79:1,
81:9, 106:13,
107:12, 119:11,
120:19
**clearly**
70:8, 74:8,
78:20, 78:21,
102:10, 104:20,
120:2
**client**
19:10, 19:16,
63:13, 94:12
**close**
117:12, 119:20
**closed**
70:2
**closing**
93:8
**closure**
39:4, 48:21,

61:19, 109:16
**clothed**
71:19
**code**
66:7, 78:16
**cold**
37:18, 91:10
**collateral**
111:13
**collection**
120:12
**colorful**
71:3
**come**
6:12, 18:3,
25:14, 25:15,
27:4, 50:16,
52:5, 63:15,
72:21, 78:7,
80:14, 82:18,
85:22
**comes**
111:6, 111:7,
112:10, 112:22,
116:19, 119:5
**comfort**
57:13
**comfortable**
71:20
**coming**
9:5, 11:5,
49:21, 70:5,
70:7, 100:18
**commit**
18:11, 116:20,
121:16
**committed**
104:19
**common**
106:2
**communicate**
7:15
**communicated**
9:7
**communication**
21:12, 79:20,
119:7
**communicator**
6:10

**community**
86:12
**company**
65:22
**comparable**
63:4
**complaint**
20:22, 21:8,
21:14, 26:21,
27:2, 38:20,
39:16, 40:14,
46:7, 46:10,
46:22, 47:20,
49:9, 54:11,
54:12, 54:14,
72:7, 75:22,
77:4, 80:8,
81:1, 81:13,
82:3, 117:16,
117:21, 118:2,
118:22, 119:10,
119:21, 120:20,
120:21, 121:4,
121:5
**complaints**
27:8
**complete**
9:22, 10:4,
11:10, 12:21,
33:7, 90:5
**completely**
80:6
**completeness**
109:4
**complicated**
105:2
**component**
70:21, 70:22
**comprehensively**
9:22
**computer**
78:21
**conceptual**
121:14
**concern**
25:9, 115:14
**concerned**
20:9, 24:11,

60:14
**concerning**
15:13
**conduct**
120:1
**confirm**
71:6
**confused**
76:21
**consensual**
71:7
**consent**
4:10, 5:8, 5:12
**consequences**
111:13
**consider**
59:6, 59:9
**considered**
81:6
**constant**
21:8, 54:17,
55:2, 55:15,
56:10, 56:22,
57:10
**constantly**
58:16, 82:21
**constitute**
86:9
**constitutes**
107:15
**constraints**
62:17
**contact**
7:7, 7:10,
14:13, 14:14,
19:18, 19:21,
20:2, 20:10,
34:22, 36:7,
39:22, 40:14,
43:11, 43:14,
54:15, 54:17,
55:2, 55:13,
55:15, 55:18,
56:2, 56:4,
56:11, 56:22,
60:18, 60:22,
61:10, 61:22,
72:7, 79:14,

80:2, 85:3,
85:10, 86:11,
101:3, 105:12,
106:3, 110:13,
114:7, 118:7,
121:17
**contacted**
14:15, 36:10,
55:6, 55:22,
61:10, 81:22,
82:1, 84:21,
85:10, 113:19,
115:3, 115:4
**contacting**
14:17, 32:3,
32:7, 32:11,
32:15, 32:19,
36:15, 61:7,
61:13, 81:20,
119:16
**contain**
123:8
**contend**
111:2, 113:15
**contention**
9:21
**context**
13:6, 23:21,
31:4, 33:6,
43:17, 43:18,
87:10, 105:5,
114:17
**continue**
20:10, 34:22,
70:13, 99:8
**continued**
21:8, 54:15,
55:13, 55:18,
56:3, 69:17,
69:19, 82:5,
105:3
**continues**
119:17
**continuing**
7:4, 21:12,
61:10, 83:7
**contract**
106:19

**contradicted**
117:14, 120:17
**contradictory**
107:9, 111:5,
117:13
**controlled**
103:17
**convenient**
91:14
**conversation**
10:1, 10:4,
11:6, 12:10,
14:1, 14:3,
14:6, 14:8,
33:10, 33:12,
48:21, 53:22,
59:12, 85:20,
86:4, 92:7,
95:19, 118:14,
119:4
**conversations**
10:14, 49:14,
86:8, 95:10
**convincing**
101:15
**coordinated**
77:11
**coordinating**
76:17
**copies**
8:16
**copy**
11:10, 94:7
**correct**
10:20, 11:15,
21:5, 21:17,
25:16, 26:9,
26:22, 28:21,
31:8, 31:15,
33:1, 33:14,
37:5, 38:1,
38:8, 39:16,
40:21, 41:2,
41:8, 41:13,
42:5, 42:6,
42:9, 42:12,
42:22, 43:5,
46:9, 46:13,

46:17, 48:10,
50:8, 51:2,
51:5, 51:8,
54:12, 59:18,
78:10, 81:14,
83:16, 84:18,
84:22, 86:20,
87:1, 87:9,
87:16, 87:20,
88:2, 88:6,
88:16, 89:2,
89:6, 89:9,
89:19, 89:22,
90:3, 90:8,
90:13, 90:18,
91:1, 92:11,
95:7, 97:14,
104:2, 123:8
**corroborate**
56:15
**corroborates**
118:11
**cost**
58:18
**could**
23:11, 43:21,
43:22, 57:19,
58:7, 62:4,
75:18, 85:11,
90:1, 93:9,
94:8, 96:20,
97:8, 102:21,
105:1
**couldn't**
4:3, 38:17,
93:1
**counse**
3:2
**counselor**
63:21, 65:5
**count**
62:4, 63:7
**counting**
63:6, 79:16,
79:17
**county**
1:11, 76:16
**couple**
11:19, 48:13

**course**
5:14, 11:5,
14:12, 62:1,
95:14, 105:6,
107:22, 109:12,
109:13, 109:15,
110:7
**court**
2:2, 2:9, 2:12,
2:14, 2:20,
4:22, 6:15,
8:14, 8:18,
10:6, 11:9,
13:5, 14:9,
16:20, 16:21,
18:15, 19:6,
19:11, 19:15,
20:15, 20:17,
20:18, 20:20,
23:1, 23:12,
23:22, 27:13,
27:18, 28:19,
28:22, 34:12,
35:16, 37:3,
43:9, 46:3,
51:17, 54:8,
57:5, 60:15,
62:10, 62:12,
62:22, 63:14,
63:18, 64:9,
64:13, 65:1,
65:2, 65:9,
65:13, 66:9,
79:17, 83:6,
83:13, 93:6,
93:11, 94:6,
94:11, 94:14,
102:2, 102:15,
103:6, 103:7,
104:5, 104:14,
115:17, 117:9,
121:7, 121:13,
122:7, 122:11
**courthouse**
1:11
**courtroom**
44:15, 111:12
**coward**
32:3, 32:8

crazy
6:4, 47:8,
57:16, 62:8
credibility
111:15, 112:6,
112:9, 112:20
criticize
6:17
cropped
30:16, 30:18,
109:3, 114:14
cross
2:4
culminates
120:5
curious
16:14, 89:1,
89:3
current
111:6
currently
3:4, 65:19,
65:21
cv
2:3
cv-009
121:10

**D**

da's
104:1
daily
82:9
date
8:2, 34:20,
46:11, 56:2,
59:14, 72:10,
85:9, 107:10,
107:11
dated
18:9, 40:20
dates
57:3, 61:22,
62:6
dating
3:14, 71:16,
94:18, 96:17
daughter
95:2, 103:9

day
14:17, 34:15,
34:18, 43:12,
45:15, 48:5,
48:9, 58:3,
74:3, 77:5,
105:15
day-to-day
82:10
days
74:1
de-escalate
70:3
deal
72:2, 83:3,
108:16
dealing
115:15
debunk
17:13
decade
66:8
decent
57:22
decided
45:8, 61:11,
74:12, 74:13,
75:7
decision
108:13, 110:5,
110:6
decisions
110:11
declare
123:2, 123:12
deeply
81:8
defects
59:4
defend
80:14, 121:1
defendant
3:9, 12:20,
111:11
defendant's
22:6, 24:19,
27:20, 28:10,
34:16, 36:6,

36:18, 37:2,
40:20, 41:21,
43:8, 49:17,
50:10, 50:20,
51:15, 93:13,
94:1
defendants
27:16
defer
103:6
deines
60:9
delete
10:10, 11:7
deleted
10:9, 11:4,
80:6
demanded
70:11
demean
97:5
demonstrably
118:18
denies
117:10
department
76:17, 77:3
depends
87:17
depo
111:22, 112:4,
112:8, 113:9,
114:16, 117:1,
117:8, 117:10,
119:5, 119:21
depression
68:1
describe
3:21
deserve
88:1, 88:5
deserved
16:2
deserves
110:21, 111:1
design
3:8
detail
18:16, 27:7

details
10:14, 27:8,
91:17
detweiler
2:6, 2:8,
104:9, 117:11
developed
18:8
diagnosed
67:22
die
85:17, 93:20
died
103:12
difference
100:21
different
58:1, 68:7,
68:11, 75:20,
76:4, 84:14,
114:8, 115:12
difficult
62:5, 106:21,
110:11
difficulties
109:5, 109:6
dig
23:6, 93:15,
115:22
digging
106:8
diligence
36:17
diminishing
97:10, 97:11
dines
29:20, 30:1
dinner
47:19
directing
49:17
directions
10:2
directly
120:12, 121:17
dirt
115:22
disabled
66:6

discharge
66:6
disclose
78:19
discuss
63:15, 73:9,
90:2
discussion
35:3, 45:5
dismiss
104:2, 121:4
disorder
18:8, 67:22,
68:1
displayed
20:6, 20:7
disproven
117:19
disputed
117:4
distress
106:9, 106:13,
106:18, 106:20,
107:4, 114:4,
114:20
divorce
92:4
document
8:19, 12:5
documentation
68:2
dodan
92:19
doing
17:17, 19:8,
31:17, 85:7,
99:5, 113:14,
115:8
domestic
108:18, 110:6,
110:19, 110:20,
111:19, 116:21,
121:16
done
23:6, 24:16,
25:15, 27:5,
31:19, 32:8,
38:17, 44:4,

52:2, 78:13,
80:16, 110:10,
114:18
door
70:2, 91:2
doors
91:13
doubt
111:8
down
11:11, 14:20,
63:6, 89:16,
91:2, 98:22
downhill
58:18
draft
42:8, 42:11,
45:2, 48:16
dram
42:8, 42:11,
45:2, 48:16
dramatic
17:14
drank
41:13, 69:15,
74:22, 75:1,
75:5
drawer
100:7
drink
42:2, 69:17,
69:19, 97:16,
98:9, 98:11,
98:12
drinking
42:21, 98:8,
98:14, 112:14,
112:20
drinks
39:19, 72:20,
74:14, 103:1,
118:13
drive
91:9, 122:2
drives
103:2
driving
45:14, 98:12

drop
45:11
dropped
48:9, 75:17
drove
91:7
drunk
37:16, 38:16,
45:8, 69:12,
75:6, 92:2, 98:5
due
36:17, 109:10
duration
77:15
during
4:11, 4:18,
15:6, 18:10,
48:12, 54:5,
57:9, 57:12,
66:8, 67:20,
68:5, 71:10,
71:12, 81:3,
82:17, 85:20,
86:4, 89:16,
92:20, 96:17,
97:21, 98:1,
98:10, 101:20,
102:20, 110:7,
121:22
duty
29:22, 60:8,
66:5
dvd
105:16
dvpo
1:8, 39:21,
111:8, 123:21
dwi
103:3, 103:4,
103:8, 103:16
dynamic
94:22

**E**

each
2:16, 35:2,
49:4, 63:18,
64:11, 64:13,

65:2, 65:5,
70:13, 87:6,
97:12, 121:15,
121:20
earlier
28:16
easier
25:21
eating
18:8, 106:17
effect
72:19, 87:21,
88:4, 111:8
efficient
63:9, 65:1,
104:12
effort
84:22, 114:12,
115:7
eight
41:22, 43:8,
51:5, 53:21,
58:1, 68:6,
73:6, 118:12
either
40:12, 70:12,
72:8, 92:13,
99:3, 100:15,
100:17, 109:17
elements
106:7, 107:6
elizabeth
3:1
else
11:4, 19:15,
20:14, 36:1,
48:22, 62:10,
102:1
embarrass
61:13
emotional
106:9, 106:13,
106:18, 106:20,
107:4, 114:4,
114:20
emotionally
96:5
emotions
15:21, 57:11

employed
3:4, 65:19,
123:6
employment
65:20
end
6:13, 31:1,
33:7, 58:18,
74:21, 81:16,
83:10, 114:12
ended
73:5
ending
83:9
enemy
84:2
enforcement
77:7
engage
120:7, 120:9
engaged
116:17
enough
6:8, 61:13
enroll
83:2
ensure
121:8
enter
121:11
entire
21:9, 29:15,
33:2, 74:3,
74:17, 76:9,
87:7, 96:17
entitled
117:1
erratic
15:12
especially
15:19
essentially
11:14, 74:11
eve
69:9, 90:22,
91:2
even
12:10, 36:3,

54:15, 55:14,
55:19, 56:4,
60:21, 100:17,
109:1, 109:9,
109:18, 116:1,
116:7, 122:4
evening
118:13
event
122:7, 123:10,
123:13
eventually
110:14, 113:19
ever
3:19, 4:10,
4:13, 5:7, 7:14,
45:7, 52:3,
52:13, 60:18,
67:12, 68:4,
70:17, 76:5,
76:7, 76:22,
77:16, 90:10,
96:22, 99:10,
99:20, 102:9,
108:13
every
7:13, 14:17,
14:22, 27:7,
27:11, 82:20,
93:3, 117:17,
118:17, 118:22,
120:8, 120:15
everything
12:12, 22:21,
44:3, 62:21,
71:6, 71:19,
72:4, 99:1,
99:10, 105:5,
109:9, 110:10
evidence
13:5, 13:12,
16:20, 24:17,
57:15, 67:4,
78:5, 95:7,
104:15, 107:8,
117:12, 117:14,
117:19, 119:14,
120:16, 120:18

ex
35:20, 82:1,
116:5
ex-boyfriend
115:14, 115:19
ex-wife
36:8, 90:19,
90:21, 98:19,
115:4
exact
8:2, 10:14,
57:11, 62:6,
92:8
exactly
72:5, 73:8,
91:16, 107:10
example
24:13, 25:4,
25:8
excessive
61:22
exchange
32:22, 109:15
exchanged
22:16, 25:1,
94:3
excuse
106:12, 107:18,
109:16
excused
110:11
exhibit
8:15, 8:20,
9:17, 9:22,
10:22, 11:13,
11:18, 12:17,
12:18, 22:7,
24:17, 24:19,
27:16, 27:20,
28:10, 30:7,
34:14, 34:16,
35:15, 36:6,
36:18, 37:2,
40:20, 41:21,
41:22, 43:8,
49:17, 50:10,
50:20, 51:16,
93:13, 93:14,

94:1, 94:7
exhibits
28:16, 39:9,
48:14
expecting
63:4
experience
83:4, 111:7
experiences
102:7
expiring
121:20
explain
23:11, 23:16,
23:19, 23:20,
25:8, 39:6,
44:3, 66:17
express
7:9, 8:10
expressed
14:12
expressing
15:3
expunged
103:4, 103:20
extend
104:9
extended
108:1
extent
20:3, 58:8,
58:10, 88:7,
95:9
extra
65:2, 91:12
extremely
104:12
eye
72:3

**F**

fabrication
78:2, 78:3,
90:5, 118:19,
118:20
face
5:21, 5:22,
38:4, 68:13,

68:21, 69:3
**fact**
11:9, 13:7,
13:11, 13:18,
14:5, 14:7,
21:22, 48:8,
79:10, 96:16,
109:16, 118:12,
119:3
**faggot**
38:4, 38:6,
69:4, 85:16,
86:7, 93:18,
97:4, 103:10
**fair**
9:9, 21:10,
22:15, 24:22,
28:11, 32:21,
34:4, 36:19,
41:17, 43:2,
51:10, 61:22,
70:19, 78:1,
81:19, 82:4,
86:18, 94:1,
107:8
**fall**
5:3, 18:1
**false**
81:10, 82:2,
82:11, 82:14,
82:18, 83:1,
118:18, 119:10,
119:22, 120:5,
120:12, 120:20
**familiar**
22:12
**family**
122:2
**fantastic**
35:19
**far**
35:11, 71:9,
74:22, 75:5,
76:21
**fast**
35:17
**fat**
5:20

**father**
95:2, 103:9,
103:10
**fault**
64:7, 64:15
**fear**
8:10, 80:17,
82:5
**february**
6:14, 7:2, 7:6,
21:2, 26:19,
33:13, 33:21,
37:7, 38:22,
39:2, 40:1,
43:12, 43:15,
43:19, 44:11,
45:21, 46:8,
46:9, 46:11,
46:12, 46:14,
47:21, 47:22,
48:2, 49:5,
50:15, 51:7,
51:19, 51:20,
52:4, 52:16,
53:9, 53:18,
69:14, 72:8,
72:9, 72:11,
72:12, 72:14,
73:6, 83:3,
90:14, 90:16,
99:18, 117:22,
118:3, 118:7,
118:9
**federal**
78:12
**feel**
15:15, 58:13,
86:15, 91:11,
95:18, 96:5,
96:7, 99:6,
101:12
**feeling**
44:4, 44:5,
58:18, 74:14
**feelings**
15:3
**felt**
80:14

**female**
97:3, 97:5
**few**
69:2, 70:4,
71:16, 71:17,
79:4, 89:17,
109:11
**fight**
25:20, 64:16
**fighting**
31:19, 121:15
**figure**
12:16, 17:16,
19:13, 88:16,
115:15
**file**
55:17, 80:8,
120:22, 121:10
**filed**
54:12, 77:4,
80:11, 82:11,
83:8, 119:6,
121:4, 121:5
**files**
2:3, 119:9
**finally**
26:3, 26:15,
96:3, 96:4,
108:3
**financial**
123:7
**finds**
14:9, 121:13
**fine**
8:9, 38:13,
92:15, 99:6
**firearm**
92:16, 100:9,
100:11, 100:13
**first**
20:21, 34:6,
59:14, 61:3,
66:5, 67:1,
67:7, 67:8,
68:18, 68:19,
68:20, 70:15,
88:14, 90:17
**five**
34:14, 34:16,

35:15, 93:3
**flipping**
88:21
**focus**
17:12
**follow**
80:5
**followed**
8:8, 8:11,
34:4, 81:18,
82:2
**following**
26:19, 33:13,
34:14, 34:17
**food**
39:19
**force**
91:15
**forced**
70:15
**forces**
23:15, 24:4,
24:8, 28:7,
29:20, 60:8,
61:12, 66:5,
66:20, 67:1,
67:6, 83:19
**forget**
25:20
**form**
80:3
**former**
111:17
**forth**
33:17, 57:7,
72:18, 73:16,
95:21, 103:14
**forward**
35:17
**forwarded**
86:16
**found**
22:17, 47:4,
88:19, 91:11,
117:17
**foundational**
10:7
**four**
30:7, 38:1,

| | | | |
|---|---|---|---|
| 50:5, 76:13 | **gary** | **giggled** | 11:1, 16:12, |
| **frankly** | 1:9, 2:3, 2:4, | 69:1 | 16:16, 16:21, |
| 60:13 | 20:22, 21:9, | **girl** | 17:11, 18:3, |
| **freaky** | 26:12, 26:18, | 47:5, 47:7, | 23:3, 23:9, |
| 15:22 | 26:21, 27:4, | 97:7 | 24:17, 25:5, |
| **frequently** | 31:16, 33:12, | **give** | 35:15, 35:17, |
| 14:14, 14:16 | 33:20, 34:19, | 18:15, 20:10, | 40:5, 45:13, |
| **friend** | 35:8, 36:21, | 43:22, 63:10, | 45:16, 57:14, |
| 47:1 | 37:5, 38:21, | 65:2, 74:12, | 57:16, 61:14, |
| **friend's** | 39:22, 40:7, | 104:22, 117:7, | 63:21, 64:10, |
| 76:12 | 42:4, 42:21, | 122:6 | 64:16, 64:17, |
| **friends** | 43:4, 43:12, | **given** | 65:15, 67:17, |
| 19:2, 25:10, | 44:14, 46:8, | 8:16, 17:7, | 69:22, 70:12, |
| 28:5, 47:6, | 48:17, 50:7, | 19:7, 115:2, | 72:9, 75:3, |
| 47:13, 69:15, | 50:16, 51:2, | 116:2, 117:7 | 75:12, 75:13, |
| 69:16, 70:8, | 51:12, 51:19, | **gives** | 80:17, 85:15, |
| 118:19 | 57:1, 121:8, | 3:14 | 88:22, 95:1, |
| **front** | 121:9 | **giving** | 99:7, 99:21, |
| 81:7, 85:17, | **gary's** | 7:17, 57:11, | 102:12, 104:2, |
| 93:20, 103:12 | 35:20, 36:7, | 64:11, 73:9, | 105:14, 106:1, |
| **frustrated** | 48:3 | 101:12 | 106:8, 107:3, |
| 103:13 | **gaslight** | **glad** | 107:21, 108:2, |
| **fuck** | 6:3, 26:2, | 107:2 | 108:8, 108:9, |
| 14:18, 23:6, | 89:14 | **glasses** | 108:11, 108:13, |
| 31:15, 31:16, | **gaslighting** | 41:13, 42:4, | 108:15, 108:21, |
| 87:8, 87:12 | 17:13, 101:14, | 42:12 | 109:13, 110:2, |
| **fucking** | 105:13 | **glock** | 110:22 |
| 16:5, 23:2, | **gather** | 76:1, 76:3, | **gone** |
| 23:3, 23:7, | 115:12 | 76:5, 76:6, | 106:14 |
| 23:9, 23:12, | **gathering** | 76:20, 76:21, | **good** |
| 32:3, 32:8, | 57:15 | 77:1, 100:21 | 20:19, 24:13, |
| 32:11, 75:13 | **gave** | **go** | 25:4, 25:7, |
| **full** | 77:11 | 2:14, 14:20, | 64:6, 65:14, |
| 12:10, 30:16, | **general** | 16:9, 22:21, | 65:16, 91:8, |
| 31:4, 33:10, | 95:20 | 23:7, 31:19, | 101:13 |
| 66:1, 97:2, | **generalized** | 34:13, 43:22, | **gotten** |
| 108:22, 109:2, | 68:1 | 54:10, 58:17, | 21:1, 38:22 |
| 123:8 | **generally** | 62:15, 64:6, | **government** |
| **fund** | 84:19, 96:10, | 65:7, 69:12, | 78:12, 78:13 |
| 16:5, 87:20 | 105:13 | 72:13, 74:17, | **gps** |
| **further** | **genuinely** | 76:17, 84:12, | 82:20, 120:8 |
| 62:9, 62:11, | 44:5, 44:7, | 85:20, 94:6, | **grabbed** |
| 72:7, 80:2, | 58:13 | 107:16, 108:14, | 69:11 |
| 93:4, 94:5, | **getting** | 114:10, 114:11, | **grace** |
| 104:4, 121:16, | 15:20, 38:16, | 119:7, 119:12, | 64:22 |
| 123:12 | 44:8, 92:4, | 122:8 | **gradually** |
| **G** | 109:6, 109:10, | **going** | 86:20 |
| **gap** | 112:4 | 2:5, 2:15, 6:9, | **grant** |
| 94:21, 109:4 | | | 121:5 |

granted
111:20, 111:22,
112:8, 120:21
grants
117:9
great
37:12, 37:13
grooming
17:14
grossly
81:15
group
66:5, 67:1,
67:8, 67:10
guess
12:17, 42:14,
90:12, 102:21
guilty
95:18, 96:7
gun
76:7, 76:9,
77:8, 77:14,
77:16, 77:18,
77:20, 93:1,
100:1, 118:18
guy
75:9
guys
86:20
gym
72:16, 72:17,
72:22

**H**

hair
69:11
half
38:12, 76:14,
92:20
hand
65:9
handful
18:14
handle
102:6
happen
40:12, 70:17,
71:10, 87:18,

91:11, 111:5
happened
3:21, 5:1,
6:15, 10:1,
18:16, 43:19,
63:11, 68:10,
69:5, 73:1,
73:13, 74:20,
90:1, 90:4,
91:16, 98:4,
99:3, 102:9,
102:20, 104:20,
105:6, 107:10,
109:20, 112:19,
115:13
happening
62:20, 99:2,
105:8, 112:13
happens
76:12
happiness
18:4
happy
104:9
harass
83:7, 122:1
harassing
36:15, 120:11
harassment
82:5, 105:4,
120:4, 121:14
hard
94:7
harder
71:13
harm
24:12, 25:9
harmed
81:5
hate
69:20, 86:9,
89:5
he'll
54:16, 55:14,
56:5
head
62:6
heal
34:22

health
17:10, 20:7,
67:20, 82:10,
83:2, 120:10
hear
112:15
heard
60:14, 87:4,
97:13, 104:11,
113:15, 116:12,
116:15, 120:2
hearing
1:8, 39:9,
64:11, 116:19,
123:21
hearsay
60:16
help
26:4, 26:15
helpful
65:4
here
12:4, 13:7,
13:16, 23:21,
26:3, 26:14,
55:9, 55:12,
76:12, 80:14,
105:2, 105:15,
111:5, 112:6,
115:1, 116:15,
116:18, 117:3,
120:14, 120:19
here's
93:13, 113:1
hereby
123:2
herself
69:1, 108:7,
118:22
hey
116:4, 116:9
hi
20:20
high
5:3
himself
19:1, 24:12,
25:10, 44:1,

58:13, 121:1
history
33:3, 65:20,
76:16, 119:13
hit
4:2, 38:13,
102:20
holmes
2:9, 2:10
home
45:12, 45:14,
48:9, 73:7,
74:4, 74:6,
75:7, 75:8,
75:16, 77:10,
91:5
homophobic
96:17
honest
66:19, 95:2
honestly
114:9
honor
2:10, 2:21,
13:14, 24:18,
28:15, 30:10,
34:9, 35:15,
37:1, 40:17,
41:22, 43:8,
48:15, 50:11,
51:16, 57:6,
64:7, 65:7,
65:14, 104:7,
107:9, 107:20,
117:11, 118:21,
119:5, 120:14,
121:3, 122:10
honorable
66:6
hooked
91:21
hope
59:4, 59:22,
103:11, 105:18,
110:18
hopefully
70:1, 70:3
hopes
85:16, 93:19

hoping
86:16, 114:5
hour
47:10
house
47:2, 47:9,
76:12, 76:17,
92:21, 108:9
household
122:3
houses
118:19
however
65:4
hung
73:3
hurt
106:10
hurtful
96:13
hurts
71:22

**I**

icloud
12:11, 12:13
idea
38:9, 38:12,
68:16, 102:10
identification
24:20, 27:17,
30:8
identified
36:18
illegal
100:8
illegally
78:12
images
109:1
imagine
2:16
immediately
20:12, 74:9
imminently
104:1
impaired
91:1

important
100:12
importantly
105:7
in-person
40:14, 43:11
incentive
112:7
include
21:13, 27:7,
27:9, 27:11,
28:19
included
9:21, 13:20,
93:14
including
49:9
incoming
49:18, 51:4
inconsistent
15:10, 15:16
increased
106:16
incredibly
80:13
incremental
33:15
indicate
31:12
indicating
82:1
indications
15:17, 64:10
indirectly
121:18
individual
58:14
indulgence
54:9
inebriated
69:7
inflict
106:8, 106:20,
114:4, 114:19
inflicting
113:2, 114:22
influence
68:15

information
77:11, 116:2,
123:4
informing
92:10
infosec
79:1
initial
11:21
injured
113:11
injury
104:20, 113:3,
113:4, 113:5,
113:7, 113:10,
114:22, 117:5
inquire
19:4
inquired
62:14
insisted
45:14
instagram
91:18
instance
68:18
instances
3:22, 71:15
instead
6:22
insult
5:15, 17:2,
59:7, 96:8,
96:11, 114:2
insulted
24:15, 38:13,
87:1, 87:2, 87:6
insulting
15:1, 15:2,
86:19, 105:13
insults
105:13, 107:5,
109:17, 110:15
intend
106:8
intended
106:19
intensive
83:3

intent
62:15
intention
62:22
intentionally
78:11, 78:15,
114:19
interest
20:1, 35:8,
36:16, 123:7,
123:12
interested
7:4
interfere
122:1
interrogated
84:18
interrogation
83:21
intervening
39:22
intimate
70:20
introduce
9:17, 39:9,
119:2
invitation
53:9
invited
44:3, 72:15,
118:8
issue
63:12, 112:6,
115:9
issues
20:7, 44:2,
109:10, 112:9,
112:10, 112:20,
115:19

**J**

jail
103:2
january
76:11
job
1:20, 111:6,
111:16, 122:5

**join**
19:3
**joke**
96:19
**judge**
2:18, 8:13,
9:16, 10:22,
13:5, 19:17,
21:11, 21:15,
21:18, 27:3,
39:21, 40:6,
104:4, 117:8
**judicial**
103:7
**jump**
72:9, 73:12,
75:20
**june**
1:10, 121:20
**junk**
93:2
**justice**
66:8, 78:17

### K

**keep**
7:19
**keeping**
63:19
**kept**
85:15, 85:22,
95:14, 100:4
**keys**
91:6, 91:10
**kick**
75:12
**kicked**
91:2
**kiddo**
95:3
**kids**
6:21, 6:22,
59:4, 106:2,
106:4
**kill**
75:13, 99:21
**killed**
24:8

**killing**
19:1
**kind**
24:16, 36:7,
62:19, 72:14,
80:2
**kiss**
45:16
**kitchen**
37:9, 37:15,
37:19, 70:5
**knew**
6:18, 8:6,
57:13, 58:4,
58:6, 58:7,
58:16, 96:20
**knife**
37:9, 70:5,
90:12, 90:18,
90:19
**know**
3:9, 9:4, 9:20,
12:2, 12:10,
13:10, 14:7,
36:3, 36:9,
58:7, 61:2,
62:14, 64:2,
77:7, 78:14,
80:12, 82:15,
86:1, 91:13,
100:2, 100:20,
104:8, 105:19,
105:20, 106:1,
106:4, 107:2,
107:20, 108:1,
108:20, 109:9,
111:12, 112:2,
112:5, 112:16,
113:2, 113:21,
114:14, 115:18,
116:3, 116:4,
116:5, 116:9,
116:10, 116:11,
117:3, 118:14
**knowing**
53:20, 57:13,
86:7, 97:1,
97:2, 100:12,

100:15
**known**
13:15
**knows**
108:19

### L

**labeled**
73:18
**landlord**
91:13
**lash**
96:6
**lashes**
116:8
**last**
14:21, 26:8,
34:6, 36:4,
39:1, 44:11,
44:14, 54:16,
54:19, 55:5,
55:6, 55:11,
55:14, 55:19,
55:21, 55:22,
56:2, 56:4,
61:2, 66:4,
66:22, 69:13,
79:13, 79:19,
93:7, 104:15,
116:8
**lasted**
33:13, 51:5
**late**
35:12
**later**
7:1, 45:15,
47:3, 47:12,
58:19, 69:2,
70:4, 71:17,
95:17, 119:9
**laundry**
119:10
**law**
77:7
**leading**
119:14
**learn**
67:19

**learned**
118:6, 118:8
**least**
11:21, 38:1,
121:21
**leave**
22:1, 45:4,
61:18, 79:3,
79:6, 79:7,
79:8, 79:10,
86:17, 120:11
**leaves**
63:19
**leaving**
73:5
**left**
21:7, 22:11,
53:1, 63:1,
72:22, 76:11,
91:6, 118:3,
118:4
**legitimate**
105:22, 106:5,
106:19, 113:14,
113:16, 114:18
**less**
93:2
**let's**
25:15, 31:3,
55:10, 100:1
**level**
105:14, 117:8
**liar**
32:4
**lied**
22:18, 24:6,
29:14, 29:15,
47:8
**life**
31:20, 71:4,
76:10, 82:9,
82:11, 98:2,
112:12, 119:8
**light**
80:15, 98:11
**likes**
80:5
**line**
20:21, 26:8,

**27:10**, 89:11,
89:20, 111:16,
112:2
**lines**
89:9, 107:1,
115:7, 116:4,
116:9
**list**
2:5, 82:2,
119:10
**listed**
123:10
**littered**
119:22
**little**
12:22, 14:4,
15:21, 18:15,
32:12, 32:16,
35:11, 38:19,
65:17, 65:19,
65:20, 66:17,
68:9, 73:10,
78:6, 80:20,
96:3, 100:14,
107:21, 108:3,
109:11, 114:13,
114:14, 117:7
**live**
3:2, 3:3,
18:18, 82:15
**lived**
92:18
**lives**
110:7
**location**
77:8
**lock**
91:15
**locked**
57:20
**locks**
91:12, 91:14
**log**
49:18, 52:18,
82:20, 118:15
**logging**
120:8
**logistician**
66:4

**long**
33:16, 34:3,
34:4, 53:22,
82:2, 85:13,
105:15
**longer**
19:22
**look**
16:12, 22:12,
89:1, 95:6,
105:5, 105:17,
106:7, 114:17,
114:18, 119:13
**looked**
69:3, 72:3,
88:19, 89:3,
91:17
**looking**
11:13, 30:9,
67:9, 82:21
**looks**
50:4, 50:6,
76:20, 89:2,
89:19, 116:4
**lose**
111:14, 111:18,
111:21, 120:6
**loser**
18:19, 23:2,
32:16
**lost**
19:2, 82:16
**lot**
5:5, 15:18,
17:13, 20:7,
24:6, 25:20,
57:7, 85:18,
95:13, 95:17,
97:4, 101:21,
102:3, 103:15,
107:7, 111:18
**love**
31:18, 72:4,
87:16, 99:9
**loved**
15:5
**loving**
101:5

**lying**
47:4, 116:5,
116:9

**M**

**ma'am**
2:13, 62:12
**made**
12:20, 13:9,
66:13, 76:1,
81:1, 81:13,
90:10, 115:3,
117:18, 118:17,
119:11, 120:15
**majority**
96:1
**make**
2:6, 6:3, 10:3,
15:15, 18:22,
19:9, 26:17,
27:12, 28:6,
36:14, 47:11,
55:7, 56:20,
57:15, 58:5,
58:6, 58:10,
58:12, 83:10,
84:5, 92:9,
92:14, 108:13,
109:19, 110:6,
110:7, 112:4,
112:7, 114:10,
114:11, 116:1
**makes**
71:21, 75:21,
95:18, 100:5,
100:14
**making**
7:5, 66:19,
86:20, 110:11,
112:21, 119:10
**male**
86:9
**man**
32:12, 32:16,
60:8
**manhattan**
42:13
**manhattans**
42:14, 42:19

**many**
18:13, 19:2,
19:4, 24:8,
51:22, 52:1,
57:19, 59:13,
62:2, 62:3, 62:6
**march**
9:2, 14:16,
22:16, 28:13,
31:6, 31:7,
31:11, 31:12,
34:18, 39:3,
40:3, 40:18,
40:20, 43:3,
44:16, 44:21,
45:21, 46:1,
46:20, 48:3,
48:15, 48:20,
49:7, 58:22,
61:5, 73:12,
73:18, 73:19,
73:21, 73:22,
74:2, 74:14,
79:5, 79:8,
79:9, 88:21,
92:2, 99:15,
118:7, 118:14,
118:16, 123:18
**mark**
24:17, 34:13,
48:13, 65:5
**marked**
8:15, 8:20,
22:6, 24:19,
27:19, 40:19,
50:19
**marking**
36:6
**matter**
2:2, 121:9
**matters**
100:16, 121:7
**maybe**
97:17, 110:4
**mean**
13:17, 23:12,
24:1, 39:18,
56:1, 56:20,

57:21, 63:9,
64:1, 70:21,
82:13, 97:1,
107:19, 110:9,
111:21, 114:11,
115:2, 116:20,
116:22

**meaning**
23:17, 55:22

**means**
24:2, 31:12,
60:10, 60:21

**meant**
24:10, 55:21,
56:12, 56:13,
107:6

**media**
8:7, 88:18

**medication**
83:4

**meet**
39:4, 47:6,
48:16, 61:15,
72:19, 74:13,
110:4

**meeting**
41:8, 43:18

**meets**
118:13

**member**
23:15, 122:2

**members**
86:11, 86:12

**memory**
11:3

**men**
96:20

**mental**
17:9, 20:7,
67:20, 82:10,
83:2, 88:12,
120:9

**mentally**
70:8

**mention**
26:20, 39:16,
48:7

**mentioned**
48:11, 48:12,

115:6

**message**
16:19, 26:12,
27:11, 33:2,
47:14, 59:2,
59:13, 74:3,
77:3, 79:19,
90:6, 92:3,
107:13, 119:18

**messages**
9:1, 9:5, 9:10,
9:13, 9:21,
10:8, 10:12,
10:13, 10:16,
11:5, 11:8,
11:14, 11:18,
12:1, 12:2,
12:4, 12:14,
12:19, 13:1,
13:8, 13:19,
13:21, 15:7,
15:8, 15:10,
15:16, 15:19,
21:9, 22:7,
22:15, 24:20,
25:1, 26:9,
26:18, 26:21,
30:12, 30:21,
31:6, 32:22,
33:17, 34:5,
34:15, 34:17,
34:19, 36:17,
36:20, 56:14,
57:12, 62:2,
62:6, 80:1,
80:4, 91:20,
92:8, 93:17,
94:2, 95:6,
95:21, 105:9,
105:11, 106:6,
107:13, 107:14,
107:17, 107:22,
109:2, 109:6,
109:7, 109:11,
114:1, 116:8,
117:6, 119:3

**messed**
46:11

**met**
3:11, 3:13,
39:5, 40:3,
40:7, 48:6,
67:17, 75:3,
109:16, 118:15

**methods**
114:9

**michael**
16:8, 28:5,
30:5, 30:6,
75:10

**mid**
68:18

**midway**
39:5

**might**
19:7, 24:11,
25:9, 101:9,
104:9, 107:9

**mikey**
16:9, 16:10,
16:12, 75:10,
75:13, 88:21,
89:1

**military**
22:18, 28:11,
29:2, 29:7,
29:16, 60:2,
66:8, 66:17,
67:13, 67:15,
78:9, 78:17,
78:18, 81:21,
92:16, 111:7,
111:17, 115:9,
115:19, 115:21

**millimeter**
76:19

**mind**
5:3, 36:11

**minute**
53:22, 74:9,
75:16, 91:8,
118:12

**minutes**
2:17, 2:20,
50:8, 51:5,
62:21, 63:1,

63:3, 63:6,
63:8, 63:18,
63:20, 64:12,
64:13, 64:17,
64:18, 65:3,
70:4, 73:4,
73:6, 74:11,
76:14, 77:10,
82:20, 93:7,
104:14, 120:8

**mis**
51:21

**misinterpreted**
64:8, 64:20

**misremembered**
51:21

**misrepresent**
67:12, 84:2

**missed**
50:5, 50:7

**missing**
10:13

**misunderstood**
63:2, 64:14

**model**
47:11

**moment**
88:11, 91:4

**monitor**
18:7

**monitoring**
8:6, 58:4

**month**
40:9, 61:15,
109:12

**months**
24:16, 26:19,
32:1, 33:13,
71:17, 81:18,
119:4, 119:13

**mood**
58:17

**more**
2:17, 10:6,
18:15, 57:4,
63:21, 70:21,
74:22, 75:5,
80:21, 83:11,

83:17, 84:5,
98:14, 105:2,
105:7, 116:7,
117:13, 119:7
**morgan**
1:9, 2:2, 2:4,
3:1, 68:4, 72:6,
76:8, 77:16,
79:3, 79:14,
103:16, 121:7,
121:10
**morning**
20:19, 65:15,
65:16, 70:11,
91:10, 91:16
**most**
11:2, 68:12,
91:14
**motherfucker**
16:15, 89:1
**motion**
81:18
**mouth**
71:13
**move**
9:17, 22:22,
28:16, 34:9,
35:15, 37:1,
41:21, 43:7,
50:10, 51:15,
62:16, 67:18,
104:5, 113:13
**moved**
82:15, 92:21,
119:8
**much**
15:7, 62:20,
63:20, 69:7,
75:1, 76:21,
95:2, 95:20,
98:14, 101:6,
102:14, 105:20,
111:14, 121:6
**multiple**
4:15, 8:3,
32:1, 90:3,
110:19
**must**
57:21

**myself**
44:9, 80:14
**myway**
41:1, 41:4,
41:7, 41:12,
42:1, 42:3,
43:5, 45:2,
48:16, 61:16

---
**N**
---

**naaden**
1:22, 123:2,
123:17
**name**
2:22, 16:7,
36:4, 61:2,
61:3, 65:18,
88:20
**nasty**
15:8, 114:15
**nature**
105:10, 106:6,
107:5, 107:14,
113:22
**nd**
50:15, 51:8,
52:5, 52:16,
53:9, 72:14,
73:6, 118:9
**near**
55:2
**nearly**
54:17, 55:15,
56:10, 58:16
**necessary**
83:7
**need**
2:16, 12:17,
22:22, 63:22,
80:14, 92:11,
102:8, 104:22
**needed**
73:10, 77:11,
121:1
**needs**
13:6, 22:22,
110:21, 111:1
**negatively**
59:10

**neither**
69:22, 116:18,
122:6, 123:5
**nervous**
82:19
**never**
15:5, 36:7,
38:6, 38:13,
38:15, 43:16,
45:7, 76:6,
77:18, 77:20,
77:22, 81:5,
81:6, 90:4,
90:20, 96:20,
97:20, 99:3,
102:19
**new**
16:7, 69:8,
69:9, 75:9,
82:18, 83:1,
88:16, 90:22,
91:2, 99:21,
108:9, 115:13,
116:3
**next**
45:15, 59:13,
70:11, 100:6
**nice**
15:7, 80:12,
101:5, 114:9
**night**
37:12, 37:13,
37:17, 39:15,
41:19, 45:5,
53:6, 70:11,
73:2, 73:13,
73:14, 73:18,
74:18, 74:21,
75:3, 75:7,
75:18, 97:7,
98:11, 112:15
**nights**
66:1, 112:19
**nine**
49:17, 50:11,
76:19
**nobody**
112:1

**none**
13:19
**nonstop**
20:22, 38:21,
117:22
**nope**
45:7
**north**
1:12
**nothing**
62:11, 65:11,
76:20, 80:5,
103:5, 109:20
**notice**
103:7
**november**
103:3
**nowhere**
75:6
**number**
7:21, 9:6,
46:20, 48:3,
49:22, 50:21,
80:6, 121:10
**numerous**
29:9, 86:8,
107:22

---
**O**
---

**oath**
27:4, 39:21,
40:6, 49:9,
54:6, 94:15
**object**
16:16
**objectified**
89:18
**objection**
9:19, 11:1,
23:18, 28:18,
34:11, 50:12
**objective**
117:14, 117:18,
117:19, 119:14,
120:17
**obsessed**
102:10
**obviously**
58:14, 86:2

occasions
18:13, 90:3
occur
71:1
occurred
113:11
october
68:19
offended
80:13, 80:20,
80:22, 81:12
offense
59:18, 59:21
offensive
58:21
office
104:1
official
78:22
officially
93:6
often
7:12, 18:1,
57:8, 97:16,
97:17, 97:19,
98:10, 98:12
oh
14:15, 73:20,
74:22, 85:22,
87:6, 87:14,
88:11, 106:1,
107:18, 112:15
okay
4:14, 4:16,
8:13, 9:4, 9:16,
10:8, 12:7,
22:13, 32:20,
42:15, 43:7,
46:13, 52:19,
59:17, 64:14,
64:16, 67:12,
72:6, 84:16,
85:6, 87:15,
91:17, 93:11,
95:9, 99:2,
110:16
old
93:2, 94:16,

104:18
omitted
30:20, 30:22
once
71:15, 71:17,
75:2, 93:3,
97:17, 100:3,
116:2, 116:3
one
8:16, 8:20,
9:17, 11:14,
14:6, 22:7,
25:11, 27:16,
28:5, 28:16,
30:19, 34:6,
34:7, 35:14,
38:3, 42:4,
47:12, 58:2,
64:17, 67:22,
69:8, 69:22,
73:12, 76:9,
78:9, 84:13,
84:15, 84:16,
85:15, 85:16,
89:6, 89:15,
90:11, 92:13,
93:22, 97:9,
98:11, 99:1,
106:7, 118:19,
119:2, 120:15,
120:20, 121:19,
122:6
one-sided
14:7
ones
95:13
ongoing
33:12, 119:4
only
5:21, 23:3,
43:11, 61:3,
75:16, 78:22,
89:19, 97:10,
109:18, 111:3,
119:14
onward
119:8
operate
78:14

opponent
13:8
opportunities
5:22
opportunity
63:11, 64:21,
95:5, 104:11
opposing
8:16, 30:8
opposite
99:12
order
2:5, 20:10,
20:13, 77:6,
83:6, 101:2,
110:21, 110:22,
111:1, 111:20,
121:9, 121:12,
121:19, 121:22,
122:7
ordered
121:15, 121:20
orgasms
59:14
original
75:2
originally
80:10
other
30:20, 35:2,
43:11, 48:13,
49:4, 58:5,
63:12, 64:19,
70:13, 77:8,
77:14, 78:18,
81:7, 85:18,
87:7, 97:12,
113:14, 114:10,
121:17, 121:21,
122:1, 122:2,
122:3, 122:6
otherwise
46:4, 123:7
out
4:4, 5:3,
12:16, 17:16,
19:14, 21:1,
21:7, 22:17,

25:5, 30:2,
30:4, 38:22,
39:18, 45:1,
47:4, 50:16,
52:4, 61:11,
61:12, 64:5,
69:14, 69:17,
70:4, 72:10,
73:3, 73:18,
75:6, 75:17,
76:11, 80:7,
82:18, 85:9,
88:16, 88:19,
88:21, 92:16,
92:21, 93:6,
96:6, 97:19,
98:2, 98:7,
104:8, 106:2,
112:3, 112:11,
112:19, 115:15,
115:20, 116:8
outbursts
4:5, 25:17
outcome
123:7
outgoing
49:19, 50:6
outright
78:2
outside
36:11, 44:15,
46:3, 47:1,
47:9, 70:22
outweighed
15:8
over
4:4, 7:14,
39:5, 39:12,
40:9, 44:3,
58:4, 62:1,
67:17, 72:17,
72:21, 75:14,
82:21, 85:9,
85:22, 86:19,
87:13, 95:10,
104:8, 105:6,
107:22, 109:12,
109:15, 110:5,

119:15

**overlap**
64:5

**own**
40:7, 68:17,
100:8, 100:11,
114:2, 120:8

**owned**
76:5, 76:6,
76:9

**P**

**pack**
98:11, 112:14

**page**
13:20, 93:14,
123:10

**pages**
1:21, 11:21,
40:19, 93:22,
94:10, 123:8

**paid**
41:15

**pao**
78:17

**paranoid**
120:7

**parenting**
106:4

**part**
14:3, 83:19,
84:1, 84:8,
92:12, 101:14,
116:15

**particular**
24:1, 80:21,
92:22

**parties**
123:6

**partner**
58:15

**partners**
97:3

**party**
2:16, 13:8,
13:13, 69:10,
91:6, 120:20,
121:15, 121:20

**pasewicz's**
117:15

**pasewiczhas**
120:15

**passed**
4:3, 35:3

**passenger**
75:15

**past**
82:11

**patchy**
11:3

**pathetic**
32:12, 32:16

**pbo**
67:10

**pbr**
42:4, 42:22

**pecking**
121:9

**penalty**
123:3

**people**
24:9, 81:8,
96:8, 96:11,
104:22, 110:7

**perceived**
89:17

**perfect**
15:7

**period**
40:1, 54:5,
57:9, 62:1,
86:19, 87:7,
95:10, 108:1

**perjured**
118:22

**perjury**
119:22, 123:3

**permission**
122:7

**person**
7:18, 21:16,
36:12, 38:14,
39:2, 40:7,
44:11, 44:15,
47:18, 47:19,
48:9, 59:10,

59:21, 74:15,
78:15, 81:2,
93:1, 96:9,
96:10, 97:10,
107:3, 107:16,
107:17, 108:17,
109:13, 109:21,
110:1, 113:21,
122:1

**person's**
122:2, 122:3

**personally**
10:10

**phone**
10:12, 49:21,
50:21, 73:5,
73:15, 74:4,
80:4, 80:7,
118:11, 118:12,
118:15

**photo**
29:1, 29:2,
29:18, 30:2,
31:13, 67:11,
78:5, 78:6,
78:8, 81:21

**photograph**
28:10, 28:12,
67:2, 102:18

**photographic**
102:22

**phrase**
55:20, 87:12

**physical**
39:22, 70:21,
70:22

**physically**
37:4, 37:22,
68:4

**pick**
76:18, 77:3,
77:12, 97:7,
103:2, 109:11

**picking**
108:3

**picture**
31:11, 78:12,
78:21, 108:22

**piece**
24:2, 96:3

**piecemeal**
13:22, 14:2

**pieces**
107:21, 108:3,
109:11, 115:13

**pile**
119:18

**pills**
68:16

**pissed**
24:4

**place**
83:10, 88:14,
91:5, 121:19

**plaintiff**
2:11, 14:5,
71:11, 81:4,
83:5, 85:9

**plaintiff's**
8:20, 9:17,
9:20, 11:13,
14:10, 62:16,
63:6

**plan**
39:9, 75:2

**please**
2:22, 3:22,
8:17, 65:9

**plenty**
97:2

**plus**
13:20, 109:12

**point**
4:3, 4:19, 5:7,
5:15, 6:2, 7:3,
7:20, 9:16,
16:1, 16:4,
16:18, 17:1,
18:11, 60:4,
73:5, 77:15,
83:20, 85:13,
85:15, 85:16,
89:6, 89:15,
90:11, 90:21,
95:13, 101:8,
106:9, 111:13,

121:1
**points**
14:21
**police**
82:22
**pop**
2:20
**popping**
25:20, 26:2
**portray**
86:13, 86:15
**pos**
23:10, 23:13,
24:2
**position**
109:20, 110:8,
111:19, 113:22
**positive**
15:3, 96:10
**possession**
76:8, 76:10,
76:13, 77:16,
78:7, 100:2
**possibility**
45:5
**possible**
2:18, 2:19,
98:3
**possibly**
65:1
**post**
87:7
**potential**
13:10, 62:15
**potentially**
58:21, 74:12,
82:5
**pounds**
82:16
**power**
94:22
**preceded**
34:3
**prefer**
19:8
**present**
104:16, 108:22
**presentation**
14:1

**presumably**
14:6, 116:3
**pretty**
5:20, 5:22,
14:15, 15:22,
40:11, 69:7,
75:2, 75:6,
96:17, 119:20
**prevent**
98:16
**previous**
10:12, 66:2,
96:12
**previously**
57:18
**prior**
38:1, 66:2,
67:5, 96:14
**prisoner**
84:20
**probably**
50:4, 54:3
**problem**
19:11
**problems**
44:6
**procedurally**
62:14
**proceeding**
40:5
**proceedings**
46:4
**process**
101:6, 103:22
**produced**
14:5
**profusely**
69:15
**prolonged**
64:10
**promised**
48:20, 61:17
**proof**
52:8, 102:22,
111:2, 111:3
**proper**
29:21, 60:9,
78:13, 78:14

**protective**
111:20, 121:11
**proud**
88:13, 95:16,
106:11
**provably**
24:5
**prove**
117:2
**proven**
113:10, 114:21,
115:4, 117:4,
118:18
**public**
75:11, 86:11
**published**
9:18
**pull**
40:4, 78:17,
90:21
**pulled**
90:18, 90:19
**purpose**
41:8, 85:6,
105:22, 106:6,
113:15, 114:19
**purposes**
113:16
**pussy**
25:15, 27:4,
38:10, 103:11
**put**
13:6, 63:10,
64:21, 85:11,
104:8, 104:15,
109:8, 110:8
**putting**
11:2, 108:17

**Q**

**qualities**
89:19
**question**
9:20, 23:19,
23:22, 25:7,
27:14, 31:5,
60:1, 60:2,
86:22, 110:18,

111:15
**questioning**
27:10
**questions**
10:7, 11:13,
14:11, 57:4,
58:20, 61:21,
62:9, 83:11,
93:5, 94:5,
104:4
**quick**
65:15
**quickly**
75:18
**quite**
79:4
**quote**
75:12, 85:11

**R**

**race**
66:1
**rage**
85:13
**raise**
65:9
**rank**
66:16, 67:6,
67:13, 116:5,
116:10, 116:13,
116:20, 117:1
**rape**
15:20, 88:1,
102:5
**raped**
16:2, 105:19,
107:2
**rapes**
96:12
**ratty**
93:2
**rd**
3:13, 9:3,
33:21, 35:18,
36:21, 79:16,
79:18, 79:21,
80:3, 80:6,
119:8, 121:20

**reach**
52:4
**reached**
30:2, 30:3,
50:16
**reaching**
106:2
**react**
59:10, 84:17,
109:13, 110:14
**reacted**
108:3
**read**
23:1, 25:5,
55:8, 55:10,
80:11, 118:2
**ready**
82:22, 104:5,
119:6
**realize**
75:1
**really**
11:17, 27:12,
52:2, 66:18,
67:14, 69:13,
74:15, 91:19,
95:1, 95:12,
95:15, 101:13,
104:22, 108:12,
110:1, 110:17,
116:18, 117:3
**reason**
24:7, 92:22,
106:5, 109:18
**reasonable**
59:9, 107:3,
110:14, 113:21
**reasons**
100:5, 121:3
**rebuttal**
62:15
**recall**
13:2, 19:10,
22:2, 27:22,
37:7, 37:8,
38:16, 38:17,
49:8, 49:15,
50:17, 52:7,

53:21, 57:19,
59:3, 76:1,
79:5, 84:7,
89:20, 92:6,
99:2, 99:20
**recalling**
19:12
**receipt**
40:20, 43:3
**receipts**
39:11, 39:15,
41:18, 118:16
**receive**
15:16, 83:20
**received**
9:10, 51:11,
51:14, 62:2,
62:3, 81:20,
113:22, 122:4,
123:9
**receiving**
15:10, 116:7
**recent**
56:1
**recenter**
17:12
**recently**
61:9
**reciprocation**
58:16
**recognize**
8:19, 22:7
**record**
14:5, 28:4,
28:20, 65:18,
71:8, 72:13,
80:15, 80:22
**recording**
2:22, 40:4,
40:6
**recordings**
123:4
**records**
29:21, 60:2,
60:4, 60:8,
60:10, 72:17,
78:19, 115:10,
115:11, 115:21

**recovered**
10:11
**redeeming**
89:19
**redirect**
93:10
**refer**
26:8
**reference**
18:18, 26:17,
31:13, 75:21,
95:3
**referenced**
15:19, 15:20,
29:8, 93:17
**referencing**
73:19
**reflect**
9:22, 14:6
**reflected**
45:15
**reflection**
22:15, 25:1
**reflective**
10:3
**reflects**
34:18, 34:21
**refuse**
22:3
**refused**
22:1, 78:19
**refusing**
120:11
**regarding**
3:18, 123:10
**regular**
110:7
**regularly**
71:14, 112:14
**rehab**
70:12
**rehashing**
14:19, 35:8
**related**
11:20, 123:5
**relating**
120:1
**relation**
97:11

**relations**
4:11, 71:1
**relationship**
3:15, 3:18,
4:18, 5:15, 6:2,
6:9, 6:12, 7:18,
15:6, 17:8,
18:10, 21:1,
27:7, 29:9,
33:20, 38:14,
38:22, 67:19,
67:20, 68:7,
71:16, 73:9,
74:13, 77:15,
81:17, 82:17,
87:7, 94:22,
97:12, 97:22,
98:1, 98:10,
99:7, 101:15,
103:10, 104:18,
105:8, 114:13
**relationships**
97:5, 105:6
**relevance**
14:4
**relevant**
13:4, 27:6,
27:9, 52:2
**remember**
8:1, 10:14,
14:17, 25:21,
26:4, 26:5,
27:15, 30:9,
73:8, 85:19,
87:19, 88:3,
89:7, 89:10,
92:7
**remembering**
98:16, 112:17
**remind**
94:14
**repeat**
11:1
**repeated**
106:3
**repeatedly**
4:2, 81:19,
85:19, 86:19,

87:1, 87:8,
87:15, 99:4,
113:18
**rephrase**
16:22
**replace**
91:13, 91:15
**replying**
95:13
**report**
80:11
**reported**
67:8, 67:9
**representation**
9:10, 28:12,
32:22, 33:7,
33:9, 34:5,
36:20, 41:18,
43:3, 51:11
**representations**
94:2
**represented**
29:6
**representing**
29:13, 111:11
**request**
29:22, 60:4,
60:10, 117:9
**requested**
48:18, 48:19,
60:6, 60:7,
63:13, 71:11,
121:8, 121:11
**requests**
80:5
**require**
104:10
**residence**
92:17, 122:4
**resisting**
94:9
**respect**
11:3, 29:7,
117:9
**respond**
13:19, 19:10,
66:12, 83:21,
85:14, 114:2,

119:17
**responded**
11:22, 12:2,
12:5, 13:2
**responding**
88:12
**responds**
23:5
**response**
23:1, 23:7,
26:1, 30:22,
31:20, 32:3,
32:7, 32:15,
35:2, 120:22
**responses**
13:11, 13:20,
22:11
**restart**
64:18
**restraining**
77:6
**restroom**
64:3, 64:6,
69:21
**result**
82:16, 83:4,
107:4, 113:7
**results**
103:16
**retard**
17:2, 89:6,
89:8, 107:1
**reveal**
119:3
**revising**
47:21
**ride**
75:8, 75:16
**right**
11:18, 22:11,
25:12, 26:12,
26:15, 28:6,
29:7, 31:12,
31:21, 32:4,
32:8, 32:12,
32:16, 33:6,
33:21, 35:3,
35:9, 35:12,

41:5, 41:10,
41:15, 44:12,
44:21, 46:20,
48:4, 49:8,
49:22, 50:21,
52:10, 52:18,
54:22, 55:12,
55:19, 59:4,
59:15, 65:9,
77:4, 81:10,
85:4, 87:2,
88:10, 89:13,
91:3, 92:5,
93:16, 100:6,
101:20, 110:18,
116:10
**riled**
85:11
**rise**
105:14, 117:8
**road**
98:13
**rough**
4:1
**routines**
82:10
**row**
14:18
**rudolf**
92:19
**ruin**
112:5
**rule**
13:15, 109:4
**run**
65:22
**running**
31:17

---

**S**

**safety**
100:4
**said**
15:5, 16:14,
19:2, 22:20,
22:21, 22:22,
24:3, 24:11,
25:10, 25:14,

25:19, 27:4,
31:13, 35:1,
35:2, 36:9,
36:13, 47:9,
47:10, 54:15,
55:5, 56:10,
57:18, 58:21,
60:3, 68:22,
71:13, 72:4,
72:5, 72:18,
72:21, 73:8,
73:10, 73:17,
74:3, 74:6,
76:18, 80:17,
81:22, 85:18,
87:21, 88:1,
88:4, 88:8,
88:13, 89:9,
89:22, 90:20,
92:4, 93:19,
95:15, 99:9,
102:19, 103:1,
103:9, 103:15,
105:7, 105:18,
106:11, 107:19,
108:17, 108:20,
110:10, 110:16,
113:17, 113:20,
114:15, 115:5,
115:6, 115:10,
116:20, 117:12
**same**
19:8, 59:12
**sat**
98:22
**savannah**
3:7
**save**
12:9, 12:11,
93:7
**saved**
12:14
**saw**
39:1, 39:3,
44:11, 44:14,
44:16, 44:21,
45:21, 47:1,
69:16, 74:8,

75:11, 78:4
**say**
4:7, 5:17,
5:20, 5:21, 6:3,
6:6, 6:7, 15:9,
16:11, 18:14,
20:22, 21:10,
23:12, 26:11,
27:6, 28:15,
32:11, 35:7,
40:13, 46:7,
46:8, 46:14,
47:20, 48:2,
52:19, 62:1,
68:13, 69:6,
70:19, 71:4,
71:12, 77:2,
78:1, 80:12,
80:19, 81:19,
82:4, 84:5,
86:18, 96:19,
99:10, 99:12,
103:14, 106:1,
106:10, 106:21,
107:8, 110:15,
114:15
**saying**
25:21, 26:4,
26:5, 29:15,
30:1, 31:2,
33:4, 35:7,
39:20, 43:21,
70:7, 81:7,
88:9, 89:18,
91:21, 106:22,
107:9, 108:4,
108:7, 108:8,
109:22, 110:1
**says**
31:10, 31:11,
32:2, 32:6,
32:10, 32:14,
32:18, 35:11,
46:11, 59:3,
72:6, 76:3,
76:15, 78:22,
90:7, 113:19,
116:3, 116:8,

**seen**
46:4, 68:2
**send**
90:6, 91:20,
92:3
**sending**
27:15, 29:1,
95:21, 105:12
**sense**
27:12, 62:19,
92:9, 92:14,
100:5, 116:1
**sensitive**
111:10
**sent**
9:2, 10:18,
10:19, 10:21,
12:22, 13:7,
26:18, 26:21,
29:19, 94:2,
107:13, 107:18
**sentences**
55:11
**separate**
62:18, 105:15
**separating**
44:9
**sergeant**
67:10
**series**
26:8, 30:11,
34:19
**serious**
113:3, 113:4
**served**
77:6, 80:10
**server**
78:17
**service**
22:18, 23:15,
29:7, 29:16
**set**
48:17, 80:15
**seven**
40:20, 41:22,
58:1, 63:7,
66:4, 66:22,
68:6

119:18
**scare**
23:8, 90:7,
100:18
**scared**
7:1, 15:18,
18:3, 24:7,
39:7, 102:11,
102:12
**scares**
20:2, 100:17
**scarier**
100:14
**school**
3:7, 84:11,
84:12, 84:15,
84:20, 84:21,
85:3
**scissors**
100:6
**screaming**
75:13
**screenshot**
30:16, 109:2,
114:15
**screenshots**
9:8
**seat**
2:14, 75:15
**second**
50:5, 69:1
**seconds**
93:9
**see**
15:19, 25:15,
43:16, 52:2,
55:10, 67:2,
68:15, 72:10,
74:8, 74:14,
78:20, 81:6,
83:9, 96:2,
108:11, 109:3,
109:22
**seeing**
10:17, 15:21,
70:13, 75:9
**seemed**
91:14

**sex**
4:2, 5:4, 5:8,
6:11, 52:9,
52:11, 52:15,
52:20, 53:3,
53:13, 71:2,
71:3, 71:10,
71:12, 73:2,
73:4, 97:8,
99:17, 101:20,
102:20, 118:9
**sexual**
4:11, 20:6,
71:1, 96:12,
97:11, 102:3,
105:21
**sexually**
4:19, 70:16,
70:20, 99:1,
102:4
**sf**
67:8
**shame**
114:6
**shape**
80:2
**share**
6:8
**shared**
41:19
**she'd**
69:5
**shelter**
122:5
**sheriff's**
76:17, 77:3
**shit**
23:6, 24:3,
31:17, 32:8,
95:15
**shocked**
80:20
**shocking**
114:1
**shoot**
93:3
**shop**
65:22

**shortly**
59:12, 118:12
**shot**
73:9
**should**
86:12, 107:16,
107:17, 108:12,
109:21, 110:4,
110:12, 110:13,
114:16
**shoulder**
82:21
**shouldn't**
113:20, 119:1
**show**
22:6, 39:9,
40:5, 80:1,
82:22, 87:10,
108:8
**showed**
77:18, 100:3,
100:4
**showing**
24:19, 27:19,
30:8, 30:11,
34:15, 36:5,
40:19, 42:1,
50:19, 75:22,
93:12, 118:19
**shown**
28:9
**shows**
11:14, 49:18,
51:4
**side**
22:8, 25:11,
30:19, 63:3,
63:11, 63:18,
64:11, 64:13,
64:17, 64:19,
65:2, 75:15,
107:21, 120:15
**sided**
14:6, 119:3
**sides**
64:11, 112:10
**sierra**
66:11

**signaling**
64:9
**signature-kyoss**
123:15
**significant**
111:8, 112:7,
112:20
**since**
21:1, 38:22,
52:14, 54:15,
55:14, 55:19,
55:21, 56:4,
82:11, 82:17,
92:15, 106:14,
117:22
**single**
27:11, 102:18,
117:17, 120:16
**sir**
8:14, 8:21,
9:12, 10:6,
11:16, 22:9,
26:13, 26:16,
27:18, 28:14,
28:22, 30:13,
34:1, 35:22,
36:3, 37:6,
37:10, 37:12,
38:2, 38:5,
40:22, 42:2,
43:6, 45:22,
46:2, 52:22,
59:5, 59:8,
59:11, 93:4,
93:17, 95:8,
103:19
**sitting**
108:6
**situation**
47:3, 70:3,
108:17
**situations**
84:17
**six**
36:18, 37:2,
63:20, 84:14
**skip**
67:17

**slap**
68:12, 71:13
**slapped**
38:3, 68:21,
69:2
**slapping**
97:14
**slaps**
113:8
**sleep**
17:20, 120:6
**sleeping**
106:17
**slew**
57:12
**slow**
81:18
**slurs**
96:22, 97:2
**slut**
16:5, 59:14,
87:20, 107:1
**small**
65:22
**smiled**
72:4
**smith**
76:18, 76:19,
100:21
**smoke**
5:2
**smooth**
110:5
**snapshot**
95:10, 96:2,
117:7
**snippet**
34:6, 114:14
**sober**
37:16, 37:18,
69:22, 71:18
**social**
8:7, 88:18
**sodas**
98:13
**software**
65:22
**sole**
76:13

**solemnly**
65:10
**some**
7:20, 11:20,
12:3, 12:14,
13:19, 24:20,
26:3, 26:15,
27:8, 34:15,
45:5, 47:1,
58:21, 69:15,
81:21, 82:13,
82:14, 85:13,
86:16, 93:17,
95:15, 105:17,
107:19, 109:1,
109:5, 110:15,
113:5, 114:9,
114:15, 115:2,
117:3
**somebody**
107:1, 108:14
**somehow**
57:13, 117:1
**someone**
7:15, 11:4,
36:1, 78:7,
78:11, 78:20
**someone's**
30:22, 105:21
**something**
13:14, 15:5,
18:3, 54:4,
57:14, 59:17,
59:21, 68:13,
68:15, 69:6,
72:19, 72:20,
82:1, 83:10,
87:4, 87:21,
88:7, 89:9,
89:22, 92:14,
101:12, 101:13,
101:15, 102:12,
108:9, 108:12,
110:3, 111:18,
113:14, 113:20,
115:6, 116:4,
116:8, 122:8
**sometime**
3:16

sometimes
58:2, 68:13,
69:5, 69:6
soon
6:22
sorry
35:1, 35:8,
35:9, 44:13,
44:18, 51:19,
73:17, 86:21,
89:12, 89:13
sort
6:20, 64:9,
69:5, 69:21,
70:6, 70:21,
70:22, 81:16,
81:17, 116:14,
120:5
sorts
61:19
sounds
11:2, 17:14,
118:2
source
81:21
space
73:10
spanning
33:20
speak
67:14
speaking
89:5
speaks
65:5
special
23:15, 24:4,
24:8, 28:7,
29:20, 60:8,
61:12, 66:5,
66:20, 67:1,
67:5, 83:16,
83:19
specific
61:22, 71:15,
83:18, 89:10
specifically
5:11, 13:1,

13:3, 58:22,
68:10, 71:11,
71:18, 76:3,
76:22, 84:7,
85:19, 86:11,
88:3, 92:6,
105:17, 112:22,
114:3, 115:5,
115:10, 119:22
spectrum
67:22
speculation
60:15, 60:17
speech
69:20, 86:9,
89:5
spelling
61:3
spend
75:3
spent
66:4, 66:22,
74:15
spit
71:13
spoiled
16:5, 87:20
spoke
74:11
spot
62:7
stack
109:7
stalker
115:14, 115:19
stalking
105:3, 105:14,
107:6, 107:15,
113:13, 115:1,
120:3, 120:4,
120:10
stand
63:5, 65:8,
94:13
standing
70:4
start
2:15, 96:11

started
14:20, 75:8,
75:13, 94:17
starting
33:8, 33:11,
55:12
state
2:22
stated
38:21, 54:11,
54:14, 117:20
statement
2:7, 21:17,
21:19, 21:20,
55:1, 55:16,
55:18, 56:20,
59:10, 117:13,
117:21
statements
12:20, 13:8,
13:12, 105:18
status
82:10, 103:8
stay
18:2, 121:20,
122:3, 122:5
stayed
92:21
still
12:19, 13:4,
94:14, 100:17
stolen
29:3, 29:8,
66:14, 116:17
stone
37:18
stop
5:5, 5:6,
22:20, 25:20,
36:15, 61:13,
80:18, 81:20,
83:7, 85:14,
86:6, 99:5,
101:2, 105:1,
109:19, 114:6,
115:8
stopped
22:4, 33:22,

69:2
story
6:20
stove
100:6
straight
67:18, 80:15
streak
61:5
street
3:3, 111:12
striking
71:9
string
30:20, 31:6,
34:3, 34:4,
34:17, 36:20,
85:13
strings
33:16
struck
37:22, 69:19
stuff
6:1, 6:11,
12:9, 18:19,
19:3, 34:22,
69:13, 95:3,
102:6, 107:7,
114:15
stupid
107:1
subject
75:21
submit
14:4, 118:21,
119:19
submitted
60:10
substance
112:10
substances
98:16, 103:17
substantial
106:8, 106:13,
106:18, 106:20,
107:4, 114:4,
114:20
substantiated
16:19

**suffer**
107:3, 107:17
**suffered**
104:19, 113:7
**suffering**
106:12
**suggest**
29:6, 101:9,
116:16
**suggested**
64:6
**suggesting**
29:12
**suggestive**
102:4
**suicide**
18:11, 90:3,
90:7, 90:9
**super**
65:3, 102:16
**support**
23:4
**supported**
101:6
**supporting**
123:4
**supportive**
18:21, 24:13
**sure**
10:3, 12:15,
18:22, 19:13,
22:8, 28:6,
31:14, 40:12,
53:8, 57:15,
58:5, 58:6,
58:10, 66:18,
72:21, 74:6,
86:1, 107:10,
109:20, 112:4,
112:7
**surprised**
89:21, 96:18
**suspected**
28:7
**sustained**
82:16
**swings**
58:17

**sworn**
21:19, 38:20,
39:16, 40:14,
48:12, 49:9,
54:11, 54:22,
55:16, 55:17,
82:3, 117:15,
117:20, 117:21
**system**
78:13, 103:5,
103:18
**systems**
76:22

**T**

**tab**
41:15
**table**
16:22
**take**
59:18, 59:21,
68:16, 75:7,
103:7, 108:4,
114:13, 114:14,
117:7
**talk**
8:9, 47:5,
58:9, 68:17,
70:11, 72:20,
74:4, 90:7,
100:1, 109:4
**talked**
48:19, 50:8,
50:15, 73:3,
90:9
**talking**
42:17, 47:7,
74:2, 87:2,
87:17, 102:4,
102:5
**tape-recording**
123:9
**targeted**
17:17
**tarnished**
111:18
**tattoo**
61:4

**tavern**
39:5, 41:2,
43:5, 61:16
**tax**
76:16
**teach**
84:2
**technical**
109:5, 109:6,
109:10
**tell**
4:13, 4:22,
5:11, 6:15, 7:3,
16:1, 20:14,
27:3, 28:2,
52:1, 52:21,
53:11, 59:3,
63:11, 65:17,
65:18, 65:20,
68:9, 68:17,
72:1, 78:4,
78:5, 80:20,
81:7, 98:19,
99:4, 102:1,
103:11
**telling**
6:22, 30:17,
30:21, 40:6,
75:9, 85:22,
99:20
**temporary**
122:4
**tequila**
41:13, 42:4
**terrible**
17:4, 89:13,
109:14, 110:1,
110:8
**terrified**
19:1, 61:20
**test**
121:9
**testified**
12:22, 13:18,
39:20, 46:19,
49:2, 51:18,
54:6, 83:15,
90:11, 98:22,

101:1, 102:17,
105:10, 106:14,
109:18, 112:14,
120:6, 120:22
**testify**
14:11, 19:9,
97:13, 112:18
**testifying**
16:22, 49:8,
91:1
**testimony**
10:5, 11:2,
36:6, 38:20,
39:1, 43:10,
44:10, 45:20,
48:12, 56:9,
65:10, 70:15,
92:15, 104:21,
111:4, 112:15,
112:21, 113:6,
114:5, 115:13,
116:16, 117:15,
119:1
**text**
7:13, 9:1,
9:21, 10:13,
11:5, 11:7,
13:19, 13:21,
15:7, 15:8,
15:19, 16:19,
21:9, 22:7,
22:15, 24:20,
25:1, 26:9,
26:11, 26:18,
26:20, 27:11,
30:11, 30:20,
31:6, 32:22,
33:2, 33:8,
34:4, 34:5,
34:15, 34:17,
34:19, 36:17,
36:20, 47:14,
53:10, 56:14,
57:12, 59:2,
61:6, 74:3,
77:2, 79:19,
80:1, 90:6,
92:8, 93:17,

94:2, 95:6,
95:21, 95:22,
105:9, 105:10,
109:2, 109:5,
109:7, 116:8,
117:6, 119:3,
119:18
**texted**
22:20, 28:12,
55:7, 87:12,
87:15, 88:22
**texting**
14:17, 14:22,
21:1, 22:4,
32:1, 38:21,
43:21, 72:18,
73:16, 92:10,
103:14, 108:8,
117:22
**texts**
10:13, 34:3,
102:4
**th**
6:14, 7:2, 7:6,
9:2, 14:16,
22:16, 26:19,
28:13, 31:6,
31:7, 31:11,
34:18, 39:3,
40:3, 40:18,
40:21, 43:3,
43:15, 43:19,
44:11, 44:21,
45:21, 46:1,
46:9, 46:12,
46:14, 46:15,
46:20, 47:22,
48:2, 48:4,
48:15, 48:20,
49:5, 49:7,
51:19, 51:20,
53:18, 54:20,
55:1, 56:11,
57:1, 59:1,
61:5, 72:8,
72:9, 72:11,
72:12, 73:19,
73:22, 74:14,

79:5, 79:8,
79:9, 88:21,
92:2, 99:15,
99:18, 118:7,
118:16
**thank**
2:21, 57:6,
62:12, 65:13,
65:14, 83:12,
93:4, 94:5,
94:10, 102:14,
121:6, 122:10
**thanksgiving**
3:17
**therapy**
17:11, 44:1,
83:4, 106:16,
120:9
**thing**
69:5, 91:14,
95:3, 113:1
**things**
5:17, 6:3, 6:6,
6:7, 47:15,
58:21, 70:7,
71:9, 71:14,
80:16, 81:7,
84:2, 84:5,
85:18, 88:12,
89:16, 92:10,
96:13, 98:17,
103:14, 105:7,
106:22, 107:12,
107:19, 109:14,
110:2, 110:15,
112:17, 112:18,
113:16, 114:13
**think**
2:18, 6:4,
11:19, 11:20,
11:22, 12:4,
12:7, 12:19,
12:21, 13:4,
13:15, 14:18,
14:21, 19:8,
20:16, 45:18,
46:5, 47:9,
48:11, 48:12,

53:7, 53:18,
54:16, 55:14,
56:5, 57:18,
57:22, 59:3,
59:20, 60:11,
60:16, 61:1,
62:4, 63:21,
72:10, 73:10,
74:19, 80:20,
97:10, 98:2,
98:11, 100:16,
105:1, 107:8,
110:17, 111:14,
113:2, 115:12,
116:14, 117:11,
117:13, 120:2,
120:14, 120:19
**thinking**
57:14, 58:7,
108:6
**thought**
15:6, 36:14,
44:7, 45:16,
49:10, 49:11,
54:7, 61:11,
61:12, 62:21,
63:2, 63:5,
64:8, 64:15,
64:16, 75:1,
75:5, 89:15
**thread**
21:8
**threaten**
18:11, 37:20
**threatened**
37:14, 37:19,
98:20
**threatening**
37:9
**threats**
90:10
**three**
27:16, 27:20,
28:10, 28:17,
38:1, 41:13,
42:4, 66:10,
76:4
**through**
8:7, 28:17,

29:19, 29:21,
60:9, 61:18,
73:13, 73:22,
74:17, 77:15,
78:13, 80:3,
80:11, 102:7,
106:14, 107:16,
107:17, 108:2,
108:14
**throughout**
5:14, 8:3,
21:9, 29:9,
32:1, 68:7,
87:7, 95:18,
101:6
**throwing**
75:14
**thrown**
72:10
**tic**
82:19
**time**
2:15, 7:13,
8:4, 19:8,
20:18, 21:9,
21:22, 28:17,
29:15, 33:20,
34:6, 35:2,
37:2, 39:1,
44:11, 44:14,
50:14, 52:10,
53:19, 55:5,
55:6, 55:22,
57:9, 57:12,
62:1, 62:17,
62:20, 63:4,
63:10, 63:19,
63:21, 64:6,
65:5, 66:1,
67:5, 67:18,
68:5, 68:12,
68:18, 68:20,
69:1, 69:8,
69:13, 70:15,
74:15, 76:8,
79:13, 81:3,
83:13, 86:19,
90:17, 91:9,

92:20, 93:6,
95:11, 96:17,
99:1, 99:5,
104:8, 104:9,
108:1

**times**
4:15, 8:3,
29:9, 32:1,
38:1, 38:3,
52:1, 57:19,
58:1, 68:7,
68:12, 68:16,
71:5, 72:3,
72:5, 76:4,
79:2, 79:4,
87:13, 89:17,
95:17, 97:5,
108:19

**timing**
63:16

**tinder**
3:11

**today**
63:17, 74:5,
76:12, 96:14,
119:1

**together**
20:1, 54:4,
68:5, 68:19,
74:12, 75:4,
81:3, 82:4,
99:14, 101:10,
121:15

**told**
4:15, 4:16,
5:5, 5:7, 6:10,
6:20, 7:1, 7:17,
20:1, 21:11,
21:15, 21:18,
22:3, 24:3,
24:7, 29:9,
39:18, 40:2,
40:3, 43:15,
44:5, 47:1,
47:4, 47:11,
47:12, 47:15,
47:17, 47:18,
56:2, 75:11,

78:18, 81:22,
85:16, 87:8,
88:17, 88:20,
90:19, 92:1,
92:14, 97:9,
109:14, 109:15

**tolerated**
119:1

**tommy**
29:20, 30:1,
60:8

**ton**
112:1

**took**
9:7, 39:21,
51:5, 78:12,
78:20, 88:15

**top**
31:10, 50:21,
119:21

**totally**
116:12, 120:20

**touch**
74:20

**toward**
37:5

**towards**
104:6

**toxicity**
121:13

**track**
63:19

**traditional**
70:22

**trained**
83:16, 84:4,
84:17

**training**
76:21, 83:20,
84:1, 84:8, 84:9

**transcribed**
1:22

**transcriber**
123:1, 123:2

**transcription**
123:9

**trauma**
17:7

**traumatic**
96:13

**tried**
24:12

**trouble**
84:22, 94:8,
106:17

**true**
6:20, 52:3,
90:18, 91:2,
123:8

**trust**
16:5, 87:20

**truth**
33:11, 52:21,
53:12, 65:11,
121:2

**truthful**
120:21

**try**
18:3, 18:21,
48:22, 57:14,
58:12, 58:15,
65:1, 65:15,
74:13, 84:22,
109:8, 109:19,
110:4, 115:7

**trying**
12:15, 17:12,
17:16, 23:6,
23:8, 23:20,
26:2, 34:21,
36:10, 54:4,
58:10, 114:8,
114:9, 114:10,
115:11, 115:22

**tuesday**
54:16, 54:19,
55:14, 55:19,
55:21, 55:22,
56:4

**turn**
110:22, 117:17,
118:17, 118:22

**twice**
73:4, 98:2,
112:12

**twitter**
91:18

**two**
14:22, 22:16,
24:18, 24:19,
40:19, 41:18,
42:3, 42:7,
42:11, 42:14,
42:19, 45:6,
49:14, 49:18,
55:11, 71:15,
73:22, 79:15,
93:7, 93:14,
93:22, 94:9,
104:14, 105:15,
114:2, 119:9

**type**
5:17, 6:6,
59:10, 67:22,
95:3, 103:9,
108:15

**types**
15:16, 105:12,
107:17, 110:15

**typing**
22:21

---
**U**
---

**uber**
45:14

**ubered**
41:4, 91:5,
91:8

**ubering**
91:11

**ucmj**
79:1

**unblock**
108:11, 108:15

**unblocked**
8:3, 46:20,
48:3, 51:22

**unblocking**
57:9, 58:2

**uncertainty**
108:16

**unclassified**
28:4, 28:20

**unclear**
12:22

uncomfortable
71:22
unconscious
4:20, 5:9,
70:16
uncontradicted
105:10
under
6:9, 27:4,
39:21, 40:6,
49:8, 54:6,
68:14, 94:15,
123:3
undercut
120:16
undermined
120:10
understand
35:2, 44:8,
47:21, 78:6,
111:9
understanding
34:2
unhappy
58:14
uniform
28:11, 29:2,
66:7, 78:16
unit
67:9
universe
80:1
university
3:5, 3:6,
86:10, 86:13
unless
11:10, 53:19,
77:1, 79:16,
83:10, 101:2
unloading
47:5
unlocked
57:20
unreasonable
111:14, 115:2
until
18:1, 33:21,
118:7

untouched
11:10
untrue
47:13, 81:13
uplift
18:22, 58:15
upset
80:13, 116:7
upsetting
81:8, 81:10
use
6:22, 13:5,
78:22, 93:8,
93:9, 96:22
usually
68:15, 111:10

**V**

vague
18:17
valid
57:16, 116:14
validation
36:11
valor
29:3, 29:8,
66:14, 116:17
values
86:14, 86:15
various
78:18
vehemently
97:9, 101:11
vehicle
91:6, 91:7
verbally
4:4, 7:19
verizon
12:16
versions
84:14
versus
2:3, 2:4,
121:8, 121:10
veteran
24:4, 66:6
via
74:3

victim
105:3, 105:21,
110:5, 110:19
violate
122:7
violated
78:16
violation
79:1
violations
66:7
violence
102:3, 108:18,
110:6, 110:19,
110:20, 111:19,
116:21, 121:16
violent
4:11, 7:1,
15:8, 20:6,
20:8, 37:5,
68:5, 68:8,
98:14
volatile
6:17
volume
105:9, 106:6,
107:5, 107:13,
113:22
voluntarily
40:7, 41:10,
42:8

**W**

wait
19:9, 44:13,
64:4
waiting
82:21
wake
1:11, 5:4,
76:16
walk
73:13, 73:22
walked
68:20, 69:1,
69:2, 69:4,
71:18
want
2:6, 6:10,

6:18, 7:10,
7:14, 7:15,
10:3, 11:11,
13:22, 14:13,
19:17, 19:20,
20:14, 22:6,
25:7, 26:3,
31:18, 31:19,
38:19, 45:9,
54:10, 58:3,
60:3, 72:1,
74:17, 74:19,
75:20, 75:21,
96:8, 101:3,
102:1, 109:22,
111:22
wanted
18:7, 25:8,
45:17, 58:5,
58:6, 60:22,
64:4, 72:7,
97:7, 101:11,
102:2
wanting
6:21
wants
19:3, 115:15,
115:18, 119:19
war
19:3, 84:20
watch
97:8
watched
85:17
waving
70:6
way
6:18, 9:14,
17:22, 35:18,
40:12, 44:4,
56:20, 57:11,
57:16, 80:12,
81:5, 86:13,
86:16, 90:10,
91:5, 91:15,
99:4, 100:16,
100:17, 112:3,
112:13, 113:7,

113:12, 116:16
**ways**
58:5, 84:5,
114:9, 114:10
**we'll**
19:13, 62:18
**we're**
11:13, 19:7,
23:6, 70:12,
79:16, 87:17
**we've**
21:1, 22:21,
109:9, 113:15,
118:6, 118:11,
118:15, 120:14
**weakness**
88:12
**weapon**
76:18, 76:22,
90:21, 92:20,
92:21, 93:2,
100:4, 100:15,
100:18
**website**
86:10
**weed**
5:2
**week**
82:11, 85:9,
97:18
**weekends**
66:1
**weeks**
14:20, 14:22,
69:2, 71:16,
119:9
**weight**
13:5, 18:8
**weird**
12:11, 69:13
**went**
6:18, 14:21,
29:21, 33:4,
33:5, 39:18,
41:7, 42:8,
43:4, 45:1,
45:2, 57:1,
60:9, 64:2,

64:5, 69:9,
69:10, 69:14,
69:17, 69:18,
69:21, 70:1,
72:22, 84:13,
84:15, 88:18,
89:16
**weren't**
84:4
**wesson**
76:18, 76:19,
100:21
**whatever**
77:5
**whatsoever**
81:6
**whenever**
6:16
**whereabouts**
120:8
**whether**
11:4, 12:21,
13:2, 13:6,
110:11, 110:12,
110:22, 111:11,
114:18, 114:19
**whichever**
26:20
**whiskey**
42:12, 42:15,
42:19
**whole**
37:17, 65:10,
98:2
**wife**
35:21, 82:2
**willingly**
78:16
**winter's**
64:19
**wished**
43:16, 96:19
**wishes**
113:20
**within**
30:20, 33:6,
34:5, 74:9
**without**
53:19, 58:16,

80:17
**witness**
2:15, 13:18,
22:5, 24:18,
40:18
**witness's**
11:3
**witnesses**
57:5
**woman**
90:18
**woman's**
36:4
**women**
97:12
**wonder**
94:8, 108:7
**word**
85:1
**word's**
23:17
**wording**
56:8
**words**
21:4, 25:12,
25:16, 25:18,
26:9, 35:5,
55:21, 56:3
**work**
44:1, 74:5
**worried**
101:1
**worse**
82:6, 103:15,
105:20
**wouldn't**
5:5, 14:8,
22:4, 48:21,
48:22, 58:17,
59:20, 68:17,
69:6, 69:12,
82:15, 85:14,
86:5, 89:21,
112:16
**write**
63:20
**written**
12:4, 21:20,

27:1
**wrong**
89:15
**wrongdoings**
89:17

---

**Y**

**yankee**
66:10
**yards**
121:21
**yeah**
3:11, 4:6,
4:17, 8:12,
11:20, 15:4,
17:3, 22:13,
23:20, 25:3,
26:10, 31:2,
34:8, 35:13,
39:11, 40:2,
40:11, 41:20,
42:17, 42:20,
44:17, 44:20,
45:3, 46:13,
47:3, 54:21,
55:11, 56:16,
56:21, 57:3,
59:16, 59:19,
62:8, 71:8,
84:19, 89:14,
89:16, 96:1,
96:4, 97:15,
100:19, 101:22
**year**
25:2, 36:21,
37:8, 43:4,
69:9, 92:19,
104:18, 121:19
**year's**
69:9, 69:10,
90:22, 91:2
**years**
66:3, 66:5,
66:22, 76:14,
93:3
**yell**
71:12
**you's**
14:18

**yourself**
70:16, 88:15,
103:3

**.**

**.92**
66:10

**0**

**00**
33:19, 116:8
**00924**
121:10

**1**

**10**
6:14, 7:6,
26:19, 46:12,
46:14, 47:22,
50:20, 51:16,
63:1, 65:2,
66:3, 72:8,
75:16, 75:18,
93:13, 123:18
**100**
71:6, 121:21
**11**
93:14, 94:1
**12**
9:2, 14:16,
39:3, 40:3,
40:18, 40:21,
43:3, 44:21,
46:1, 48:15,
48:20, 73:19,
73:22, 74:14,
88:21, 92:2,
98:11, 99:15,
112:14, 118:16
**122**
123:8
**123**
1:21
**13**
7:2, 31:11,
43:15, 43:19,
44:11, 45:21,
46:20, 48:4,

**15**
82:20, 120:8
**16**
51:7
**17**
46:9, 46:15,
48:2, 49:5,
51:20, 118:7
**18**
22:16, 28:13,
59:1, 79:5, 79:9
**19**
31:6, 31:7
**11**
3:2

**2**

**20**
1:10, 3:13,
13:20, 34:18,
61:5, 63:20
**2013**
31:12
**2014**
67:10
**2018**
33:13
**2020**
76:11
**2023**
3:13, 3:17
**2024**
1:10, 6:14,
7:2, 21:2,
22:16, 24:21,
31:6, 31:7,
44:12, 50:15,
51:8, 55:1,
55:2, 55:17
**2025**
121:20, 123:18
**21**
94:17, 104:18
**22**
50:15, 51:8,

49:7, 53:18,
72:9, 72:11,
72:12, 79:8,
118:7

52:5, 52:16,
53:9, 72:14,
73:6, 94:17,
118:9
**23**
3:13, 9:3,
33:21, 35:18,
36:21, 79:16,
79:18, 79:21,
80:3, 80:6,
119:8, 121:20
**24**
1:10, 2:3,
34:18, 121:10,
123:21
**27**
51:19, 99:18
**2820**
3:3

**3**

**30**
2:17, 54:20,
55:1, 56:11,
57:1, 73:4,
83:14, 91:8,
91:9, 93:9
**35**
82:16
**36**
94:20, 104:18

**4**

**40**
76:14, 91:8
**41**
50:8, 74:11
**45**
2:20, 62:21,
63:3, 63:6,
63:7, 63:18,
64:11, 64:13,
64:17, 64:18,
73:4, 77:10

**5**

**50**
87:13

**574794**
1:20, 123:21
**5th**
24:20, 25:2,
26:12, 28:20,
58:22, 59:2,
85:8, 93:18,
94:3

**6**

**6-**
123:21
**600878**
2:3
**64**
14:18
**6th**
54:12, 54:19,
55:1, 55:17,
56:11, 57:1

**7**

**7**
51:7

**8**

**819**
50:2
**8467**
50:2
**8th**
37:7, 69:14,
73:12, 73:18,
73:21, 74:2,
90:14, 90:16,
118:14

**9**

**910**
2:3, 2:5,
121:10
**919**
50:2
**9th**
21:2, 26:19,
33:13, 33:21,
39:1, 39:2,
43:12, 46:8,

46:12, 47:21,
72:8, 73:18,
117:22, 118:3

___

___

27:5, 31:16

**EXHIBIT 2**

March 18, 2024



# EXHIBIT 3

Transcript of Hearing
Conducted on June 24, 2024                    85

1          MR. WINTERS:  That's not how I would word it,

2     no.

3          COUNSEL 1:  But you did contact your school,

4     right?

5          MR. WINTERS:  Yes I did.

6          COUNSEL 1:  Okay. What was the purpose of

7     doing that?

8          MR. WINTERS:  On April 5th, while I was on a

9     date, the plaintiff, out of the blue, after over a week

10    of no contact, contacted me in an attempt to get me,

11    quote, "Riled up so she could", quote, "get me put

12    away."

13         It's the long string of rage. At some point,

14    to get -- she wouldn't stop. It's -- I didn't respond

15    to her, she just kept going. At one point, she called

16    me a faggot. And at one point she told me she hopes

17    that, "I watched my children die in front of me."

18         She said a lot of other things I don't

19    specifically remember. But I repeatedly asked her

20    during this conversation to go away again, and she did

21    not.

22         Oh, she also kept telling me to come over to

April 5, 2024

I'm not. Someone sent me your newest mug shot.

1 Reply

If you'd stop popping back up to fight me, I'd forget you a lot easier

1 Reply

I regret ever meeting you. You were a horrible mistake

I hope your kids have birth defects.

You repel women like me

Yeah? How many orgasms did you have on our first date, slut?

Where's Mikey?

None. No man has ever made me orgasm. You really put a lot of value in that huh? What about actually loving me, instead of trying to control me all the time and using me as your punching bag

I'm not. Someone sent me your newest mug shot.

1 Reply

Bull shit. You have no friends. No one is on your side

Come on pussy I'm not done. Let's see that "anxiety" huh?

If you'd stop popping back up to fight me, I'd forget you a lot easier

1 Reply

I'm not popping up, you are. Try to gaslight me all you want, I'm here to break you so you can finally get some help